**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 19-cr-64** |
| **JOHN DOUGHERTY** | : | |

### GOVERNMENT'S SUPPLEMENTAL RESPONSE
### IN OPPOSITION TO DEFENDANT'S MOTION

The United States of America, by its attorneys, Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, and the undersigned Assistant United States Attorneys, submits this supplemental response to the defendant's motion to dismiss the indictment. Based on the government's investigation leading up to the scheduled evidentiary hearing, it is clear that the defendant's motion is based on inaccurate factual and legal bases, and that following the evidentiary hearing, the defendant's motion should be denied.

## I.    BACKGROUND

The lengthy procedural history of this case has been well-documented. Presently before this Court are two motions filed by defendant John Dougherty which seek dismissal of the indictment based on the allegation that his attorneys and the United States Attorney's Office suffered from conflicts of interest. The first motion was filed in February 2023 by counsel Caroline Cinquanto and Alan Tauber. The government responded and agreed that a hearing would be necessary to dispose of the claims. A supplemental motion was filed by attorney Gregory Pagano in August 2023. An evidentiary hearing on the defendant's claims is scheduled for March 20, 2024.

On January 15, 2024, this Court entered an order confirming that the defendant had waived attorney-client privilege between himself and his legal team at Ballard Spahr. Thereafter, the government interviewed relevant witnesses, including attorney Henry J. ("Hank") Hockeimer, Jr., who served as the defendant's lead counsel prior to the appointment of Ms. Cinquanto and Mr. Tauber.

These interviews revealed that the defendant's claims are built almost entirely on an imagined factual record. The testimony at the upcoming hearing will show that no conflicts of interest existed for the defendant's legal team, and that, in any event, counsel's performance was not adversely affected by any of the alleged conflicts. The defendant's claims therefore fail, and his motion should be denied.[1]

## II.   **LEGAL PRINCIPLES**

The principal assertion here is that Mr. Dougherty's counsel at his first trial, Henry Hockeimer, and his team, suffered from a conflict of interest because Mr. Hockeimer represented and was beholden to a company that employed certain witnesses in the case. It is helpful at the outset, when considering the pertinent facts, to set forth the applicable legal principles with regard to a defense attorney's conflict of interest.

---

[1] The defendant's conflict motions included other claims in addition to the claim concerning Ballard Spahr's representation of Comcast (including a claim that prior counsel also represented Local 98 and that there was a conflict within the United States Attorney's Office), and additional bases for suggesting that there was evidence of an actual conflict from prior counsel's firm's representation of Comcast (including that an attorney from the firm was representing Comcast when he showed up at the trial and that lead counsel sought to pressure the defendant into a plea so that another partner's chances at becoming the United States Attorney would be enhanced). However, government counsel has been advised that these claims are no longer being pursued by the defendant. This response addresses only the parts of the defendant's pending motions that are apparently still being pursued in some fashion.

Conflicts involving multiple representation commonly arise in situations far different than the one presented here. Multiple representation conflicts typically arise when one attorney represents multiple defendants in a single action. *Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 135 (3d Cir. 1984). But a multiple-representation conflict may also form when personal interests of counsel "were inconsistent, diverse, or otherwise discordant with those of his client and which affected the exercise of his professional judgment on behalf of his client." *Id.*

The existence of multiple representation does not, by itself, entitle a defendant to relief. *Id.* at 136. ("It is now well-established that multiple representation or merely the possibility of conflicting interest does not constitute a constitutional violation."). Rather, the conflict of interest must be "actual" and must adversely affect his attorney's performance. *Id.*

Even multiple representation of defendants in the same case "does not violate the Sixth Amendment unless it gives rise to a conflict of interest." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Rather, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* Only once these elements are met is a defendant relieved of any obligation to show actual prejudice on the jury's verdict. *Id.*[2]

An actual conflict of interest exists "if, during the course of the representation, the [codefendants'] interests diverge with respect to a material factual or legal issue or to a course of action." *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (quoting *Sullivan v.*

---

[2] Notably, as a general rule, a trial court has no obligation to inquire in advance of trial, even in the case of multiple representation, unless counsel brings to its attention the possibility of an actual conflict. *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980) ("trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist").

*Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983)). Mere representation of multiple parties is insufficient. The Third Circuit adopted and has repeatedly applied this standard:

> In order to establish an actual conflict the petitioner must show two elements. First, he must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (quoting *United States v. Fahey*, 769 F.2d 829, 834 (1st Cir. 1985)). Although there is no prejudice requirement once those elements are satisfied, "It is important to note that overemphasis on the presumption of prejudice cannot operate to obviate the requisite obligation to demonstrate the existence of an actual conflict." *United States v. Gambino*, 788 F.2d 938, 951 (3d Cir. 1986). Put differently, a showing that counsel "actively represented conflicting interests" is a "constitutional predicate" to succeeding on a claimed conflict of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).

In sum, the only way that a defendant can succeed on a claim that his attorney was burdened with an actual conflict of interest is to show a divergence of interest between the attorney and his client, a plausible defense strategy that was not pursued, and a causal connection between the attorney's divided loyalties and his decision not to pursue that strategy. *See Zepp*, 748 F.2d at 135 (holding that to prove a conflict of interest, a defendant "must prove (1) multiple representation that (2) created an actual conflict of interest that (3) adversely affected the lawyer's performance"). As will be discussed, the defendant's claim fails because he cannot meet any part of this standard.

It is important to emphasize that the constitutional ground rules here are well-marked: the defendant must show that his attorneys suffered from an actual conflict of interest that adversely

affected their performance. A trial and its result are not discarded simply because local rules or some other norms may suggest that counsel may have given superior performance if he acted differently.

Notably, at this stage, the defendant's persistent reference to and interpretation of local ethics rules, including through the presentation of an expert report, borders on irrelevant. The government disputes that any such rules were violated here. But that is immaterial: local rules of ethics do not supplant the Constitution; to put it differently, a state bar or legislature cannot amend the United States Constitution and add to the constitutional rights a federal defendant possesses. *See, e.g.*, *United States v. Kilpatrick*, 798 F.3d 365, 375 (6th Cir. 2015) ("The constitutional question we must answer is not whether Kilpatrick's attorneys violated ethical rules, but whether an actual conflict existed that adversely affected their performance."); *United States v. Nickerson*, 556 F.3d 1014, 1019 (9th Cir. 2009) (same). *See also Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("Under the *Strickland* standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel. When examining attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts.").

The Third Circuit has confirmed: "Thus, while professional standards provide guidance in evaluating the performance of counsel, they do not define the boundary between constitutionally acceptable and constitutionally unacceptable performance." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1431 (3d Cir. 1996). *See also, e.g.*, *United States v.*

*Bassett*, 553 F. App'x 196, 198–99 (3d Cir. 2014) (not precedential) ("Bassett's sentence cannot be vacated because of alleged ethical breaches by his counsel. Rather, . . . Bassett must demonstrate that an actual conflict of interest adversely affected his counsel's performance.").

Likewise, the defendant is incorrect in suggesting that this Court may apply a "supervisory power" and impose its own view of proper attorney conduct. *See* ECF 429 at 9. The Supreme Court has made clear:

> It is true that some of our precedents describe a "supervisory authority" that inheres in federal courts. *See, e.g., McNabb v. United States*, 318 U.S. 332, 343-345 (1943); *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). But the Court's precedents have also identified clear limits when lower courts have purported to invoke that authority. For example, supervisory rules cannot conflict with or circumvent a constitutional provision or federal statute. *Thomas v. Arn*, 474 U.S. 140, 148 (1985). Nor can they conflict with or circumvent a Federal Rule. *Carlisle v. United States*, 517 U.S. 416, 426 (1996). Finally, and most relevant here, lower courts cannot create prophylactic supervisory rules that circumvent or supplement legal standards set out in decisions of this Court. *United States v. Payner*, 447 U.S. 727, 733-737 (1980).

*United States v. Tsarnaev*, 595 U.S. 302, 315-16 (2022). Here, the pertinent constitutional rule, as defined by the Supreme Court, is clear: a defendant's rights are violated when he is represented by an attorney who suffers from an actual conflict of interest, and where that conflict results in an actual adverse impact on the attorney's performance. Whether that occurred here is the only question properly before the Court, and as explained throughout this response, the answer in this case is plainly that no such constitutional violation occurred.

III.     **COUNTER-STATEMENT OF FACTS**

Henry Hockeimer began representing defendant John Dougherty in approximately 2006. Mr. Hockeimer is a partner at the law firm of Ballard Spahr and has been since 2005. He is currently the head of Ballard Spahr's White Collar Defense/Internal Investigations Group and has represented dozens of clients in white collar criminal investigations as both witnesses and defendants. When Mr. Hockeimer first met the defendant, in or about 2006, the defendant was a subject in an ongoing federal investigation. Mr. Hockeimer represented the defendant for the duration of that investigation, which ultimately did not lead to charges against the defendant.

After the initial federal inquiry closed, Mr. Hockeimer continued to represent the defendant. Until the indictment in this case was unsealed, the defendant's employer, Local 98, paid Mr. Hockeimer for his representation of the defendant. But Mr. Hockeimer never performed any legal work for Local 98; his client was always the defendant.

By 2013, prosecutors in the United States Attorney's Office for the Eastern District of Pennsylvania ("EDPA") had opened a new covert investigation in which the defendant was a subject. Shortly after the investigation began, Assistant United States Attorney ("AUSA") Frank Costello, an experienced prosecutor with more than two decades of service at that time, assumed responsibility as the lead prosecutor. In that role, AUSA Costello directed the investigation including sending subpoenas, obtaining search warrants, and reviewing collected evidence. FBI Special Agent Jason Blake was the lead investigator assigned to the case.

In 2013, Mr. Hockeimer needed electrical outlets at his house repaired. He therefore contacted Pat Bianculli, an administrator at Local 98, and asked for a recommendation for electricians who could perform work on the Hockeimer residence. Bianculli recommended MJK Electrical Contracting. Mr. Hockeimer arranged for electricians from MJK to repair outlets in his

home and to install landscape lighting in his front yard. After the lighting was installed, Mr. Hockeimer received a bill from MJK which did not include the landscape lighting. Mr. Hockeimer called Mr. Bianculli and asked him to arrange for MJK to send a bill. Mr. Bianculli promised to contact Mr. Peltz, but no bill was ever delivered. Ultimately, the landscape lights installed by MJK failed and were replaced by a different contractor.

At the time the work was completed, Mr. Hockeimer was unaware that George Peltz, the head of MJK, may have charged Local 98 for the work completed at the Hockeimer residence. He remained unaware of that possible arrangement until six years later, in June 2019, as discussed further below. After Mr. Hockeimer learned that this might have been the case, Mr. Hockeimer spoke to the defendant, who also seemed unaware that Mr. Peltz had billed the union. In other words, neither the defendant nor Mr. Hockeimer were aware that the work at Mr. Hockeimer's house may have been paid for by the union at the time it was completed.

In April 2015, prosecutors obtained a wiretap that authorized interceptions of phone calls and text messages on various phones, including the defendant's. On August 5, 2016, the government's investigation involving the defendant became public when federal agents executed search warrants on the defendant's residence, several buildings owned by Local 98, and the homes and workplaces of other subjects. Mr. Hockeimer learned from the attachments to some of the search warrants that Comcast might be involved in the investigation. Attachment B to search warrants executed at Philadelphia City Councilman Robert Henon's home and office indicated that agents were searching for "[d]ocuments pertaining to the most recent Franchise Agreement between the City of Philadelphia and Comcast, including contracts memoranda of understanding, e-mails, correspondence, and notes of meetings." Until the search warrants were executed, the investigation into the defendant's role in extorting Comcast with codefendant

Councilman Robert Henon was entirely secret. Prior to the execution of the warrants, Mr. Hockeimer had no basis to know that an investigation even existed, much less that Comcast was involved in the government's investigation.

Mr. Hockeimer's firm, Ballard Spahr, represented Comcast. Ballard Spahr is a national law firm employing over 600 attorneys. Upon learning that the government's investigation into the defendant involved Comcast, Mr. Hockeimer contacted his firm's administration to create an ethics wall. On December 19, 2016, William Slaughter, Ballard Spahr's general counsel, e-mailed the firm's Director of Risk Management and requested that an ethics wall be erected separating the attorneys who represented the defendant from the attorneys who represented Comcast on labor matters. That same day, the ethics wall was enabled, as shown in the image below which was obtained by subpoena from Ballard Spahr after this Court ruled that the defendant had waived attorney-client privilege with respect to these claims:

### Local 98 Investigation-00199050 vs. Labor Relations Advice-00119079 (Enabled)

**Exclusionary Wall (One-Sided)**
Exclusionary

| | |
|---|---|
| **Wall ID** | **Wall Acknowledgments** |
| 10070 | 0% ( 0 / 0 ) |
| **Created** | **Last Modified** |
| 12/19/2016 5:10 PM | 2/1/2024 1:32 AM |

The wall prevented any attorney working on Comcast matters from accessing the physical or electronic files of the attorneys working on the defendant's case, and prevented the attorneys working on the defendant's case from accessing the physical or electronic files of the attorneys working on Comcast matters. The wall also prevented any attorney working on the

defendant's case from billing for work completed on behalf of Comcast, and prevented attorneys working on Comcast matters from billing on behalf of the defendant.

Meanwhile, the government's investigation continued, now with more overt steps, such as witness interviews. Beginning in 2017, investigators interviewed Comcast employees who witnessed the defendant's criminal activity. All of the Comcast witnesses—Kathleen Sullivan, Mark Reilly, Andrew Topping, and Pat Moser—were represented by attorneys from the law firm of Davis Polk.

After the indictment was returned on January 19, 2019, Mr. Hockeimer read the allegations regarding Comcast and confirmed with Ballard Spahr management that the ethics wall at Ballard Spahr remained in place.

The indictment alleged, among other crimes, that the defendant had committed labor bribery by requesting, demanding, receiving, and accepting specific things of value from MJK and its owner, George Peltz. In early June 2019, Mr. Hockeimer reviewed a discovery production from the government relating to the labor bribery allegations. Among those discovery materials were witness statements about the work MJK had done at Mr. Hockeimer's house. The statements indicated that Mr. Peltz had directed that some of the costs of that work be billed to Local 98. Until that time, Mr. Hockeimer did not know that Mr. Peltz may have arranged for Local 98 to pay for the work performed at his house.

Mr. Hockeimer immediately contacted AUSA Costello about the discovery. AUSA Costello informed Mr. Hockeimer that the government did not believe he had committed a crime or engaged in any wrongdoing, and that the evidence about the work at Mr. Hockeimer's house was not being used in the prosecution of the defendant. Mr. Hockeimer recalls that AUSA Costello told him that the government did not see a conflict requiring Mr. Hockeimer to cease

representing the defendant. Although AUSA Costello does not specifically recall giving this assessment, he will testify that if he had been asked, that would have been his response. AUSA Costello's statements and assessment were based on his knowledge and understanding of the facts and the law, as discussed further below.

In addition to speaking with AUSA Costello upon receipt of the labor bribery discovery, Mr. Hockeimer called the defendant but was initially unable to reach him. So Mr. Hockeimer reached out to the defendant's daughter who worked for Local 98. Mr. Hockeimer eventually spoke with the defendant, questioning him about the matter. The defendant did not acknowledge knowing that the work at Mr. Hockeimer's residence was included in an MJK bill to Local 98. The defendant told Mr. Hockeimer not to worry, and said that if it was a problem, it was George Peltz's problem.

In the lead-up to the first trial, the parties litigated pretrial matters including a motion to sever the indictment into separate trials. This Court granted the severance motion on November 2, 2020, splitting the counts in the indictment into two trials—referred to throughout this litigation as the "Honest Services Trial" and the "Embezzlement Trial." The labor bribery allegations fell into the second phase. On the day this Court issued its opinion, Mr. Hockeimer sent it to the defendant. Two days later, Mr. Hockeimer requested a meeting with the defendant to discuss the ruling. Mr. Hockeimer, the defendant, and David Axelrod—another partner at Ballard Spahr who represented the defendant—then met at Misconduct Tavern on November 5, 2020.

At that meeting, Mr. Hockeimer explained to the defendant that the severance ruling requiring two separate trials provided a strategic advantage for the defense to work out a favorable plea agreement. Mr. Hockeimer informed the defendant—correctly—that the

government would expend huge amounts of time and resources on two trials. He counseled the defendant that the government may be amenable to a global resolution of the case to avoid expending those resources. The government had not provided a written plea agreement to the defendant prior to that meeting and would not provide a written agreement until 18 months later, after Mr. Dougherty was convicted in the first trial. Mr. Hockeimer believes that the defendant may have joked about Mr. Axelrod becoming the next U.S. Attorney for the EDPA, but there were no discussions about the defendant pleading guilty to facilitate that appointment. Mr. Hockeimer advises that any passing mention of Mr. Axelrod becoming U.S. Attorney had absolutely no impact on Mr. Hockeimer's advice to the defendant, and there was never any discussion about Mr. Axelrod needing Comcast or Ballard Spahr support to secure an appointment.[3]

The defendant obviously did not heed Mr. Hockeimer's advice to work out a plea agreement with the government. The defendant expressed to Mr. Hockeimer that his primary goal was to delay matters as long as possible so that he could care for his wife. At no time prior to the Honest Services Trial did the defendant ever express a legitimate interest in pleading guilty. So the case proceeded to trial.

Mr. Hockeimer recognized that his representation of the defendant during the Honest Services Trial would require him to question witnesses from Comcast. He knew that the defendant was aware that Ballard represented Comcast in other matters because they had previously discussed that representation. But he did not know how Comcast would react to his cross-examination of its employees. Accordingly, Mr. Hockeimer contacted the partner in his

_____

[3]  The 2020 presidential election was held two days before the Misconduct Tavern meeting, and neither Pennsylvania's nor the nation's electoral results had been certified.

- 12 -

firm that was responsible for managing the relationship with Comcast, Norman Goldberger. In turn, Mr. Goldberger spoke with the general counsel at Comcast. On August 6, 2021, the general counsel at Comcast relayed to Mr. Goldberger that Comcast had no objection to Mr. Hockeimer representing the defendant and cross-examining its employees. Emails memorializing these discussions will be admitted in the upcoming hearing.

The Honest Services Trial began on October 4, 2021. Comcast witnesses testified during the third week of the trial and were cross-examined by Mr. Hockeimer. At no time during the trial did Mr. Hockeimer feel any pressure to alter his litigation strategy because of Ballard Spahr's relationship with Comcast. To the contrary, Mr. Hockeimer knew that Comcast had explicitly stated that it had no issue with his participation. Accordingly, Mr. Hockeimer's litigation strategy was in no way affected. Mr. Hockeimer will attest to this Court that he did not personally represent Comcast during any portion of the time he represented Mr. Dougherty during this investigation and prosecution; that he did not favor Comcast in any way during this representation; and that he strived to his fullest abilities to vigorously advocate on Mr. Dougherty's behalf, without conflict from any competing interest.

During the trial, the defendant provided regular feedback to Mr. Hockeimer, and Mr. Hockeimer consulted with him about trial strategy. This included the possibility of calling David Cohen, a high-ranking executive at Comcast and a former partner at Ballard Spahr who left the firm in 2000–more than 20 years before trial started. Mr. Hockeimer advised against calling Mr. Cohen because emails produced in discovery showed that Mr. Cohen believed that the defendant had engaged in unlawful conduct against Comcast. As discussed in greater detail below, Mr. Hockeimer had successfully petitioned this Court to exclude any reference to a Comcast witness' conclusion that the defendant had committed extortion, and calling Mr. Cohen as a

witness would likely undo that important ruling. The defendant did not object to this trial strategy.

The Ballard Spahr attorneys also had multiple meetings when the possibility of the defendant testifying was discussed. They prepared the defendant for that possibility, but after much discussion—including mock examinations of the defendant, counseled assessments of the evidence that could become admissible if he testified, and discussions about whether testifying would further his defense—the defendant decided not to testify. Mr. Hockeimer confirms that this decision was the defendant's and had nothing to do with Comcast.

In sum, the facts that the government intends to elicit at the upcoming hearing will show that Ballard Spahr's relationship with Comcast did not present an actual conflict of interests, and had no effect on Mr. Hockeimer's representation of the defendant before, during, or after trial.

## IV.   ARGUMENT

The defendant's motion should be denied because it is based on incorrect facts and faulty legal reasoning. His claim that he is entitled to a dismissal of the indictment (or a new Honest Services Trial) because his attorneys were burdened by a conflict of interest, and therefore he was denied his Sixth Amendment rights, must be denied.

### A.  The Defendant's Attorneys Did Not Have an Actual Conflict of Interest.

The defendant's claims fail because he cannot show that his attorneys from Ballard Spahr suffered from any conflict of interest at all, and because he cannot show that any allegedly divided loyalties affected their performance.

The defendant alleges that a conflict existed because 1) other members of the firm that employed his counsel simultaneously represented Comcast in matters unrelated to the criminal investigation for which he was represented (ECF 429 at 3-5); 2) his attorneys' loyalties were

divided by personal interest in securing a political appointment (ECF 520 at 7-9); and 3) his lead attorney, Mr. Hockeimer, received free electrical work from MJK Electric (ECF 429 at 5-7). All of these allegations are "multiple representation" conflicts, where the personal or professional interests of an attorney cause his loyalties to become divided.

As explained in detail earlier, to obtain relief at this stage, a defendant "must prove (1) multiple representation that (2) created an actual conflict of interest that (3) adversely affected the lawyer's performance." *Zepp*, 748 F.2d at 135. The facts in this matter fail to prove every prong of this test.

As an initial matter, many of the defendant's claims are based on a fictionalized account that will be easily disproven by facts developed at the upcoming evidentiary hearing. For example, the defendant claims that Mr. Hockeimer and Mr. Axelrod summoned him to a bar, presented him with a written plea agreement, and informed him that they wanted him to sign that plea agreement, so that Comcast would support Mr. Axelrod's appointment as United States Attorney by the newly elected President. ECF 520 at 8. These allegations are demonstrably false. Mr. Hockeimer will testify that he never had any conversation with the defendant about pleading guilty to appease Comcast or bolster Mr. Axelrod's chances of becoming United States Attorney. Additionally, Mr. Hockeimer never felt any divided loyalties around the time of the election and his sole interest throughout his representation was the best outcome for the defendant. Moreover, the government did not send any written plea agreement for signature by the defendant until late April of 2022, *18 months* after the meeting at which the defendant claims he was presented with a written plea agreement, and after the sole trial at which he was represented by Mr. Hockeimer.

- 15 -

Similarly, the defendant mischaracterizes Mr. Hockeimer as being a participant in the defendant's embezzlement scheme. The actual embezzlement scheme—which was the subject of the later Embezzlement Trial when the defendant was represented by Mr. Pagano—involved the defendant and codefendants Brian Burrows and Michael Neill burying the cost of personal work completed by contractor Anthony Massa in Local 98 invoices. The individuals charged with the embezzlement conspiracy and substantive theft crimes were charged because they had knowledge of the operative facts underlying the crimes. There are no allegations that Anthony Massa did any work at Mr. Hockeimer's house.

The Embezzlement Trial included charges of labor bribery against the defendant.[4]  Ind. Cnts 88- 107. Labor bribery laws prohibit officers and employees of labor unions from requesting, demanding, receiving, or accepting things of value from employers and persons acting on behalf of employers. The labor bribery charges in this case arose from evidence that MJK and its owner George Peltz provided things of value to Mr. Dougherty, including free work at a business co-owned by Mr. Dougherty, Mr. Dougherty's home, and the homes of Mr. Dougherty's family members. *Id.* The evidence developed during the government's investigation revealed a sufficient basis to allege and prove that the defendant knew of the free work done by MJK at these locations, which, of course, is a predicate for charging the union official with labor bribery. *See e.g. United States v. Lanni*, 466 F.2d 1102, 1110 (3d Cir. 1972) (noting that the labor bribery statute covered both "direct and indirect payments to a union official" if the

---

[4]  When the Court severed the counts in the indictment for trial, the Court included the labor bribery charges with the embezzlement counts, not the honest services fraud counts. Mr. Hockeimer and his firm, of course, were out of the case before the Embezzlement Trial. Ultimately, at the Embezzlement Trial, the government elected not to put on the evidence supporting the labor bribery charges that had been alleged in the indictment.

recipient of the payment acted as "middleman of the officials or of management"); *accord United States v. Carlock*, 806 F.2d 535, 555 (5th Cir. 1986) (noting that a payment from an employer to a third party can be labor bribery when the payment was made at the request and direction of a union official).[5]

When AUSA Costello learned of the allegation that MJK Electric had billed Local 98 for performed work at Mr. Hockeimer's house, he correctly concluded criminal liability could only arise if Mr. Hockeimer knew of the scheme and had been a willing participant. Further, prosecution for labor bribery would require evidence that Mr. Hockeimer was a conduit for the benefit bestowed by Mr. Peltz, and that the true beneficiary was the defendant. Likewise, to successfully prosecute the defendant for either embezzlement or labor bribery on these facts, the government would need to prove the defendant was aware that the work occurred, was provided for free, and was billed to Local 98. No such evidence existed—either then or now. As a result, AUSA Costello sought no charges against either Mr. Hockeimer or the defendant arising from the work done at the Hockeimer residence. The defendant's characterization that Mr. Hockeimer engaged in "participation in [the] embezzlement scheme" (ECF 429 at 4) is therefore false.

The defendant's argument that Mr. Hockeimer should have been disqualified because he was a potential witness also fails. At best, Mr. Hockeimer was a witness to uncharged, noncriminal conduct. The defendant acknowledges as much by correctly enunciating the standard for attorney-as-a-witness conflicts, stating that an actual conflict exists "when defense

---

[5] *Lanni* relied on out-of-circuit precedent that emphasized the "conduit" theory of labor bribery for indirect payments. *Brennan v. United States*, 240 F.2d 253 (8th Cir. 1957) (check written to nonexistent corporation and given to third party, who deposited check and gave portion of proceeds to union officials); *Korholz v. United States*, 269 F.2d 897 (10th Cir. 1959) (employer made loan payments for union official); *United States v. McMaster*, 343 F.2d 176 (6th Cir. 1965) (employer payment to a corporation controlled by union representative).

counsel has independent personal information regarding the facts underlying his client's charges and faces potential liability for those charges." DE 429 at 14, *citing Zepp*, 748 F.2 at 138-39. In this case, Mr. Hockeimer did not have any independent information regarding the facts underlying the claims in the indictment, which involved entirely distinct labor bribery and embezzlement schemes. Nor did Mr. Hockeimer face potential criminal or professional liability for the work completed at his house. Mr. Hockeimer was not aware of Mr. Peltz's actions until six years after the fact, his client defendant Dougherty had not admitted any knowledge of Mr. Peltz's actions with respect to Mr. Hockeimer's house, and AUSA Costello confirmed that Mr. Hockeimer was not a target of the investigation.

The defendant unpersuasively attempts to shoehorn Mr. Hockeimer into case law involving attorneys with far clearer criminal exposure. In *Zepp*, for example, an attorney was present in a house with his client when cocaine was flushed down a toilet. 748 F.2d at 128. During a trial for destruction of evidence, the attorney entered a stipulation with the government that, if called to testify, he would state that he never flushed any toilets. *Id.* The Court found an actual conflict of interest arose because the attorney was a witness to the underlying facts (he was present in the house and effectively testified against his client by stipulating) and could have been indicted for the same conduct as his client because "counsel had equal access and opportunity while alone in the house with [his client] to flush cocaine down the toilet." *Id.* at 136.

The other cases on which the defendant relies also involve attorneys who, unlike in this case, actually witnessed charged conduct that would be the subject of testimony at their clients' trial. *See United States v. Gotti*, 771 F. Supp 552, 557, 565 (E.D.N.Y. 1991) (attorneys were "house counsel" for a RICO enterprise and participated "in the events underlying the obstruction

of justice count" charged in an indictment); *United States v. Stout*, 723 F. Supp. 297, 306 (E.D. Pa. 1989) (attorney disqualified pretrial because his law firm was charged in the indictment with receiving payments from a union's Legal Services Fund in violation of the fund's Declaration of Trust, thereby making it "entirely foreseeable that [the attorney's] name and the name of his law firm will surface repeatedly during the course of the trial"); *United States v. Cannistraro*, 794 F. Supp. 1313 (D.N.J. 1992) (attorney disqualified pretrial because he was a witness for his client's signature on an Indemnity Agreement that was the subject of testimony and the attorney was therefore "necessarily connected to the events underlying the facts charged in the Second Superseding Indictment"); *United States v. Cunningham*, 672 F.2d 1064, 1074-75 (2d Cir. 1982) (remanding to determine if an attorney should be disqualified because he was party to a conversation that would be the subject of testimony, and the attorney's statements were "subject to an interpretation that would readily support the charges"); *United States v. Locascio*, 357 F. Supp. 2d 536, 556-57 (E.D.N.Y. 2004) (attorney disqualified because another attorney in his law firm was likely to be a government witness in the case to rebut an advice-of-counsel defense); *United States v. Fulton*, 5 F.3d 605, 610 (2d Cir. 1993) (concluding that counsel suffered from a conflict of interest where a coconspirator testified in a narcotic importation trial that the attorney had received a portion of a shipment of heroin that the coconspirator smuggled into the country).

In short, Mr. Hockeimer did not face a conflict with regard to the payments for work at his house. That matter was not involved at all in the trial in which he represented Mr. Dougherty, and Mr. Hockeimer had no reason to curry favor with the government regarding an incident in which he committed no wrong and was personally assured as much by the prosecutor.

Turning to the issue of representation of Comcast, again, there was no conflict, and the inquiry should end there. Mr. Hockeimer was not engaged in multiple representations because he

was screened from performing any work for Comcast and had received permission from Comcast's counsel to examine their witnesses. He therefore did not feel any obligation to Comcast as a client. He will testify that the firm's representation of Comcast did not affect his advice to the defendant, his defense strategy, or the way he examined any witness during the trial. At all times, all of Mr. Hockeimer's interests were dedicated to winning an acquittal or resolving the case in the most advantageous way for the defendant. *See United States v. Kilpatrick*, 798 F.3d 365, 375 (6th Cir. 2015) (where criminal defense counsel's firm represented a plaintiff in a suit against the defendant (the city mayor), there was no actual conflict, in part because defense counsel was entirely walled off from the separate representation).

We observe again that most of the defendant's presentation at this time, and all of the report of his expert, focuses on an attorney's obligations under ethical rules, which counsel the best approach to potential or actual conflicts. But to repeat, the defendant's reliance on attorney's ethical rules to support his claims is unavailing. The bounds of the Sixth Amendment's right to counsel cannot be dictated by rules promulgated by a state bar association. *Burt v. Titlow*, 571 U.S. 12, 24 (2013) ("[W]e have held that a lawyer's violation of ethical norms does not make the lawyer *per se* ineffective."). This rule is self-evident. The Constitutional standard for attorney effectiveness cannot change based on model rules of professional conduct.

Of course, prior to trial, a district court may look to ethics rules to prospectively disqualify a conflicted or potentially conflicted attorney whose representation may violate those rules. *See, e.g. United States v. Moscony*, 927 F.2d 742, 749 (3d Cir. 1991); *United States v. Dolan*, 570 F.2d 1177, 1184 (3d Cir. 1978) (an attorney's representation violating ethical rules "invites disrespect for the integrity of the court" and is "detrimental to the independent interest

of the trial judge to be free from future attacks"). A court may even reject a defendant's offer to waive a conflict in order to do so. *Id.* But that power is based on "the likelihood and dimensions of nascent conflicts of interest [that] are notoriously hard to predict." *Moscony*, 927 F.2d at 750 (quoting *Wheat v. United States*, 486 U.S. 153, 162 (1988)). Where, as here, a court has the "wisdom of hindsight after the trial has taken place," the Sixth Amendment standard for conflict-of-interest claims controls. *Wheat*, 486 U.S. at 162. As set forth above, the defendant's claims fail under that standard. The standard demands a showing of an actual conflict – an attorney facing conflicting interests – which does not appear here. That should end this inquiry.[6]

### B. The Defendant's Attorneys Did Not Did Not Fail to Pursue Any Plausible Alternative Defense Strategy as a Result of Any Divided Loyalty.

Even if the defendant could show that his former attorneys had an actual conflict of interest, which he has not, he would still have to show that that conflict adversely affected counsel's performance. This he also has not done and cannot do. Notably, the defendant has not identified any specific trial strategy that was not pursued beyond vague notions that Mr. Hockeimer's cross-examination of Comcast employee Kathleen Sullivan should have been

---

[6] The defendant further suggests that it was the Court's responsibility to identify and address a possible conflict before trial, and its failure to do so entitles him to relief. *See* ECF 429 at 11-12. But that is not the law. *Mickens v. Taylor*, 535 U.S. 162, 173-74 (2002) (holding that a court's failure to inquire into a potential conflict "does not reduce the [defendant's] burden of proof" and that he must still "establish that ]the conflict of interest adversely affected his attorney's performance"); *United States v. Berroa*, 374 Fed. App'x 266, 269 (3d Cir. 2010) (not precedential). There is no remedy for a court's alleged failure to inquire into a potential conflict of interest. As stated earlier, as a general rule, a trial court has no obligation to inquire, even in the case of multiple representation, unless counsel brings to its attention the possibility of an actual conflict. *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980) ("trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist"). Rather, the situation presented here is common, where a defendant claims after trial or on habeas review that his attorney suffered from a conflict, and it is incumbent on the Court to make factual findings and apply the precedent described at length earlier regarding conflict-of-interest claims.

longer and that he should have called Comcast executive David Cohen as a witness. The

defendant does not include the questions Ms. Sullivan should have been asked, nor does he

explain how the testimony of Mr. Cohen could have aided his defense. Mr. Hockeimer will

testify that he believed that he elicited all the testimony that was needed from Ms. Sullivan after

the following exchange:

| | |
|---|---|
| Mr. Hockeimer: | You described that meeting as cordial, the December 2nd meeting? |
| Ms. Sullivan: | Yes. |
| Mr. Hockeimer: | No demands were made or anything like that? |
| Ms. Sullivan: | Well, he said I want my guys -- |
| Mr. Hockeimer: | He wanted his guys -- |
| Ms. Sullivan: | I want jobs for – Yeah, but it wasn't – like a – like a demand, like we have to have this or else. It wasn't like that. |
| Mr. Hockeimer: | It wasn't like that? |
| Ms. Sullivan: | No. |

Notes of Testimony ("N.T."); 10/27/2021, 75.

This cross-examination directly refuted the government's description of the nature of the

December 2, 2015, meeting. Consider the following characterization of that meeting from the

government's opening statement:

> On December 2nd, the day before the City Council Committee, chaired by
> defendant Henon, was going to vote on moving the agreement forward,
> Defendant Henon held a meeting in his Philadelphia City Council
> Chambers with Defendant Dougherty and Comcast employees who were
> involved in negotiating the Comcast agreement. No one from the City of
> Philadelphia who were negotiating with Comcast was present for this
> meeting. And Defendant Henon let John Dougherty conduct the meeting.
> And you are going to hear what happened at the meeting. Defendant
> Dougherty made a big speech designed to convey how much political power
> he had. And he told the Comcast negotiators that if Comcast did not agree
> to give certain fiber-optic work to union contractors, the franchise

> agreement would not be approved by City Council. And the Comcast folks
> got the message.

N.T. 10/5/2021; 43. Mr. Hockeimer's cross-examination was short not because he was afraid of embarrassing a witness who worked at Comcast. It was short because it was effective, and made the point he wanted to make.

Similarly, the decision not to call Mr. Cohen was the product of a thoughtful trial strategy, not a conflicted one. Prior to trial, Mr. Hockeimer had reviewed discovery and learned that Mr. Cohen had been concerned about the legality of the defendant's efforts to use the renewal of the Franchise Agreement to make gains for the union. The Comcast witnesses called by the government at the trial did not include Mr. Cohen, but instead included the two Comcast executives who actually attended the December 2, 2015, meeting that codefendant Robert Henon had arranged in his City Council office. That meeting became a critical piece of proof in the prosecution's case. One of the Comcast participants was Ms. Sullivan, as discussed above. The other Comcast participant in that meeting, Mark Reilly, had described the meeting in emails as "extortion" by the defendant. During the trial, Mr. Hockeimer had successfully petitioned this Court to require the redaction of the word "extortion" from the emails, and to instruct the government not to elicit this word from Mr. Reilly during his testimony. Mr. Hockeimer will testify that he believed that if Mr. Cohen were called to testify, his view of the defendants' conduct as criminal would become admissible, effectively undoing the important ruling Mr. Hockeimer had previously obtained on the defendant's behalf.

The defendant attempts to analogize this case with *United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002), but that case is easily distinguishable. (ECF 429 at 9). There, four police officers were charged for assaulting an arrestee. One of the officers, Schwarz, was represented by attorneys Stephen Worth. Worth was chosen to represent Schwarz by the Police Benevolent

Association ("PBA") in New York, and Worth's legal fees were to be paid by the PBA. While the officers' case was pending, Worth formed a law firm and received a $10 million retainer from the PBA to represent police officers in all manner of litigation, including civil litigation. At the officers' trial, the victim testified that two officers assaulted him in a bathroom. The testimony created an incentive for Schwarz, through attorney Worth, to shift blame for the assault from himself to his codefendants. Doing so, however, could have hampered the PBA— which was also Worth's client—in a pending civil suit related to the assault. Schwarz's attorney did not pursue the strategy of casting blame on Schwarz's codefendants and he was convicted.

Under these circumstances, the Second Circuit concluded that Schwarz's attorney labored under an actual conflict of interest. The two prongs of the relevant test were easily satisfied. First, Worth's interests were plainly divided between two current clients. Worth could have shifted blame from Schwarz during the criminal trial to the other police officers, but doing so would have incurred greater civil liability for the PBA in the pending lawsuit, thus violating his "unalloyed duty to the PBA as his client to refrain from any conduct injurious to its interests." *Id.* at 91. Second, Schwarz was easily able to show that "but for the conflict, counsel's conduct of the trial would have been different." *Id.* at 92. Proffer statements and trial evidence showed that two officers assaulted the victim, and that Schwarz was not one of the officers who escorted the victim to the bathroom where the assault took place. Instead of pursing this strategy, which was clearly supported by the evidence, Worth advanced "the implausible and factually unsupported theory that [a single officer] had acted alone and that [the victim] fabricated the presence of a second officer to demonstrate system police brutality and to salvage his 'manhood.'" *Id.* at 92. This trial strategy was pursued solely "in an effort to obtain an acquittal for Schwarz without having to implicate another member of the PBA." *Id.* In fact, the Second

Circuit concluded that "Worth's failure to pursue this strategy was almost certainly the result of this conflict." *Id.* at 94.

This case differs from *Schwarz* in every material respect. Mr. Hockeimer's loyalty was not divided between two current clients. He did not forego a plausible defense strategy because Mr. Cohen was not a witness to any of the charged activity, and therefore the admissibility of his testimony is, at best, questionable. And the decision not to call Mr. Cohen did not arise from self-interest, but from a desire to avoid exposing the defendant to damaging conclusions about his behavior. *Schwarz* does not help the defendant.

When the actual facts are considered, none of the defendant's allegations regarding Mr. Hockeimer demonstrate any conflict of interest warranting relief.

## V.    **CONCLUSION**

For these reasons, the United States respectfully requests that, following the evidentiary hearing in this case, this Court enter an order denying the defendant's motion to dismiss.

Respectfully yours,

JACQUELINE C. ROMERO
United States Attorney


*/s/ Anthony J. Carissimi*
BEA WITZLEBEN
Assistant United State Attorney
JASON GRENELL
Assistant United States Attorney
ANTHONY J. CARISSIMI
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the attached response in opposition has been served on this date by electronic filing to:

Gregory Pagano, Esquire
Carrie Cinquanto, Esquire
Alan Tauber, Esquire

*/s/ Anthony J. Carissimi*
ANTHONY J. CARISSIMI
Assistant United States Attorney

Date: March 13, 2024.