UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, ) Criminal No.: 19-64-1
)
)
vs. )
)
)
JOHN DOUGHERTY, )
) Reading, PA
) July 11, 2024
Defendant. ) 10:20 a.m.

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JEFFREY L. SCHMEHL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government: FRANK COSTELLO, ESQUIRE
BEA WITZLEBEN, ESQUIRE
ANTHONY CARISSIMI, ESQUIRE
JASON GRENELL, ESQUIRE
RICHARD BARRETT, ESQUIRE
U.S. ATTORNEY'S OFFICE
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

For the Defendant: GREGORY PAGANO, ESQUIRE
LAW OFFICES OF GREGORY PAGANO, P.C.
1315 Walnut Street, 12th Floor
Philadelphia, PA 19107

Audio Operator: TANYA L. ALLENDER

Transcribed by: DIANA DOMAN TRANSCRIBING, LLC
P.O. Box 129
Gibbsboro, NJ 08026
Office: (856) 435-7172
Fax: (856) 435-7124
E-mail: dianadoman@comcast.net

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X


| SENTENCING COLLOQUY: | | | | PAGE |
|---|---|---|---|---|
| By the Court | | | | 4 |
| ARGUMENTS: | | | | PAGE |
| By Mr. Costello | | | | 27 |
| By Mr. Pagano | | | | 69 |
| By Ms. Witzleben | | | | 77 |
| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
| Erin Dougherty | 39 | -- | -- | -- |
| Joseph Patrick McGrath | 56 | -- | -- | -- |
| Donald Siegel | 59 | -- | -- | -- |
| Tara D. Chupka | 62 | -- | -- | -- |
| STATEMENT OF DEFENDANT: | | | | |
| By John Dougherty | | | | 72 |
| SENTENCE: | | | | |
| By the Court | | | | 81 |

(Proceedings commenced at 10:20 a.m.)

COURTROOM DEPUTY: All rise. The United States District Court for the Eastern District of Pennsylvania is now in session, the Honorable Jeffrey L. Schmehl presiding.

THE COURT: Good morning, everybody, you may be seated.

ALL COUNSEL: Good morning, Your Honor.

THE COURT: We are all here today for the sentencing hearing in the case of the United States of America versus John Dougherty, Criminal Action Number 19-64-1. There was a split indictment and two guilty jury verdicts. I note, the presence, for the record, of the prosecutors in this case, all Assistant United States Attorneys, Frank Costello, Bea Witzleben, Jason Grenell, Anthony Carissimi and also Mr. Barrett. Mr. Pagano is here representing Mr. Dougherty. Mr. Dougherty is present. And we have our probation officer from the U.S. Probation Service, Megan Maier.

Mr. Dougherty, please stand, so you can be sworn.

COURTROOM DEPUTY: Please raise your right hand.

JOHN DOUGHERTY, DEFENDANT, SWORN

COURTROOM DEPUTY: Please state your name for the record.

THE DEFENDANT: John J. Dougherty.

COURTROOM DEPUTY: Thank you.

THE COURT: Mr. Dougherty, you understand why you're

here today -- you may be seated. Please move the microphone closer so we can hear you. You understand why you're here today, right?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Have you had enough time to discuss sentencing with your attorney?

THE DEFENDANT: Yes, I have, Your Honor.

THE COURT: All right. Is there any reason you know of why I should not proceed today?

THE DEFENDANT: No, Your Honor.

THE COURT: All right. Have you and your attorney gone over the presentence reports?

THE DEFENDANT: Yes, we have, Your Honor.

THE COURT: All right. This document here?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Has your attorney explained the report to you?

THE DEFENDANT: Yes, he has, Your Honor.

THE COURT: Has he answered any and all questions you had about that report?

THE DEFENDANT: Yes, he has, Your Honor.

THE COURT: Is -- I mean, I notice some objections and things to discuss about the report, but was there anything in that report that you found to be factually inaccurate, wrong?

THE DEFENDANT: No, Your Honor.

THE COURT: All right. Is there anything not in that report that you felt should have been in that report?

THE DEFENDANT: I wouldn't know, but I don't think so.

THE COURT: Okay. Well, you can consult with Mr. Pagano.

THE DEFENDANT: Yeah.

(Counsel and defendant confer.)

THE DEFENDANT: Yes, Your Honor. There were 30 years of activities, career achievements, failures and successes at Local 98, and it was kind of difficult to narrow it down to a page or two, but, yes, to answer your question, I'm comfortable with what's in that document.

THE COURT: Okay. And those achievements and various things were memorialized in over 200 letters that I've received.

THE DEFENDANT: Some, yes, sir.

THE COURT: Okay, so -- all right.

Does the Government have any objection to the presentence report as submitted?

MS. WITZLEBEN: Your Honor, the Government didn't have any formal objections, but I did note for the Probation Office and for defense counsel two factual issues that we found with the report that I wanted to put on the record if the Court

will -- if this is the right time to do that, Your Honor.

In paragraph 44 of the report, the description of the coat cash is slightly incorrect, and so, I would suggest that, to make it accurate, the text of paragraph 44 should be modified to read, "As of August 5th, 2016, Dougherty had received and had outstanding" --

THE COURT: It says fourth, so you want to change four to five?

MS. WITZLEBEN: I'm sorry, Your Honor?

THE COURT: It says August 4th, so do you want to change four to five?

MS. WITZLEBEN: Well, the most important -- I think four is okay -- but the most important change is 53,778 instead of the 60 number. Let me just get there, Your Honor, I'm sorry. Instead of 66,278.04, that should read 53,778.04.

THE COURT: I don't see that. Oh, instead of --

MS. WITZLEBEN: Paragraph -- yeah.

THE COURT: -- 66,278.04. Okay. What should that read?

MS. WITZLEBEN: That should read 53,778.04.

THE COURT: Okay.

MS. WITZLEBEN: And then, I believe that's all we really need to do to that. Then, footnote four there, Your Honor, that should actually read -- the entire footnote should read, "The figure in the table below does not include the

additional $1,000 that he stole from the petty cash someone was holding for him in an envelope." That's -- the entire footnote should read that.

THE COURT: Okay. Repeat that again for me?

MS. WITZLEBEN: Sure. "The table in the number below -- the figure in the number below" -- sorry -- "does not include the additional $1,000 he stole from the petty cash someone was holding for him in an envelope."

THE COURT: Okay. Thank you.

MS. WITZLEBEN: The other error, Your Honor, we found in paragraph 230. And in this paragraph, it suggests that Mr. Dougherty did not receive or turned back his salary from the Building & Construction Trades, and that is not accurate. The evidence shows that the Building Trades paid him $1,167,000 from 2015 to 2022 with an annual salary between 147 and 207 between the years 2015 and 2022. I don't know if we need to include all of that, but we certainly need to strike, "and was head of the Building & Construction Trades Council" from that sentence, if it's going to go on and say that he relinquished his salary. So, there's two ways to do it. We could strike it from there. We could add it to the bottom of that paragraph. "He also served as head of the Building & Construction Trades Council from 2015 until 2022, earning $1,167,291 from that job."

THE COURT: All right. So, I take it that means, he

did not take a salary for his position as Chairman of the Redevelopment Authority and the Delaware River Port Authority?

MS. WITZLEBEN: That's what I understand Mr. Dougherty has submitted, and we don't have evidence to contradict that.

THE COURT: All right. So noted.

MS. WITZLEBEN: Thank you, Your Honor. Those are the only changes that the Government has to the PSR.

THE COURT: All right.

MR. PAGANO: Judge, may I just ask my client one question --

THE COURT: Sure, absolutely.

MR. PAGANO: -- about counsel's suggested change?

(Counsel and defendant confer.)

MR. PAGANO: Judge, just so it's clear and the report is clear, Mr. Dougherty stated that his salary from the Building Trades was approximately $150,000 a year. I'm not sure if that's what counsel said, but I -- I don't know if she said between 150 and 200.

THE COURT: I don't think that's what she said.

MS. WITZLEBEN: I mean, we have the numbers each year, but approximately 150 works for us.

MR. PAGANO: Okay.

THE COURT: Okay. All right. All right. Now, I'm turning to defense counsel, because the defense has some

objections to the report, which we need to address on the record, so, Mr. Pagano, you now have the floor.

MR. PAGANO: Yes, thank you, Your Honor. Your Honor, turning to honest services fraud regarding the calculations of the offense level for that, Mr. Dougherty was said to be a level 12, which we don't dispute. There was two points added for more than one bribe, for a continuing stream of benefits. We -- while we don't dispute that, and, perhaps, this is not the proper time to raise this issue, but we believe those figures -- or not figures, but the amount there is overstated, specifically, the value of payments being approximately $225,000.

These weren't monies that went into Mr. Dougherty's pocket. Those benefits were used to pay Mr. Henon for purposes of benefitting the Union, at least, primarily. But I think, more importantly, Judge, are the two four level enhancements that Mr. Dougherty was given here in the math, and that is a four-level enhancement for being an elected official or for bribing a public official. While that enhancement technically applies, because Mr. Henon was an elected official, Mr. Dougherty was not, and it just doesn't seem fair that he would be assessed the same points as the elected official.

But next and, perhaps, most importantly -- and, Your Honor, please bear in mind that I was not trial counsel, so I'm not as intimately familiar with the facts as counsel may be or

as Your Honor is, and based upon my review of that record and my review of the transcripts, it does not appear that Mr. Dougherty supervised five or more people in that offense, whereby exposing him to the four-level enhancement. So, that, I think, is the most important objection that relates to honest services and the Guideline calculation.

THE COURT: All right. Well, I mean, I think that's why I asked you, because I think, you know, we need to sort these issues out, and I need to decide them so that I can, first, determine what the sentencing range is before we talk about the sentence.

MR. PAGANO: Understood.

THE COURT: All right. What's the Government's response?

MS. WITZLEBEN: Thank you, Your Honor. With regard to Mr. Henon's salary as driving the Guidelines, that is how the Guidelines work. It is not a suggestion that that money went to Mr. Dougherty's pocket. It's the suggestion that's the bribe Mr. Dougherty paid to Henon, and the value of the bribe is taken into account, and the stream of benefits in this case is as indicated in the PSR, so it clearly applies.

It was applied in Henon's case, as well.

THE COURT: Yeah, all right, I agree.

MS. WITZLEBEN: With respect to the two-level enhancement because Mr. Henon is a public official, again,

that's the way the Guidelines work. You bribe a public official. You can be the public official or you can be the briber, and that applies. With respect to the four levels for Mr. Dougherty being a manger, leader, organizer or supervisor, with regard to the honest services counts, which is where we are now, Your Honor --

THE COURT: Well, that is where we are now, so that's what you have to discuss.

MS. WITZLEBEN: I'm sorry, Your Honor?

THE COURT: That is where we are now, because that's the part of the Guidelines that we're talking about.

MS. WITZLEBEN: Yes.

THE COURT: So, you know, the Government's allegations were that he bribed Mr. Henon. He didn't bribe other people.

MS. WITZLEBEN: That's correct, Your Honor, but in carrying out that crime, the Guidelines recognize, if you organize or manage a certain number of people in carrying out your crime, you get an enhancement for being a leader or a manager. And, in this case, clearly, he managed Mr. Henon, so that's the two-point enhancement there for this crime. And to the extent that the Court finds, which we submit the Court should, that the leader in the crime, if you strictly limit the crime to Mr. Henon, himself, would be Mr. Dougherty, so there is a two-point enhancement.

So, what we're really talking about is, does he get more than the two-point enhancement for the organizer, manager, leader? And there is a three, and there's a four. We think he qualifies for the four even in the honest services counts, because of the second prong of that requirement, which is, if it -- even if there aren't that many active participants in the crime, and we submit there were more than the two of them, but there aren't five of those, we don't necessarily think the Court should find. But there are other unwitting people who were used in connection with it under that prong.

And I'd just like to list for the Court, in general, we had, not just Mr. Dougherty and Mr. Henon, as we discussed, what we believe as an active participant, you also have to include Marita Crawford and Courtney Voss. But even if you don't include them as active participants, they were clearly within the scope of the people that were being used and managed in that connection, in connection with that bribery scheme.

In addition to those people, you had, for example, George Peltz, who was used in connection with the Comcast matter. You have Tommie St. Hill, who was used, and the Court will recall his name in some of the goings-on with regard to getting Mr. Henon to follow Mr. Dougherty's directions, and you have personnel in the City of Philadelphia, including, for example, Carlton Williams, from Licenses & Inspection and various and sundry other people.

The Court will recall the testimony concerning, for example, the business where they shut down the machines at Children's Hospital. In connection with the corrupt scheme, Mr. Henon's activities caused Carlton Williams and member of L & I to go and do things to carry out their corrupt scheme, so those people count. And the staffers on Mr. Henon's staff also count. In addition to Ms. Voss, we had, the Court will remember he testified all day, Tom Holroyd, who carried out a lot of these activities including towing things --

THE COURT: Those people had no knowledge, though, or idea of the bribery or the scheme.

MS. WITZLEBEN: That is correct, Your Honor, and the Guidelines accommodate for that. They say that the alternative -- you can have participants in the crime, which would be the knowing participants, and then, you can have, if there is a significant number of people who carry out the scheme unwittingly is what the Guidelines say. And that's what we're submitting here, Your Honor, for the four points on this point.

THE COURT: All right, thank you.

MS. WITZLEBEN: Thank you.

THE COURT: All right. Mr. Pagano, next issue?

MR. PAGANO: The embezzlement, I'll go to that, Judge. The embezzlement, we start at a level seven for the Guidelines. Fourteen points are added for a loss, which, according to Probation, exceeds or is $591,000 or thereabouts,

somewhere over or north of $550,000, which puts Mr. Dougherty into the 14 point enhancement with a 14-point level increase. Again, we believe that that figure is overstated for a number of reasons. I don't know if the Court wants me to get into those now?

THE COURT: Yes.

MR. PAGANO: Okay. Those reasons are as follows: incorporated in that amount, Judge, are what I would characterize as honest mistakes. There were some instances of honest mistakes that even the evidence showed at the trial. There were honest mistakes that were caused by the lack of alacrity or a lack of timing with which these credit card reconciliations were done. As Your Honor recalls, there was a batch of one year's worth of credit card reconciliations. And while it's exceedingly negligent and foolish to do bookkeeping this way, that's the way it had been done, I think, in part to Mr. Dougherty's incredibly busy schedule in 2014 and 2015. But be that as it may, there were some mischaracterizations of expenses that were just do to, for lack of a better description, not having the paperwork. And while that does go into the loss amount, it's certainly not the same intention to have an honest mistake or an error or an omission as opposed to an intentional act.

And I think also, and, maybe, even more important than that, Judge, is the fact that I don't think it's disputed

or I don't think it can be disputed that Mr. Massa did, in fact, inflate his bills to the Union. There was an instance during the cross-examination of Mr. Massa where he was confronted with a video from the pole camera footage showing that he billed for hours worth of time for dropping off a piece of plywood at Mr. Dougherty's home on Moyamensing Avenue. He filled for many hours of time that day, and the video footage showed that they were there for, I think, 20 minutes or less. He billed for three people being there that day. We only saw two go in. We saw two go in carrying the plywood, and then leave after a short period of time.

We also know that, based upon the Title Threes, that Mr. Massa billed while he was en route to his shore home in Sea Isle, New Jersey. He told John, in a Title Three call, that he stopped by to "check on" his father to see how his father was doing. Meanwhile, we subsequently saw a bill for that day, wherein Mr. Massa had billed Local 98 between five and $10,000 for work done at Somers Point that wasn't mentioned to John, that John didn't mention to him, that John didn't ask for. We don't even know if he did it, but he billed the Union for between five and $10,000. And I think, more importantly, Mr. Massa's records reflected that he charged the Union not just for the time and material for that work, but he charged for tolls and he charged for gas. And this was on a date or a time when he was, you know, attending to his own personal business

and going to Sea Isle.

So, Mr. Massa's loss is more than half of the loss in this case. It's about 60 percent of the loss. It's $390,000, give or take a few thousand dollars. But it's $390,000 of the $575,000 is about 60 percent. So, a lot of that is, you know, we have to rely upon Mr. Massa's billing and the honesty in his billing to attribute that entire loss to Mr. Dougherty.

And another fact, Judge, and I know that this isn't binding on the Court, and I know that the Court doesn't have to take into consideration the plea negotiations, but when there was a guilty plea being negotiated in the Summer of, I think it was, 2022, the Government did prepare a plea agreement that was never signed by Mr. Dougherty, wherein the Government had assessed the loss at a number under $550,000. I think that the estimated loss, then, before trial was between 350 and under 550, which is the magic number for which the Guidelines would go up two notches. But I think that that's important, because a trial should not change the facts. A trial should not change the evidence, and I know that things are done in plea negotiations sometimes, but an issue as important as this, I think, is something that the Court should consider in terms of assessing whether or not the loss here is, in fact, accurate.

And I think that there is -- given the fact that there are all of these arbitrary issues in the addition or in the methodology that is used to calculate the loss that it's

overinflated by at least whatever the number is, $590,000, minus 500, so about $40,000, and that's a pretty close number. It's not like it's -- it's not like it's a hundred thousand or several hundred thousand dollars over the next level of the Guidelines.

So, for all of those reasons, we believe that the loss is overstated for the embezzlement purposes. And, oddly, Judge -- oddly, and of course, it's up to Your Honor as to how important this issue is, but the honest services fraud is a level 32, where the embezzlement offense level is a 27. One would think that, given the facts and given the conduct and given the culpability, that it should be the other way around, but it's not, and that's because the Guidelines are arbitrary, and that's because numbers don't always, in a meaningful way, capture facts or capture circumstances. You know, this isn't a math problem, as the Court well knows and as the appellate courts have held, and that's why we're having this argument in the first place, so that's it.

THE COURT: All right, thank you. Government, regarding --

MR. PAGANO: And -- and, Judge --

THE COURT: -- the amount of loss, and we're talking about a four point to a two point.

MR. PAGANO: -- may I just say one more thing, Judge, about the embezzlement --

THE COURT: Yeah.

MR. PAGANO: -- Guideline calculations? And that is that, in that same plea agreement that I referenced before, the Government had previously agreed to an aggravating role, I think, of a two or a three, but it wasn't a four. And, again, a plea or a trial shouldn't change the facts, shouldn't change the evidence, but, you know, the Government is now asking for a four, and we don't -- we don't contest the abuse of trust. Thank you.

MS. WITZLEBEN: Thank you, Your Honor. I'll address what counsel has just done, and try to do it in the order he did. With regard to the loss overstatement allegation, about the embezzlement, Your Honor, the defendant's argument that there were honest mistakes made by his client, with all due respect, was the defense that was proffered at trial, and it was unsuccessful. And the jury was entitled to find something different, which they did, convicting Mr. Dougherty on not just the conspiracy but all of the substantive counts that were subsets of the conspiracy.

With respect to Mr. Massa, and the allegation that he inflated bills, there was a specific incidence that was, the Court will recall, at the trial, where Mr. Massa had billed for what appeared to be hours at Mr. Dougherty's house --

THE COURT: I think everything that Mr. Pagano stated about Mr. Massa and the -- the trip to Mr. Dougherty's house

and the trip to New Jersey was correct, right?

MS. WITZLEBEN: Of the trip to Mr. Dougherty, Senior's house?

THE COURT: Yeah. No, and the -- the plywood incident.

MS. WITZLEBEN: The plywood incident, I agree, Your Honor, that there did seem to be a discrepancy there. That was one in which the -- but -- but with the exception of that one incident, all of the other bills by Mr. Massa were backed-up by the grid calendars and the three levels of paperwork. So, this idea that that meant he overbilled everything, it's just not right. The record -- he would have had --

THE COURT: No. Nobody is saying that, but the incident that he stopped in New Jersey and --

MS. WITZLEBEN: With the plywood in front of --

THE COURT: -- then billed like ten grand for that visit?

MS. WITZLEBEN: The stop in New Jersey, Your Honor, I don't remember the ten grand, but I will say this --

MR. GRENELL: May I?

MS. WITZLEBEN: I'm sorry. Let me let Mr. --

MR. GRENELL: That's not accurate. Your Honor, if I may? That was a moment in the trial, there was an incident -- there was multiple incidents in which Mr. Massa went down to New Jersey. There was a Title Three wire call in which he had

mentioned that he was stopping over at one point. We went back -- I don't know if the Court recalls -- and married-up those incidents of when he charged him and when he didn't charge him. He didn't charge him that day. He did charge him for days. He did charge him for tolls. He did charge all of that, which he laid out explicitly in the billing that he gave to Mr. Burrows about those incidents. I think the important part about this is that there was transparency to what was being billed to Mr. Burrows. He would tell him exactly what was going into that, be it tolls, be it gas and whatever it was when he went down to Mr. Dougherty, Sr.'s house. But that moment we're talking about, he didn't charge him for a day that he didn't work.

He called him. He talked to him about the fact that he was going down there, and then we went back through those exhaustive grid calendars that the Court saw, the draft of his invoices that the Court saw and showed that that was not the date that he got charged. It was a separate date. It was a separate incident. And I think you'll also recall the testimony of some of Mr. Massa's underlings will also confirm the multiple incidents they went to Mr. Dougherty, Sr.'s house, and they did perform work there.

It was also, by the way, the incident that we're talking about, the plywood drop-off, while a pole camera captured him, you know, momentarily there, there's a couple of points on that I just want to point out. A, they talked about

the fact they are running from project to project, interlacing legitimate Local 98 projects, personal projects and going to different houses, and sometimes, Mr. Massa would bill that all in one spot. Whether that happened that day, he couldn't recall, and it was obviously a contentious moment during the trial. But I think the bigger point, here, is, that it wasn't a mystery to anybody that this was rampant fraud. So, to, now, later claim that you are somehow injured by the fact that maybe the fraudster frauded you is a little ironic, and it was not like it was not built-in. It was not like it was not known. Mr. Massa would literally give this documentation to Mr. Burrows, his co-conspirator and let him know everything. So, I just wanted to say that.

THE COURT: All right, thank you.

MS. WITZLEBEN: Thank you. He did that better than I could have, Your Honor. With respect to the discussions of the plea negotiations between the parties, Your Honor, we think it's inappropriate for defense counsel to be bringing before the Court plea negotiations that did not result in a plea. But since we're here, I'm prepared to address it.

THE COURT: I agree with you that it's inappropriate, and I don't want to talk about it, because I don't think it's relevant. What's relevant is the jury's verdict. What's relevant is the Guidelines, and what's relevant, for sentencing purposes, is the evidence that's going to be presented today at

the sentencing hearing.

MS. WITZLEBEN: Thank you, Your Honor. I will, and if the Court will indulge me for just one minute, that to the extent, hypothetically, that the Government makes concessions in a plea negotiation, it means that the Government thinks that those are concessions, so when, hypothetically, we tell someone they could be a three-point, instead of a four-point leader, it suggests the Government believes the truth at trial will prove them a four-point leader.

So, in any event, with respect to the issue of the way that the Guideline's structure and the offense level for the respective groups between honest services and embezzlement, it is true that honest services comes out at a 32, and embezzlement comes out at a 27. And --

THE COURT: We all agreed on that.

MS. WITZLEBEN: Yes. And that does not suggest, Your Honor, that the Guidelines are arbitrary or capricious or weren't thoughtful. It suggests that the Sentencing Commission --

THE COURT: Well, no, his point is well taken. In fact, every case is fact specific.

MS. WITZLEBEN: Every case is?

THE COURT: Fact specific.

MS. WITZLEBEN: Yes, it is, Your Honor. But, in this case, I don't think it's fair to say, as was suggested, that

somehow the embezzlement was a more important crime and got a lower score. Public corruption --

THE COURT: I don't know if he said it was more important. I think he said it was worse.

MS. WITZLEBEN: I think -- well, I'm not sure exactly what he was saying. He thought it was arbitrary that honest services was 32 points --

THE COURT: He thought, apparently, it should be more for the embezzlement than for the honest services, that's what he thought.

MS. WITZLEBEN: That's right, and the Sentencing Commission, apparently, respectfully disagrees. So, in any event, Your Honor, the way the grouping rules interact, minor changes in either of those Guideline ranges probably will not change the outcome because of the way that the two groups are so close together, which we can get to if the Court wants to make any findings otherwise.

THE COURT: All right.

MS. WITZLEBEN: Thank you.

THE COURT: I think you covered most of your objections, Mr. Pagano, is there anything else?

MR. PAGANO: No, sir.

THE COURT: All right. So, we -- I mean, we all agree that the Criminal History Category is 1, correct, Government?

MS. WITZLEBEN: Yes, Your Honor.

THE COURT: Mr. Pagano?

MR. PAGANO: I'm sorry? I'm sorry, I was talking to my --

THE COURT: The Criminal History Category is 1. Mr. Dougherty has no prior --

MR. PAGANO: That's correct. Correct, correct.

THE COURT: -- criminal record, so we know that.

MR. PAGANO: Judge, there was one more issue about grouping --

THE COURT: Okay.

MR. PAGANO: -- that Mr. Dougherty brought to my attention. I believe I lodged an objection because, originally, these were all charged together in one indictment, and they were severed for reasons that I was not a part of, but I assume, due to evidentiary reasons for whatever reasons the Court saw fit to --

THE COURT: Lots of reasons.

MR. PAGANO: But, again, as an outsider looking in, on the honest services fraud case, but as an active participant in the trial of the embezzlement case, it would appear that these two crimes are part of the same course of conduct, and I laid out in my objections what the Guidelines stated, and I think, if they're not grouped, it would result in a reduction of one point. They appear to involve a similar victim or, at

least, a primary victim, which is Local 98, although the honest services fraud victim is, I think, the City of Philadelphia or the citizens of --

THE COURT: It's the citizens of Philadelphia.

MR. PAGANO: So, that's my only other objection.

THE COURT: All right. I disagree with that. I think there's two separate offenses, two separate victims, case law clearly indicates that the Government can group that for the purposes of sentencing, if they want to. So, the issue is, the Government, adding up all of the enhancements, the Government is adding up to, puts an offense level at 33, correct?

MS. WITZLEBEN: It's a 33, if you combine the two groups, Your Honor.

THE COURT: Right.

MS. WITZLEBEN: Yes, Your Honor, so --

THE COURT: I'm saying, that's what you're asking me to do, right?

MS. WITZLEBEN: I'm sorry, I didn't hear the Court?

THE COURT: That's what you're asking me to do?

MS. WITZLEBEN: To find the combined total offense level of 33, yes.

THE COURT: Right. And, Mr. Pagano, based upon your arguments, where do you find the total offense level?

MR. PAGANO: I do have that number here.

THE COURT: I believe it's 28 or 27, but I'm not sure. If you take away two and one and another two --

MR. PAGANO: Yeah, it was 27, Judge.

THE COURT: All right. So, the Court will have to decide, then, what enhancements the Court wants to impose and what enhancements the Court does not want to impose, and we will do that at some point in time, but now, let's turn --

MS. WITZLEBEN: Your Honor, if I could, just for a moment? I don't know that Mr. Pagano found the right number. From what I read his objections to be, he would have the Court find honest services as a 28 and embezzlement as a 23. That's what he says in his objections to the PSR, and if you do that, and you use the grouping rules, that results in a 29, because 28 and 23 are five apart, and when you put it in the lovely --

THE COURT: Well, on one of our breaks, because I think we're going to take at least two or more, on one of our breaks, I'm going to consult with the Probation Office. I'm going to decide which enhancements I'm going to apply, which I'm not going to apply, and then we'll come back with what we think would be the Guidelines.

MS. WITZLEBEN: Yes, Your Honor, but just as a starting point, I did note that when I first looked at his objections where he ended up, and it was at a 29.

THE COURT: Okay. So it's not as simple as just reducing --

MS. WITZLEBEN: That's correct, Your Honor.

THE COURT: You think, even with all of the -- even with all of his --

MS. WITZLEBEN: I should say, if you --

THE COURT: -- arguably, all of his objections well taken, you think it still only reduces it to a 29?

MS. WITZLEBEN: Unless the Court agrees with him on grouping, in which case, he's a 28.

THE COURT: Okay. Well, that will be for a later point in time. All right. So, now, that we're done with that, what is the Government's position on sentencing?

Mr. Costello?

MR. COSTELLO: Your Honor, I don't expect to take more than 30 minutes, so I would ask for an opportunity to present a brief response to the defense presentation?

THE COURT: Absolutely.

MR. COSTELLO: Your Honor, this case is about the defendant's abuse of power, abuse of trust that was committed over a period of more than six years. It did not -- it was not a momentary lapse in judgment, and each of the crimes involved, the corruption offenses and the embezzlements offenses both involved some degree of deception by the defendant, which makes it clear that he knew that what he was doing was wrong.

Regarding the honest services bribery fraud, neither Dougherty nor Henon ever disclosed to Local 98, to the public

or any other elected officials the true nature of their relationship. In fact, the defendant made several statements where he tried to suggest otherwise. As picked up on the calls and set forth in more detail in our sentencing memo, he drafted a statement or some type of submission to the media for Henon's signature that, basically, said that "that Dougherty only called Henon four times a year," which, clearly, was false. At the time that the call was picked up, they've spoken at least 30 times in two weeks.

During the Comcast negotiations, he told three different people that his assistance with the Comcast franchise agreement was the only thing he had ever asked Henon since he was elected as City Council.

Likewise, the thefts that Dougherty committed had one thing in common, they all involved lying about the true nature of the expenditures to hide them from the members from whom the money was being stolen. They involved the submission of false expense reports and false invoices. Again, these lies proved the defendant knew that what he was doing was illegal.

The first conviction was in November of 2021. The defendant was convicted of paying bribes to codefendant, Robert Henon, in the form of salary and benefits between May of 2015 and September of 2016. He paid Henon in return for Henon's performance of official acts, which acts, in essence, were anything that the defendant requested Henon to do in his role

as a member of Philadelphia City Council. In fact, immediately after Henon was sworn in, after he was elected, in January of 2012, Dougherty kept him on the Local payroll. In fact, during some time in 2015, he told then Councilman James Kenney, he's on my payroll, which was the absolute truth.

The evidence showed that the defendant got what he paid for. Every time he demanded that Henon take some official action that he wanted, Henon did it. Henon never said no. He never refused any of Dougherty's demands. There was never a discussion of the merits of anything that Henon was told to do, and these official acts included improperly shutting down the installation of MRI machines at Children's Hospital, in an attempt to get work for Local 98 electricians, that the L & I inspector said they were not qualified to do, at a facility that was built with Union labor, and it prevented the hospital from using this equipment.

He had Henon delay Legislation that was detrimental to the plumbers to help him get elected as head of the Building Trades, and that was not the first time that Dougherty was willing to act against the interests of another Union. During his brother's campaign for Supreme Court Justice, he was not happy with some of the ads the Teamsters were running, and he threatened to have Bobby Henon impose a SERTA (ph) tax that would harm the Teamsters who drove SERTA trucks in retaliation.

At Dougherty's request, Henon brought the

negotiations for the Comcast franchise agreement to a screeching halt, because Dougherty did not get -- did not have the involvement in the process that he wanted, so he had Henon hold a meeting where he conducted and made demands on Comcast that the lead negotiator from Comcast described in two emails as "extortion."

Dougherty also had Henon draft towing legislation, because he was angry that a tow truck driver refused to accept his credit card after his car was up on a lift to be towed. Clearly, not all of these acts were for the greater good, and, again, Henon did whatever Dougherty wanted. He got what he paid for.

In December of 2023, the defendant was convicted of embezzling more than $500,000 from Local 98 from April of 2010 through August of 2016. As the business manager of Local 98, the defendant held the most powerful and highest office in the Local, had a duty to his members that he repeatedly violated, used his power to encourage and allow his codefendants to steal with him. The position of power that he held and the way he wielded it prevented anyone from questioning his conduct. No one in any position of authority, including the Executive Board, ever questioned or confronted the defendant about anything.

Probably one of the best demonstrations of the sense of entitlement that was displayed by this conduct was spoken by

the defendant, himself, during a phone call, which he offered someone a membership at the sporting club, and said, I got a different world than most people exist in. I'm able to take care of a lot of people all of the time. What he neglected to say was that his apparent generosity was, in fact, funded by the members of Local 98, who paid his salary, and that unless you were related to him or close to him, you were not the recipient of this Local 98-funded generosity.

He used Local 98 money for personal purchases and did that in a number of different ways that involved the submission of a number of different expense reports, and in each one of them, these purchases included meals that, some of which cost thousands of dollars, groceries, personal items, including clothing, a washing machine for his sister, gasoline for his father's car, gambling trips and concert and theater tickets.

Again, all involved the submission of false reports to the Union, in which he falsely reported that these purchases benefitted the Union as a whole, when they absolutely did not. This also involved the theft of cash that was given to him by the Political Action Committee, and the evidence at trial showed that he spent $12,000 -- approximately $12,000 of this cash on personal items, including, approximately $1,300 at Brook Brothers and $7,000 at Boyd's for suits for himself and his brother.

He claimed to give cash gratuities and actually

signed affidavits to that effect, when the evidence showed he did not. He had Local 98 employees, on Local 98 time, do things such as clean his porch, wash and gas his father's car and pack up his shore house, set up his shore house and pack it up. He paid friends and family members for services they didn't perform. Two of his nephews, one of his nieces got paid thousands of dollars from the Union for hours they never worked and consulting services they never performed at his request.

He also had the Union pay more than approximately $4,000 to send his niece and a teammate to attend a basketball tournament in Costa Rica sponsored by her college that had nothing to do with the Union, was not on behalf of the Union. Ironically, also, his niece was paid for allegedly working at Local 98 during that time.

The daughter of a friend of his was paid approximately $13,500 for not working. He also gave her some money to help her pay for a house. He paid a close friend of Marita Crawford $1,500 for electrical work he did at her house. He also paid a Local 98 consultant $5,000 simply to accompany Ms. Crawford to Florida on a personal trip.

Additionally, he had hundreds of thousands of dollars of construction and repair work done, paid for by Local 98 at his house, his daughter's house, his sister's house, the pub that he owned and his father's house. These were the people he took care of with the money that he stole from his members.

Additionally, after the indictment was returned, in the months that followed, instead of trying to reassure the employees and members of Local 98 that no matter what happened, he would make sure their future and the future of their Union was secure, Dougherty, who remained business manager until the day after his first conviction in November of 2021, chose, instead, to spread fear and retribution in an attempt to intimidate potential witnesses, by basically telling the members, the employees and the membership that anyone who spoke to the Government had a target on their back. This conduct, which is not the subject of any charges, but clearly warrants consideration is one of the reasons that no one associated with the Union ever came forward, and many of the witnesses had to be compelled by court order to testify, and it was clear, obviously, from their demeanor in court, none of them wanted to be here. They were afraid, as they should have been.

It's difficult to overstate the seriousness of the defendant's crimes, given the unique position that he held, and the position held by his codefendant, Robert Henon. Henon was (inaudible) bureaucrat, and Dougherty paid him to forsake his duty to provide honest services to the people of Philadelphia, in the powerful position of City Councilman. Dougherty was the business manager of Local 98, and, again, the highest ranking and most powerful official in the Union. His abuse of trust and goodwill that had been invested in him by the Union's

members, and his encouragement of others under his command to, also, steal from the members make his crimes even more serious.

The sentence that you impose, Your Honor, should reflect the seriousness of his willingness to deprive the citizens of their right to Henon's honest representation, because bribery is one of the crimes, where, absolutely there is a general deterrence effect.

Also, the other reason is, simply, the scope and the nature of the thefts he committed. Here, obviously, there is individual and general deterrence. As far as individual deterrence goes, it is unlikely that the defendant would ever hold a Union office, again, however, given the fact that the defendant has shown little, if any, remorse or even responsibility for his conduct, it's really hard to say whether he needs to be deterred or not.

However, there absolutely needs to be a sentence that shows the public that this type of conduct, if detected, needs to be dealt with severely. Deterrence is a particularly compelling basis for a significant sentence, in this case, where the community, in general and politicians and labor leaders, in particular, have been and are and will be watching very closely.

Your Honor, in his filings and in his objections to the and in the presentence report, the defendant talked about a lot of the good things he did on behalf of the membership, and

we don’t dispute that he did those. The difference we have is what effect they should have on his sentence. The number of good acts performed by a defendant cannot relieve him or her of being held accountable for his or her crimes. Otherwise, the people with the most power who are usually in the best position to use their position and power for good could simply get away with the best acts -- the best could get away with the worst.

As a business manager, the defendant did what he was paid to do. He did what he was expected to do. That was his job. Between 2010 and 2016, he was paid 1.5 million dollars from Local 98. That he was good at the job that he was paid to do does not, should not and cannot relieve him of being held accountable for abusing the power and trust that he had and personally profiting from it.

Additionally, Your Honor, the defendant has brought up that you sentence must take into account the fact that the defendant is a primary care giver for his wife. We don’t dispute the fact that Mr. Dougherty’s wife’s health is dire, and that he plays a big part in her care. But, again, like his position as business manager, that’s what he vowed to do in 1980 when he got married.

For the defendant to suggest that the fate of his wife rests upon the recommendation of the Government or the sentence imposed by the Court is simply beyond comprehension. I am sure Mr. Pagano will speak to this, and as he should, but

the defendant stating that he's the only available care giver seems to ignore the fact that he has two adult children, two adult siblings and many people who would support him. Additionally, his wife does have medical care around the clock. Again, this is something you should consider, but it's certainly not a get-out-jail-free card.

Your Honor, the only two defendants in this case who conduct was similar to the defendant's, and I say similar, because it's obviously not the same, and as Your Honor pointed out, every case depends on the facts.

Robert Henon and Brian Burrows. Henon's sentence of 42 months was for the honest service bribery he committed, and Burrows' sentence of 48 months was entirely separate from the crimes involving the -- was for entirely separate crimes involving embezzlements from Local 98 that he committed with Dougherty for which Henon was not charged. None of his codefendants were convicted of or committed the -- the fraud and pervasive swath of crimes for which the defendant must now be held accountable.

The evidence showed that the defendant was the primary driver of the conspiracy to rob the citizens of Philadelphia of the honest services of their elected councilman, Robert Henon, and the conspiracy to rob the Union members of their funds. In fact, the evidence strongly suggests that without him initiating these schemes, the

codefendants may not have ever even engaged in criminal conduct at all.

We are not absolving any of his codefendants of responsibility, most of whom accepted it, but there is no question on who was running the show here. And, also, none of the defendants, basically, reacted after the -- reacted to the indictment like Mr. Dougherty did and threatened their own members.

In short, his position among his codefendants in this case is unique. He, alone, is at the center of both conspiracies of which he was convicted, and his sentences should reflect that. Now, I realize Your Honor is not decided on the final number, but certainly a sentence that significantly exceeds 90 months which is the sum of the sentences imposed on Henon and Burrows are clearly warranted in this case.

We have submitted, under separate cover, a proposed order of forfeiture for $353,941.35, which represents the value of the property, which constitutes or derived of the proceeds that the defendant, himself, obtained. If Your Honor wants to have a further discussion on that, we can do that after Mr. Pagano’s presentation, but I just wanted to note that for the record, and, obviously, we want a finding sometime in this hearing.

Your Honor, the last thing we noted in our memo was,

here, there is a presumption against bail pending appeal, and we believe the defendant cannot overcome that presumption, and should not be granted bail pending appeal. And, additionally, we don't believe he can make the -- meet his burden of proving by clear and convincing evidence that he is not a danger to the community and should be remanded.

Until now, everything the defendant has done and said shows he has not accepted any responsibility for his conduct, and more importantly, has not accepted the fact or the possibility that he could be incarcerated. Before the first conviction, he made threats to retaliate against anyone whom he believed was not loyal to him. Now, he's sentenced -- we're at a different spot now. So, for that reason, Your Honor, we believe that he should be granted bail pending appeal, and he should be remanded.

THE COURT: Thank you. Mr. Pagano, it's time for you to begin your presentation?

MR. PAGANO: Thank you, Judge. May I begin by calling witnesses?

THE COURT: You may.

MR. PAGANO: My first witness is Erin Dougherty. May she sit in the witness chair? She might be a couple of minutes.

THE COURT: Sure.

MR. PAGANO: Thank you. The defense calls Erin

Dougherty.

COURTROOM DEPUTY: Good morning, Ma'am, raise your right hand.

ERIN DOUGHERTY, DEFENDANT'S WITNESS, SWORN

COURTROOM DEPUTY: Please be seated, state and spell your name.

THE WITNESS: My name is Erin Dougherty. It's E-R-I-N, D-O-U-G-H-E-R-T-Y.

MR. PAGANO: May I begin, Your Honor?

THE COURT: You may begin.

<u>DIRECT EXAMINATION</u>

BY MR. PAGANO:

Q Good morning, Erin.

A Good morning.

Q Erin, how are you related to John?

A I am his biological daughter.

Q Okay. Are there some things you'd like to tell the Court before we impose a sentence here about your father?

A Sure. Sure, I will. I really wanted to talk to you, so if you don't mind, I'm just going to talk to the Judge. Your Honor, I wanted to come today, because I think it's important that I offer some history about my family and my Dad, specifically, things that you haven't heard or don't know, as you're making this decision, that's critically important for our family. To start, my Dad's a complicated guy. He and I

have a complicated relationship, but we love each other deeply, and we have grown to accept each other for who we are at this age in our lives.

Growing up, my parents had me at a young age. They were -- my Dad had just started college. My Mom was finishing high school, and my Mom got pregnant. My Dad and Mom got married. But they had nothing. They lived with my maternal grandparents. We did for seven years. For those seven years, my Dad worked at UPS. He worked, you know, other odd jobs. He was constantly being told what to do. And my grandparents were constantly, like, you know, harping on him about things, you should do this; you should do that. They were young, right?

I think my Dad decided to join the apprentice program, and that's why we stayed with my maternal grandparents, because you're still a student for awhile, and you're trying to recoup -- you know, coup some funds. But, you know, I think the other thing was that my Dad was so young, he was just trying to figure out what his dreams were and what the objectives were and how we were going to live together as a family. And, you know, even then, he was a whirlwind, doing a thousand things at once, probably 990 of them for someone else. But, you know, he was a busy guy, always running around, hustling, trying to make money and survive for our family.

We -- the Union, you know, started to become a big part of our lives. My Dad became a journeyman electrician, and

we moved out of my grandparents house into my Dad's grandmother's house. She had just recently passed, but we moved into that home. For the first time, we were a family of three. You know, that was the first time I had my own room. It was, you know, a big, big juncture in our lives, and, you know, I think that's when I started to see my Dad change and become someone who wanted to be a leader. He wanted to be, you know, someone who could help others. You could see it. People -- our house was really tiny, as well. That house was really small, too, but back then, you know, when he was home -- he worked a lot -- he worked a ton. He was working -- he would work -- he was gone before I would go to school, and then I remember he worked building the Liberty Towers as a regular electrician, and he'd work that second shift. So, I would come home from school, and I would turn the corner, and thinking about it, now, it probably wasn't a coincidence that he was hopping on his ten-speed as I turned that corner. He really probably wanted to catch a minute of me before, you know, he went to work that second shift. And that's the kind of guy my Dad is.

He opened our home to all of these men. I mean, the truth is, guys would just be in our house all the time when he was home. They were coming to him with their problems. They were coming to him with what they hated on the job, how the Union wasn't representing them, how -- you know, they would sit

on -- we had a flight of steps, and they would sit on these stairs, and I'd be watching t.v., and I just would hear them, and I'm like, could you please stop? Like, I was trying to watch t.v. But it was Union, Union, Union business, and they were like, John, you've got to run; Doc, you've got to run; we need you; we need you; you're young. You know, we need your enthusiasm.

I was, like, 12 or 13 when he got elected to the business manager position. And, you know, those first years, there were four business agents, and, now, I think there's something like, you know, 20 or 30 people in the Union, but, back then, there were four people and my Dad, and they would sit around my kitchen table, and they would talk about jobs, and they would talk about, you know, how they were going to build the Union, and they had to be competitive, and the Carpenters were this, and the Plumbers were this; why couldn't they be this. And, you know, I would hear this constantly.

You know, and then it was, like, my Mom, I would say to my Mom, we're just doing this, right, all of our lives? It's all of us all the time. So, my Dad's, like, hey, we're going on a Union trip, how about you guys help us with sandwiches, so then it became my Mom, me, my maternal grandparents, we're building hoagies in the living room, and you know, making -- having events for the Union members constantly. And back then, there were no women. It was all

guys. They were just, you know, outside. At my Communion, there were people there. All the people -- you know, it was a family. It was their families. I went in parades, and it was, you know, other members and their kids and their wives, and that's what this was. It was a huge family initiative.

You know, I think one of the most notable things of my whole life was that you'll rarely see me without a notebook to this day, because growing up, you know, wherever we went with my Mom and Dad, growing up, we would, inevitably, my Dad would say, hey, could you just wait right here for five minutes, I have to go in there, because he spotted people who were doing non-Union work in a shop in Center City or something. It was constant. It was -- he worked all the time, and we were part of that work. He'd come back out, and he'd say, hey, write down in your notebook that address because there were no cell phones or anything back then. He was just, you know, hustling to get the work, and at that point, I was the stenographer writing that down.

And then, you'd say, how does a kid get involved in this, but I was writing that down, so I would -- on the weekends, I'd be like, hey, whatever happened at 1516 South Street, and he'd say, we flipped it, and I'd, like, cross it off as an achievement. This was a huge part of our life. You know, my Mom managed the finances. My Mom managed my life, my schedule, our family events, birthdays. She would pay my

tuition. She's hand me the check, you know. I cannot recall my Dad really even giving me money. I can't recall my Dad being involved in it. My Mom handled all of that. He really wasn't -- he was just all Local 98 all the time. That, you know, it's not surprising to me that his career exploded as I become older.

We moved out of that house, and we finally got, you know, a regular sized house, and I became incredibly active in school, so I kind of took, like, a little bit of a backseat to the Local 98 stuff. It was always there, and I always stayed involved, but I wanted to do my own thing, and I think, maybe, that's when my Dad started to get involved in politics, which is also not my thing.

I always wondered why he did that, and he would tell me that, he needed elected officials to help get work for the people, just, he would explain to me, just like the notebook. You know, there are these big buildings, and these big buildings, elected officials help these jobs go Union, so we need to do that.

You know, I think that, as he became more involved or more connected to more people, he realized that he could get more for the members than just work. He could get them, you know, better health coverage through knowing more important people in the City. And I think that he was never -- he was always -- he was never afraid to ask anybody for help for his

members, and I'm also someone who doesn't really like to ask people for things, so I would be embarrassed when he would be asking people for stuff, and I would think, how does he have -- you know, how is he not embarrassed to ask somebody for this wild thing, and I think -- like, I was thinking about what I was going to say to you today, and I think it's because no one was ever afraid to ask him for anything. The amount of people who asked him for things over my lifetime far exceeds anything anybody can even imagine.

I've never once heard my Dad say no to anyone, anyone in need. I've never once heard him make a promise to somebody that he didn't keep, and I never once thought that he was, you know, focused on giving the members the best of the best. He wanted Local 98 and the members on every job to be the best of the best. And he knew, for people like us, the best of the best was healthcare and quality of life and for family. So, I think that's where all of this focus comes in with family with him. It's family for us. It's family for every other member of Local 98. It's a Brotherhood for a reason, because that is what it is. It's a community.

And I understand, and believe me, I will talk into responsibility and accountability, because I'm incredibly pragmatic. I just think that, you know, that there's a family element that is sometimes overlooked in the sense of the broader scope of what the Union is.

I think that when my Dad was, you know, starting college, he was having me. When I was starting college, Tara came to live with us, and Tara is my biological cousin, but my parents adopted her or brought her to live with us, and I was a commuter, not a surprise. I stayed close to home, and also, you know, Philadelphia, South Philly, which is also what we're all kind of brought in. And when Tara came in, I think a lot of people think Tara is my Dad's biological family, but Tara is my Mom's biological family. Our maternal grandmother's were sisters. And when Tara came to live with us, my Dad knew that Tara needed a father figure, and he took that role, and he became Tara's person, and I loved it, because I love Tara, and I saw how she thrived with the support of my Dad by her side.

That was the same time my Mom got diagnosed with this AVM, and I know that there is a lot of talk about the AVM, and I'm certainly not a doctor, but I would like to offer you just a little bit of information about my Mom's illness. AVM is a malformation of the veins and arteries, and in her case, it's in her brain. A lot of people, you can have them in other places, but in my Mom's case, it's in the right temporal lobe of her brain.

The AVM is a congenital thing. It's similar to a birth defect. And for years and years, doctors described it to us as having hooked a garden hose, which has some knots in it up to a fire plug, that water is rushing out of that fire plug

at a high speed, and it's going into a very small space, and the very small place is tangled. So what's going to happen is we're going to see, you know, water shooting out, and we're going to see explosions every now and then. They described it to us in 1999 as fatal, you know, it's a death sentence. Essentially, the location it's in is very challenging, the amount of tangling that is there is off the charts. So, you know, obviously, that's a huge thing. My Mom, at that point, I guess, was, like, 37 or something, younger than I am today.

But my Mom, my Dad and myself, we went to see a neurosurgeon. She was misdiagnosed a couple of times. But we finally found someone who knew what they were talking about, a Dr. Rosenwasser, and we went to Jefferson Neuroscience -- I don't think it was called that at the time -- and Dr. Rosenwasser said to us, look, he said, I could try to get this thing out. I could try to take it out, but you're probably going to die on the table, and if you don't die, you're going to be left really impaired. It's a long -- a very, very long shot that I could get this out. He said most women actually die in childbirth in your age, having been 17 or 18, and you had Erin is probably the reason you didn't pass. Had you had more children, you probably would have died in childbirth. He told us this, because with every year you are alive, your veins and arteries weaken, so with every year she was alive, there was more risk of hemorrhage, more risk of rupture, that kind of

thing.

And he explained all of this to us, and he said, but, look, he also was a very aggressive, young doctor, and he said, I'm experimenting on some new stuff, where we go in, and we use glue to try to, like, tighten up some of the veins. We're experimenting with a gamma knife radio surgery. We have, you know, coils that we're going to try to put in and slow down the blood flow. The whole objective is, we want to slow down the blood flow, and my Mom and Dad, collectively, collaboratively made that decision. I did not have a say in that. It wasn't something -- no one really ever asked me. I just kind of sat as the quiet observer, you know, soaking in this news that my Mom might die.

But, at that point, again, they made this decision together. My Mom had years and years and years of treatments. She's had over 30 brain procedures. She's had multiple strokes. She's had there radio surgeries. And it was a loss, you know, of the left side of her body, with one of those strokes, over time. And needless to say, my Mom has lost a little bit of herself since 1999 every single year she's been alive. And, with that, my Dad lost part of my Mom every single year from 1999 forward.

He never did anything but try to make her life easier. He figured out, you know, if she needed something, he would take care of it. He wanted to make her happy, and he

wanted to make the quality of life that she had one that was great for her. But I think, really, that's when he delved into two things, my Mom's care and Local 98 even harder, at that point, I think. That's when he started to grow the philanthropic arm, where, like, he was the head of every nonprofit in the city, Turning Around, Variety Club or whatever else someone asked him to do. I think -- I know you've heard a lot of his phone calls, but I have heard a lot of those phone calls, as well. And I wish you could have heard them all, like we did, because the incessant ringing of his phone and text messages is something I hear when I'm still at home today. It's just something that went all hours of the day, all hours of the night.

People would call us -- and I have to kind of tell you some of the things, because I don't know that anyone gets this. They would call asking if he could get them a helicopter to take their kid from one city -- they were down the shore and trying to go to Philly. Help them because their mother-in-law's house got broken into. Help them because they suffered from addition, and they were ready to get help. Help them because they needed money for their kid's tuition. Help them because they got fired. Help them because their neighbor needed a new roof.

People called that contemplated suicide. They left mentally ill messages on our answering machines. Every single

time he got that phone call, whether it was 3:00 a.m., 5:00 a.m., the whole house would be awake, and he would make another -- he would calm the call. He would make another call to ask someone to help them, whether that be an elected official, whether that be a roofer that he knew, whether that be a guy down the street. He never once rolled over. He never once ignored the call. He picked up the call, and he helped. It wasn't family, although sometimes, it was, but all of the things that I wrote down were not family. They were just people who knew him and got his number from someone who were desperately in need.

I guess that brings us to the more, like, last seven years. My Mom had a catastrophic brain injury, and the AVm finally, completely exploded, and it has left her a quadriplegic. She was in Magee Rehab for three years -- almost three years, and every single Friday, we would have a meeting after I was done work. We would go to Magee, and we would have a meeting.

We would have a meeting with the head of the brain injury department, the head of the therapy department, her specific therapists, and sometimes, a doctor or so would come to that meeting, and we'd talk about -- we were supposed to just go in there and talk about the week's progress, but every week, my Dad would get a phone call. He would step out, so this would become a two, three hour meeting, when it could have

been an hour meeting. And in that meeting, there were so many times that Tara and I, when he left the room, because we knew this would upset him, when he left the room, we asked my Mom's care team, where is there a medical facility for my Mom? What type of nursing home does my Mom need? The level of care that my Mom needs is so serious that -- I know my Dad thinks he can do it, but I'm worried about my Dad's health at this point. I'm, like, it's a lot -- it's a whole lot.

They would tell us, time and time again, that my Mom's age and the severity of her -- or the uniqueness of her situation made a lot of -- would make her ineligible for a lot of general nursing homes, that there are certain specialty acute centers that may be a possibility, that they were very expensive, and that there were long wait lists, so we were like, okay, and we'd just look at each other. And then we talked about, you know, declaring her disabled, and potentially getting waivers, and they told us that there were two-year waits on those things, and that this isn't an easy endeavor. And they would always add, and this is just, like, anecdotally they would add -- we wouldn't say it -- they're like, yeah, but, you know, your Dad, he's your Mom's best support, and home care is the preferred pathway for any person in her condition, not just my Mom.

Since my Mom's been home, she's been living with my Dad in an apartment in Center City. My Dad, you know, resigned

from his job. He has been her sole caretaker, and she has a team of people who help him. That is absolutely true. But my Dad’s life is the absolute worst version of Ground Hog’s day. He has to listen to the same music on repeat multiple times a day, because my Mom perseverates, and the only thing that’s comfortable to her is 60's sitcoms. He gives her her food and medicine in her feeding tube multiple times a day, because I don’t think everyone knows this, but certified nursing assistants can’t give medication. Only nurses can give that, and insurance doesn’t cover for her care. They cover CNAs, if that, and they are not able to administer medication. She gets medication four times a day at least.

He catheterizes her. He changes her briefs. She gets chronic UTIs and bowl obstructions. He helps shower her, because she only feels comfortable with people she knows showering her. She will scream on the top of her lungs, which is all she can do to communicate. She’s like an infant that won’t stop crying sometimes. He cleans her bedding. He cleans her supplies. He manages her medical appointments, her medication, which, also, is, until you’re in these shoes, you don’t know how challenging it is in a pharmacy at 5:00 to get a Nuvigil prescription filled.

He serves as her communication partner, because only he and me, to some degree, even know what she needs or wants, and that’s only because we know her intimately. He coordinates

therapies with her. He prevents infection by making sure that the staff who is there isn't being lazy and drifting out on their phones, and they need to make sure that they're turning her at the intervals that they're supposed to and not taking personal calls. It's a work force. There's a lot of call-outs in a post-COVID world in nursing especially.

He does this because, you know, I think, even, you know, Mr. Costello said that he made a commitment, but I think that he did this and does this because they agreed to take this conservative approach together, which was a risk, and there is no one else to do it. Why can't I care for her? There's a lot of reasons that I can't care for her, and I hate to stand up here and say this, but it's the truth. First, I can't provide a level of in-home care for her, because I live in a South Philly rowhouse that's two stories and one bedroom, my wife and I. We both work two jobs, just for our own life. I'm 44 years old -- or two days shy of 44. I'm currently in remission from Stage 4 Lymphoma myself. I got Lymphoma and went through cancer and radiation while my Mom was in Magee.

One of my jobs requires me to travel multiple times a year. I have to go to required conferences and trainings. I'm solely responsible for my Mom's Dad, because my Mom was an only child, so my Mom's Dad is now an elderly man with his own medical needs. A transition of care for my Mom cannot happen overnight, and it has -- these waiting lists are a serious

concern for me. I know that my Dad is far from perfect. I certainly know that now that he's a convicted felon. I understand, and I believe in the idea of accountability, and I am certainly not here asking you, you know, to forget about all that has taken place. I'm just begging you to consider some sort of home confinement for my Dad. He's in a situation that's incredibly extraordinary. And while there are other codefendants in this case, and I know there were different sentences and different situation for each one, if we're really looking at everything individually, his situation is incredibly unpleasant. He is in the more -- in an incredibly humbling and punishing scenario each and every day.

I see when I do visit that it's -- it's a breath of fresh air, because he has just seen another human that can speak to him. He's lost his job. He's lost his reputation. He's lost his wife, for all intents and purposes. Please, I'm just begging you to consider some sort of alternate sentence, considering these extraordinary circumstances.

Thank you, Your Honor.

THE COURT: All right. Thank you. Anything else from you, Mr. Pagano?

MR. PAGANO: No, Your Honor.

THE COURT: Anything from the Government?

All right, thank you. You may step down.

THE WITNESS: Thank you, sir.

(Witness excused.)

THE COURT: We've been going pretty strong here. Let's take a ten minute break, and then my plan is to go until 12:30. Then, we'll take another break.

MR. PAGANO: Thank you.

(Recess, 11:41 a.m. to 11:59 a.m.)

THE COURT: Everybody may be seated. Let the record reflect everyone has returned. Mr. Pagano, you may continued your presentation.

MR. PAGANO: Thank you, Your Honor. Your Honor, the defense would call with the Court's permission Joe McGrath.

THE COURT: The witnesses can either be there at the lectern or --

MR. MCGRATH: I'll come up there with you, sir, is that okay?

THE COURT: Sure.

COURTROOM DEPUTY: Please raise your right hand.

JOSEPH MCGRATH, DEFENDANT'S WITNESS, SWORN

COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: My name is Joseph Patrick McGrath, M-C-G-R-A-T-H.

MR. PAGANO: May I, Your Honor?

DIRECT EXAMINATION

BY MR. PAGANO:

Q Mr. McGrath, good morning.
A Good morning.
Q How do you know John Dougherty?
A I know John through the work he does to make children with special needs and adults with special needs much better -- much, much better.
Q So through some organizational activity or --
A Oh, through many organizations, UCP, with the generators, when he saved the Variety Club.
Q Okay.
A St. Catherine's Day School, when they rewired that. I've got a litany, you know what I mean, but I'm not going to go into it all.
Q Yeah, just to name a few is fine, because we don't need to go through all of that history, but what would you like His Honor to know before he imposes sentence? What's the primary issue that you'd like to address?
A Your Honor, I wasn't going to address this until I heard the testimony from the Government. My daughter is 25 years old. She had Down's Syndrome, Autism. She's non-verbal, and he wears diapers. She has accidents. People don't know how much care goes into being a primary caregiver. You just can't switch out primary caregivers. Number one, home healthcare people can't give medication, and they make a lot of mistakes. And, Erin, when she said they don't show up, oh, my God, that's

an understatement. And my daughter was crying for two weeks, and we didn't know what was wrong. We brought her to three doctors, and they said, she's fine; she's fine; she's fine. Here, it turned out, she had a blood clot in her leg, and a blood clot in her belly that almost killed her. My wife discovered that. Doctors didn't discover it. The primary homecare person discovered that. I just -- I don't think people have enough empathy for what it means to be a primary caregiver for someone with multiple, multiple issues. And you can go on, and you can look up PA Wait List Campaign. You can see the waiting list for waivers, and that's just for the ones for people with intellectual disabilities.

Everybody wants to tell you what's out there, but listen, I live it. I live it, Your Honor. On that, I have Parkinson's, and I'm battling colon cancer right now. I was one of them guys down North Carolina in that water. I speak on behalf of my daughter, Maura, and I consider Doc one of Maura's heros. I have a tattoo here that says, Maura is my heart/I am her voice, so I'm here today to be the voice for Maura and for John, who made so many kids' lives much better.

You know, when Edith Kennedy passed away, she was responsible for millions of the most brilliant smiles, the Special Olympics. John's responsible for millions of the most beautiful -- well, not millions -- I'll go thousands. But, you know, and also, his fingerprints with the Buddy Walk, to start

the Trisomy 21 Center down at Children's Hospital, it was invaluable. We're one of three states, I believe, that addressed diseases just for people with Down's Syndrome and special circumstances. John has his fingers all over those things.

I know yous guys all heard -- I'm here for the first time, and I debated whether to come, and my wife said take care of yourself, and I said, no, I've got to come here and speak for my daughter, because John is one of her heros. Feel free to ask any questions anybody has.

Q Thank you. I have nothing further. Thank you.

THE COURT: Anything?

MS. WITZLEBEN: No, Your Honor.

THE COURT: Thank you. You may step down.

THE WITNESS: Thank you, Your Honor.

MR. PAGANO: Thank you, Mr. McGrath.

THE COURT: Thank you for coming.

(Witness excused.)

MR. PAGANO: The defense calls Donald Siegel.

COURTROOM DEPUTY: Please raise your right hand.

DONALD SIEGEL, DEFENDANT'S WITNESS, SWORN

COURTROOM DEPUTY: Please state and spell your last name for the record.

THE WITNESS: Donald Siegal, S-I-E-G-E-L.

MR. PAGANO: May I, Your Honor?

DIRECT EXAMINATION

BY MR. PAGANO:

Q Good morning, Mr. Siegel.

A Good morning.

Q I know that you've prepared something to say to the Judge, but did you also not write a letter?

A I did.

Q And, in the letter, if you could tell me, how long have you known Mr. Dougherty?

A Over 35 years.

Q And before we get to what you prepared to say, which is different from your letter, I just wanted to ask you a question about what's contained in your letter, do you know something about how John or what the state of the union was when -- the Local 98 Union, that is, when John took over in 1993 or whenever that was?

A The Union was basically bankrupt. They had about 1,000 people unemployed out of the membership.

Q How do you know all of this? What was your role, then?

A At the time, I was just a business manager in Local 743, Reading, Pennsylvania, this home town.

Q Okay.

A I later became an International staff member for the IBEW, and I had oversight over New Jersey, New York, Pennsylvania and Delaware, and IBEW Local 98 was one of the Locals I serviced.

But what you're talking about preempts that. At the time that John took over, the local Union did not have much money. Their funds were underfunded. They had 1,600 members at the time. They had 1,000 people off. John had -- I know you've heard this before, so I don't want to be too redundant, but there were four business managers and John, and they basically lived and slept at the Union Hall for the first few years they were in office. They took a cut in pay. It was not a good situation. It wasn't anything I'd wish on anybody.

Q It wasn't a 9:00 to 5:00 position?

A No, 24/7. And, in fact, my experience in the IBEW, and I don't say that because I'm sitting here addressing this Court, I have known all of the leaders of the IBEW since about 1988. There is no stronger or harder working person in the Labor movement than John Dougherty.

Q In addition to that, what would you like to tell His Honor before he imposes sentence here today?

A Well, the John Dougherty that I know is certainly not the one that's been fined by these two trials, and I'm certainly note going to make any excuses for what happened or what actions he took that brought us all here today, but I know the John Dougherty that Erin described and other people described, the gentleman just before me described. He was constantly looking for someone to help, someone to do something for. His activities with the Variety Club were pretty much in the news

all the time that he was there. He connected with all of those children. He also did things for the first responders in New York City after 911. He was on top of things when Katrina hit in New Orleans. He helped the City do some projects and playgrounds in Boat House Row when the City didn't have the funding to do it.

And every time I'd ever speak with him about anything, it was always, well, how is this going to help 98? How is this going to help my members? And beyond the membership, he would always be concerned about Philadelphia. He was one of the biggest cheerleaders for Philadelphia that I ever met, and I was with him out of town on the West Coast in many conferences, and he was, quite frankly, almost shamelessly proud of Philadelphia and would tell everybody to the point of annoyance, but that was John.

And he also was very, very good and brining economic development into Philadelphia. Our real estate investment trust, this is one of our most successful cites where we have a return on investment. Market Street East is just one of those examples that we have here.

So, my experience with John, that's the John Dougherty that I knew, and I have spoken with him several times throughout the time that I've known him since 1988, and especially after I became vice-president in 2002, and then retired in 2017, and I've never known him to be anything but

concerned about what's going on in Local 98; how can I put more members to work; where is there work that I can send people? That was his constant refrain with me whenever I had any communication with him.

Q Thank you. Nothing further.

THE COURT: Anything?

MS. WITZLEBEN: Nothing, Your Honor.

THE COURT: Thank you, Mr. Siegel, you may step down.

(Witness excused.)

MR. PAGANO: The defense calls, with the Court's permission, Tara Chupka.

TARA CHUPKA, DEFENDANT'S WITNESS, SWORN

COURTROOM DEPUTY: Please be seated, state and spell your name for the record?

THE WITNESS: Tara D. Chupka, T-A-R-A, middle initial, D, C-H-U-P-K-A.

DIRECT EXAMINATION

Q Ms. Chupka, good morning, is there something you'd like to say to His Honor before he imposes sentence?

A Yes. Your Honor, and if it's okay, I'm going to read?

THE COURT: That's fine.

THE WITNESS: Your Honor, I'm speaking to you today to offer a more complete picture of who John Dougherty is. I was born into a drug-addicted home. My parents were both active users throughout their lives, and I became fully aware

of their addiction in fourth grade after watching a D.A.R.E. presentation on heroin. Suddenly, everything clicked. My parents had an unstable relationship that involved fighting, guns, knives, basically anything they could get their hands on. I survived childhood because of my maternal grandmother who basically raised me.

During my freshman year of high school, my father passed away from a heroin overdose at a known drug house in North Philadelphia. Three months later, my rock, and the person I depended on the most, suffered a sudden and shocking death from cancer. Within weeks after my grandmother's death, my mom's addiction began to overtake her, and it got to the point where I knew that 14-year-old me needed adult help.

John and his wife, Cecilia, were the adults that I called. Within minutes, they were at my house pleading with my Mom to get the help she needed and gently explaining to me that I was going to need to stay with them for a few months while my Mom worked on her recovery. John and Cecilia didn't flinch. This all took place mere weeks before the school year started, and John and Cecilia made sure uniforms were purchased, tuition was paid and lunch money was on the kitchen table.

Immediately, John reached out to an attorney to secured a temporary adoption, which allowed me to access his health benefits. All of the things that had been neglected due to my parents' addiction were now being put to the forefront,

and living with the Doughertys became a comfortable routine. My Mom did success in rehab, but she succeeded by finding the love of another man and moving to Lancaster, PA. When she reached out to me to visit, I immediately panicked. I didn't want to leave where I was. John sat me down and explained to me that this was my Mom, and I had to visit, and I had to visit with an open mind, but if something fell off or it just wasn't right, my spot at the Dougherty home wasn't going anywhere. I did the visit, and everything felt off and uncomfortable. I'll never forget coming home in tears, and Johnny looked me straight in the face and telling me that I never had to go back there if I didn't want to, and that I was part of their family.

John and I became tightknit right then and there. I knew that he had my back, and that I could count on him no matter what. Unfortunately, my mother succumbed to breast cancer during my senior year of high school. I was 17 years old, with two dead parents, and I honestly only survived it because of John.

As I continued to grow up, go to college, go to law school, I was given the blessing of being able to spend a significant amount of time with John. I learned from him. I learned from the people he was in the rooms with, and more importantly, I enjoyed being his daughter. People were always cautious regarding how to address me in relation to John. I knew that they were just being respectful, but since I was 14

years old, I took pride in introducing myself as John Dougherty's daughter. Not only does John treat me as his daughter, he doesn't remember a time when I wasn't there. Every once in awhile, he'll say something like, remember when we went to Disney, you must've been in first grade, and I have to remind him that I didn't live with them at that time, and he gives me this surprised look, like, really, are you sure; is that really true? The fact that he doesn't remember a time without me is something that I cherish. Not everyone gets to experience unconditional love, and I'm thankful that I have.

John is the type of person who takes on peoples' problems and does everything humanly possible to try to help them. They no longer are just Joe Smith's problems; they are now John Dougherty's as well. I can't explain to you how many times people would knock on our front door, hoping to talk to him, get guidance, ask for something. Once John heard your situation, he went into fight mode and tried everything and anything to help someone out.

In my opinion, John did this too much, and there were plenty of people who he would help over and over again, and I felt that they were taking advantage of him. John and I would have conversations about this, and his response always was that if these people were coming to him, then they had nowhere else to go, and how could he sleep at night if he didn't at least try to make a difference.

Someone recently asked me what I would want the Court to know about John, and my first thought was that, deep down, John is a softie. He’s a pushover. He truly sees the good in people or, at least, the potential of good and will go above and beyond to help, even if these same people have disappointed him time and time again. He doesn’t forget about you. He doesn’t leave you hanging out there as a one-man island. He embraces you. Maybe he yells a little bit. And then he works with you to figure out some type of a solution.

In March of 2017, Cecilia Dougherty suffered a life-changing brain bleed. This bleed left her fully paralyzed, confined to a wheelchair or bed, unable to speak, unable to take in oral nutrition, unable to do anything but lift her right arm a tiny bit. However, this brain bleed did not take away all of Cecilia’s cognitive abilities. It may be a little bit more difficult to find her, but she’s still in there somewhere.

Cecilia would not be alive today if it weren’t for John and his actions as her caretaker. She requires and he provides 24/7 care consisting of managing medications, managing frequent infections, making sure Cecilia does some type of therapy every day to prevent her muscles from atrophying. Cecilia is his sole purpose on this Earth, and John is Cecilia’s sole purpose. When John is away from home for any period of time, you can physically see Cecilia become more and

more agitated the longer he is away. We can explain a million times that he's at the supermarket or at an appointment, and it doesn't matter. Cecilia does not calm down -- or, more, get comfortable again until he is back home in that house with her.

I'm here to ask you, today, to please consider some type of minimum or alternative sentencing for John. I don't know if I fully have the words to describe the impact John's incarceration will have on all of our lives. The Court will not only be punishing John, but they also will be punishing Ceilie (ph), who literally depends on him for her every need, myself and my sister, Erin.

Ceilie's condition requires so much attention and care, I truly don't know if we will be able to provide it without John. Your Honor, I own a home. I have a job I enjoy. I still have a significant amount of student loan debt on top of my mortgage. I have goals and dreams for my life. Incarcerating John for a significant amount of time will not only cause a significant shift in Ceilie's care, but a significant shift in life as I know it. I, sometimes, get into a panic thinking about how we can make this all work without John present, and unfortunately, I never come to a good answer. I panic that without John, we will miss a symptom of Ceilie's medical needs. I panic that I'm going to have to sell my house and move in with Ceilie. I panic that I won't be able to continue working, because Ceilie's care is so overwhelming. I

panic that Ceilie is not going to be able to handle not being in John's presence on a daily basis.

Your Honor, I understand that you have a job to do here today, and I am thankful for the respect that you have shown John throughout this entire process, and I am also thankful for you allowing me to speak to you today.

MR. PAGANO: Thank you.

MS. WITZLEBEN: Nothing, Your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness excused.)

MR. PAGANO: In terms of witnesses, Your Honor, that's all we have.

THE COURT: All right. Then, I think we'll take a recess at this time. Why don't we come back at 1:30, and Mr. Dougherty will have the opportunity to say what he wants to say regarding his sentencing, and then we'll proceed from there.

MR. PAGANO: Judge, I do have a couple words to say, but not much, so --

THE COURT: Do you want to say that now or afterwards?

MR. PAGANO: I could say it afterwards, that's fine.

THE COURT: All right.

MR. PAGANO: Thank you.

THE COURT: All right. Thank you.

Court is in recess.

COURTROOM DEPUTY: All rise.

(Recess, 12:20 p.m. to 1:42 p.m.)

COURTROOM DEPUTY: All rise. Court is again in session, the Honorable Jeffrey L. Schmehl presiding.

THE COURT: Good afternoon, everybody, you may be seated.

ALL COUNSEL: Good afternoon, Your Honor.

THE COURT: We're going to resume the sentencing hearing. I believe when we recessed, it was time for Mr. Dougherty to address the Court.

MR. PAGANO: That's correct, Your Honor. There's just a couple of things that were addressed by the Government that I did not have an opportunity to address, if I may address those few things, briefly?

THE COURT: You may.

MR. PAGANO: Thank you. Your Honor, the Government, in their speech to you, suggested, and in their sentencing memo, suggested that -- that the sentence of Mr. Burrows and the sentence of Mr. Henon could be, should be added together, and that would equal the sentence of Mr. Dougherty. The Government also suggested that Mr. Dougherty should --

THE COURT: I'm not sure they suggested that. They just used that as an example or a guideline.

MR. PAGANO: And I agree, they used that as an

example or a guide, and that Mr. Dougherty should be sentenced at a level greater than or equal to -- I think they want a sentence greater than that. But the law permits this Court to impose a sentence less than or equal to, not just that number, but greater or less than or equal to either one of those numbers. And there are two reasons why I truly believe that this Court should.

Number one is the multitude of good works and charity, community works that Mr. Dougherty has done, which are evidenced in the 246 letters that we provided to the Court, and I should also note that, since submitting these binders to the Court, we have received about another 40 or 50 letters, which I did not submit to the Court, because I didn't have the opportunity to.

The second reason why this sentence can be less than or equal to the combined sentences of those two individuals or either one of those individuals is the disparity issue. And the disparity issue is this, Your Honor, if the Court looks at the U.S. Attorney's website and looks at the press release page, there are sentences that are reported there that have transpired within the last six months to a year, but I would just note, Judge, that there is a case reported there on the U.S. Attorney's website, the Eastern District of Pennsylvania news page, which reflects that U.S. vs. Simpson, a case involving fraud --

THE COURT: That was in your memo.

MR. PAGANO: That was in my memo. Okay, well, I don't need to go there. Lastly, the Vince Fumo case, which was also in my memo, Judge, the last thing I'd like to say is, I'd just like to address a couple of things that Mr. Costello said, and number one was, Mr. Costello said that John Dougherty only helped or primarily helped friends and family. He helped people from all walks of life. He helped strangers. He helped Local 98 members. He helped non-Local 98 members, and that's clear from the letters that we submitted to the Court.

The other thing is that Mr. Costello suggested and said that, while Mr. Dougherty, you know, the fact he has all of these good works on behalf of Local 98 aren't as impactful as the defense says, because he was paid for what he did. Well, he was paid for what he did, but the fact of the matter is that Mr. Dougherty went far above and far beyond that which he was paid to do, and it's because of his efforts that Local 98 is the organization that it is today. He is the -- or was the cornerstone of that, and was the person or party responsible for that. They continue to benefit from all of his hard works over the last three decades, and that's all I have.

Thank you, Judge.

THE COURT: Thank you.

MR. PAGANO: Mr. Dougherty would like to address the Court, as well.

THE DEFENDANT: Thank you, Your Honor. First, I'd like to thank you for over three years of patience, multiple trials, COVID. Also, your staff has been more than patient and more than honorable with all of us. Second, I'd like to take just a second and a personal privilege to thank you for the way you have handled the critical situation I have at home, and just so you know, I have never used that as a crutch. Okay. People learned more about Ceilie today than they've ever learned in their life. I've never used that. Okay.

I'm here to take full responsibility. It's embarrassing. I'm sick. I've had it for years. I knew -- okay -- I've knew. I've had thousands of subpoenas -- well, not thousands -- 1,000 subpoenas, houses raid, Union raids. I've had it for years, decades. I knew better. I let the lines get blurred. Okay. I got over my head. I took a mom and pop shop and turned it into something, that down the stretch, I just lost control of it, and I'm responsible. I'm the boss. Nobody -- I'm the boss. I was the business manager for 28 years. Okay.

A couple of things I just want to touch on, so you get an idea of my mindset during that period. You already know the success of the Union. I'm not going to bore you with that. It's the best Union in America financially. It has little to no debt service, and we're one-fifth the size. Okay. But a couple of things I have to address. There's guys in the room

that work for me. The stuff that I would threaten anybody, that was me being me. If you asked any of them guys, nobody took me serious. Okay. I was trying to alert people to be on the ball, when I should have been alerting myself.

When you look at some of these issues, and there was two or three items that I completely forgot we did, Katrina. I partnered with the Eagles, Joe Banner and myself worked that out. I worked with Andy Reid. I worked with the Teamsters. There's not a Union in town that -- that was us being us, all them fights, all them -- that Mayor stuff. Everyone, the Teamsters, the Carpenters, the Electricians and myself, I'm still friends with everyone of them. That Katrina event was a very complex event. It was a blood bank. It was food. It was money. It was everything. We had third-party accounting. We counted every piece of everything that was delivered. The Teamsters drove it down. We did days and days and truckloads of taking care of it. I even forgot about it until it was brought up.

When you look at it, fast forward to the Variety Club, that was a special baby of mine, which was obvious. Man, I spent hours. And one of the things that I can take credit for, I'll take credit -- blame for everything that went on, but I never led from the back. Okay. I don't have any money anywhere. I never worried about getting rich. I was sloppy. I couldn't care less about money. I put myself out all the

time. At the Variety Club, I would be there three hours before the meeting to prep for the meeting. I'd have a Board meeting with 30 people, and then I'd take the six people who do, and get them a drink, and come wandering in the house at 11:00. And that was a charity event. That wasn't Local 98.

And the one thing I'm the most proud about that just got a little bit of a touch today was that the Camp up there, they asked me to come back. There was embezzlement. There was a big bet. I came back. I worked with some of the law firms in town. We resolved some of the issues. When we got to the point where we were pretty solvent again, I had to do something to change up the pizzazz, so I was sitting home, and I always found stuff. As you can tell, I'm lucky enough to have a couple of pretty smart kids. I bounce things off of them, and I said, I've got to do something different.

So, what we did is, I went back, and I took two weeks out of a year where I let the healthy sibling join the challenged sibling at the Camp. Now, as you would imagine, the oversight, security, insurance, money is significant to do that. But it gave the parents two weeks to have a life of their own, even if it was going to the movies and going to Benihana's. Okay. And somebody told me that. I never knew, Your Honor, how important that was until I realized Ceilie was like that. Right.

Take a look at other issues, they mentioned -- a

couple of things that were mentioned, I'm just going to touch on real quick. We spent two days during the trial, and, Your Honor, I know this is a closing -- a sentencing, not a closing, I know that, so I'm just going to blow through this. The situation where we talked about having me sending food home from The Palm. It got a lot of attention in the paper. I think we spent two days here. We played the calls 100 times.

My mother-in-law, okay, who was part of our start-up with my father-in-law, she actually came in, because we didn't have any money at the time -- I didn't have a maintenance crew -- and she would clean the bathrooms, put candy in the bowls, and we didn't -- we were working seven days a week for the first six years, so everybody was in on every Sunday. Every Sunday, she would bring gravy. She would bring meatballs, spaghetti, and on a lucky day, she would throw chicken parmesan. We'd watch the Eagles games there. We'd watch the Phillies games there. We'd work all day, all night. They were part of the team.

She was dying at the time. My father -- my father-in-law, who is, maybe, the best human being I've ever met, he wouldn't take anything from anybody, okay, drove a lug truck for 45 years for the Teamsters. He was heartbroken. My kids were there. It's the first time Ceilie had a significant emotional moment, and this was all before the catastrophe, and I could see she wasn't healthy. And it was a few months before

she had the blow-out. Okay. I was busy. My intention wasn't to sit up and figure out how I could get a crab cake and not pay for it. My intention was to send food there so that it would separate them from crying and -- by the way, she died four or five weeks after the crab cake. That was never the intent. And I could sit here and do that, but that's not the time, and I had my opportunity. I am guilty. Okay. I take full responsibility. I respect the verdict of the jury. Never did. I've always led from the front.

I'm sorry to the members. Okay. I've had about -- I don't even know how to address them. I've had about 400 emails from the members today, text messages, wishing me good luck, thanking me for what I did, and I'm sitting up here apologizing to them today, because I got out of control. I didn't -- John Dougherty and the business manager became the same person, even to the point where I violated the law.

My family, I don't want my kids up here doing that, you know, and who would believe that the only people we ever hired was my kids. In my office, over 30 years, immediate family members of other people to work for me. I hired close to 80 people. One guy, I hired every one of his four daughters. They all got paid the same. You can't expect kids to come in right out of college and not get a week's vacation. Everybody got paid. Everybody got treated the same. Okay. I get it. I'm sorry. I'm sorry to everybody. It's been 30

years that I've been doing this. I have to tell you, I'm 64. I'm tired, and I'm at your mercy.

Thank you.

THE COURT: Thank you. Mr. Costello, you asked for a brief rebuttal, at the time?

MS. WITZLEBEN: Your Honor, with the Court's permission, I'll handle the Government's rebuttal very briefly?

THE COURT: Okay..

MS. WITZLEBEN: Your Honor, I do want to address the many, many letters that were sent into the Court, and they do paint a picture of Mr. Dougherty as a person who listened to other people and cared about their needs, and that's an important side of him, and we don't deny that that's an important side of him.

But, there's clearly another side of him, and the Court heard some of that, and we outlined in our sentencing memo some of that, with regard to the threats that were captured on the tape. And I know that he wanted to characterize it just now as him talking tough to his guys to make them stay on the ball, but those aren't the parts of the tapes that we elicited in our sentencing memo. The parts of the tape that we elicited in our sentencing memo concern the parts where he was threatening people who might talk to the Government about him, using his position of power to threaten people whose livelihoods were dependent on him, so that's

another side of him that is relevant to why we're here today.

With regard to the charitable activities, we obviously don't deny that Mr. Dougherty engaged in charitable activities and got the Union -- most significantly, got the Union involved in charitable activities, but it does -- and he should get some credit for that -- but it does bear noting that in most instances, the money and the work was done by the members of the Union. It's their money, and they were there. Now, he was their leader, and as he said, he led from the front on that, and that should go to his credit. It also was a smart move, as business manager, because that generates goodwill in the community for his Union and all Unions, and that's important. But it is also, in some ways, part of his job.

Your Honor, I just want to address two other issues very briefly. Number one, I need to speak to the issue of the defendant's wife. Her situation is clearly tragic. And there's not anyone in this courtroom who doesn't feel very bad for her and her family, but we are here in this courtroom today about Mr. Dougherty and what he did, what he did for years when he committed all of these crimes that bring us all to this sad courtroom today. And he committed these crimes, Your Honor, with knowledge of her medical condition, with awareness of the risk that her health could deteriorate dramatically at any time. And I think the onus is made clear, especially today, that she suffered her most significant setback in 2017. And I

understand that she was, then, cared for at Magee Rehabilitation for two years until 2019. And in 2019, her care became in-home care. Despite that, the defendant continued to work full-time both at Local 98 and at the Building Trades, and he stayed working full-time until he was effectively forced to leave those jobs by his conviction in the first trial in this case, and that was two and a half years ago. And he's had two and a half years to make a plan for her day-to-day care.

And we know, from the extensive work done by the probation officer in the PSR, that from a financial perspective, his family has made those plans, and they are much more capable of financially dealing with her care than most families would be who would find themselves in this situation.

So, the fact, Your Honor, that Mr. Dougherty, himself, may not be around to care for his wife is not because of anything Your Honor does or anything the Government does. It's because of what he did and the crimes he committed.

My final point, Your Honor, is on the disparity argument that Mr. Pagano raised. The unwarranted sentencing disparities are supposed to be based on similarly situated defendants. And, frankly, it's hard to get closer to a similarly situated defendant on the particular honest services bribery in this case than Mr. Henon, except to the extent that, as the Court noted, Mr. Henon was more of a minion of Mr. Dougherty and did his bidding, and that's why the Government

suggests that on those crimes, that a sentence higher than Mr. Henon's is appropriate for those crimes. But then, you have an entirely different set of crimes than involving embezzlement, and it's harder -- it's impossible -- to get a closer parallel, a similarly situated defendant to Mr. Dougherty than Mr. Burrows, and for that reason, that's why the Government thought it was appropriate to note that, in terms of sentencing disparities with this very Court making those decisions, that's why we suggested the sentence that we did is compatible and consistent with what the Guidelines call for in the universe of other kinds of defendants.

That's all I had to add, Your Honor.

THE COURT: All right.

Mr. Pagano, anything you want to respond to?

MR. PAGANO: No, Your Honor.

THE COURT: All right. For the record, I went back, I reviewed the Guidelines. I have made adjustments to paragraph 166, via value, and reduced that to a 12, and then also, 183, reduced that from a four to a two, but when they are recalculated, it reduces it to a 31, and a 31 is still 108 months to 135 months. So, those are the Guidelines that we are dealing with. And, of course, there is many, many counts in both convictions.

Now, we know the Guidelines are not mandatory, and the Court must consider them with all of the other factors set

forth in 18 U.S.C. 3553A. Accordingly, the Court must determine what the applicable Guideline range is, which I have done, and consider the applicable policy statements, and then I must determine what is a reasonable sentence for these facts, this particular defendants and these particular set of circumstances. As was said earlier in the day, every single sentence is fact specific, and it's certainly not as easy as adding up two sentences -- two other sentences.

The other sentencing factors in Section 3553A are as follows: the nature and circumstances of the offense and the history and the characteristics of the defendant. Well, the nature and circumstances of the offenses are not good, although the many letters and the witnesses do speak very highly about the history and the characteristics of this particular defendant. And a lot of these letters I read and the good deeds, charitable works were not all Union-related and were not all using Union money either, so it's just not as simple as that.

Number two, the Court's sentence has to reflect the seriousness of the offense, promote respect for the law and to provide just punishment for the offense. Now, unfortunately, it's a very, very sad day. I'll get into it a little later, but it's obviously sad for you Mr. Dougherty, but it's sad for your wife; it's sad for your children; it's sad for your relatives, many of which are here in the courtroom. But this

is the day that punishment must be meted out, and it's my job to mete out the punishment.

Number three is the need to afford adequate deterrence, and I believe that's very important, and Mr. Costello raised that. The Court's sentence must deter others from committing similar conduct. All of the other purposes in sentencing, such as educational, vocational training, et cetera, really don't apply here, because, as you said, you had a long career. You're at the end of your career, and that's that.

But lastly, a Court's sentence must be sufficient, but not greater than necessary to accomplish all of those goals, plus the goals of retribution, deterrence, incapacitation and rehabilitation. So, the main issue here is, what is the appropriate sentence?

The defendant was convicted by two juries of his peers for his criminal conduct, which in the first case, deprived the citizens of Philadelphia of the honest services of their elected official. And then, in the second case, resulted in the embezzlement of assets of the Union, whose interests the defendant was supposed to be promoting and protecting.

In these two cases, first, the first case, Mr. Dougherty was using Mr. Henon to affect the Philadelphia government to his own uses, and in the second case, was supplementing his Union salary at the expense of the

electricians in Local 98.

It's clear, Mr. Dougherty, that you did an incredible job of building Local 98 into a powerful Union that did good things for the community, did good things for charitable causes and did very good things for the men and women in Local 98. But somewhere along that trip, you lost your way. You really did lose your way. You lost your integrity, and you lost your responsibility, and you created a culture that allowed Local 98 to be used as a personal piggy bank for you, your family and the top officers of the Union. That was just so wrong and an incredible breach of your duty as the leader of the Union.

Because you lost your way, you turned something that was created for good, that you helped create for good, and then it ended up being used for illicit means, and for that, you must pay the price, and today is that day. I have also read almost every single letter of support, which indicates that you have worked tirelessly over the years to improve the Union, to improve the community and to care for the people who rely on you.

The dual nature of your conduct makes this a particularly difficult sentencing. I once said sentencing is clearly the most difficult thing a Judge has to do, and, certainly, some sentences are more difficult than others. Your attorney wrote to the Court that good work cannot be erased from the Court's consideration, but good work clearly does not

absolve illegal conduct. There are, indeed, other members of the Philadelphia community who do good work, without also running afoul of the law.

So, in sentencing today, I must carry out and follow through with the determination of the juries that found you guilty and that held you accountable for your actions, notwithstanding all of the good deeds that you might have done in the past.

I need to take account for the severity of the charges, but also your lack of criminal history, your community service and the role you play in your wife’s care.

So, with that, I’m going to take a brief recess. There are a few things I want to read over, and when I come back, I will pronounce sentence. The Court is in recess.

COURTROOM DEPUTY: All rise.

(Recess, 2:10 p.m. to 2:23 p.m.)

THE COURT: All rise. Court is again in session, the Honorable Jeffrey L. Schmehl presiding.

THE COURT: All right. Good afternoon, everybody. You may now be seated.

All right. I took a few extra minutes to think about this, considering everything that was said today, all the arguments the Government made, all the arguments the defense made, the presentence investigation in order to determine, in this particular case, what is the sentence that is sufficient

but not greater than necessary to accomplish all of the goals of sentencing. And my decision is this, I find that sentencing the defendant to six years or 72 months incarceration, followed by three years of supervised release will properly punish the defendant for his crimes is fair and just punishment and will deter others from committing similar crimes.

So, the judgment of the Court is as follows that, the defendant, John Dougherty, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 60 months on each of Counts 1 through 5, 5 through 8, 10 through 13, 15 through 19, 21 through 32, 34, 35, 36, 38, 39, 40, 41 and 97, and a term of 72 months on each of Counts 43 through 46, 48 through 51, 53 through 68, 100 through 103, 105, 106 and 108, and a term of 12 months on Counts 70 through 73, and a term of 36 months on Counts 75 through 78, all such terms to be served concurrently, to produce a total term of incarceration of 72 months imprisonment.

Upon release from prison, the defendant shall be placed on supervised release for a term of three years on each of Counts 1 through 3, 5 through 8, 10 through 13, 15 through 19, 21 through 32, 34, 35, 36, 38, 39, 40, 41, 43 through 46, 48 through 51, 53 through 68, 97, 100 through 103, 105, 106 and 108, and a term of one year each on Counts 73 through 75 and 75 through 78, such terms to be served concurrently for a total term of supervised release of three years.

Within 72 hours of release from custody, the defendant shall report in person to the probation office in the district in which the defendant is released. While on supervised release, the defendant shall not commit any other federal, state or local crimes, shall be prohibited from possessing a firearm or other weapons, shall not possess any illegal controlled substance or drugs, and shall comply with all of the other standard conditions that have been adopted by this Court.

Based on information, the defendant is excused from mandatory drug testing, however, the defendant must submit to the collection to the collection of a DNA sample at the direction of the United States Probation Office, pursuant to Section III of the DNA Analysis Back Log Elimination Act of 2000.

In addition, the defendant shall comply with the following special conditions: shall provide U.S. Probation will full disclosure of his financial records, including tax returns, credit card statements or any profit and loss statements; the defendant is prohibited from incurring any new credit charges or opening additional lines of credit without the approval of the probation officer, unless the defendant is in compliance with the payment schedule for fines and restitutions.

The defendant must contribute 100 hours of community

service upon his release. The defendant must fully cooperate with the Internal Revenue Service by filing all delinquent and amended returns and by timely filing all future returns that come due during his period of incarceration or Probation. The defendant is to properly report all collectable, taxable income and claim only allowable expenses on those returns.

The defendant is to provide all appropriate documentation in support of said returns. Upon request, the defendant is to furnish the Internal Revenue Service with information pertaining to all assets and liabilities, and the defendant is to fully cooperate by paying all taxes, interest and penalties due.

The defendant will pay restitution in an amount to be determined by the Court at a later date, based upon the hearing that was held on Monday. The defendant's restitution obligation shall not be affected by any restitution payments made by the other defendants in this case, except that no further payment shall be required after the sum of the amounts actually paid by all defendants fully satisfies this loss.

The following defendants were also ordered to pay restitution: Burrows, Neill, Crawford, Rodriquez, Fiocca and possibly Massa.

The defendant shall make a lump sum payment of $50,000 towards the restitution within 15 days of the date of this judgment. If the restitution is not paid in full prior to

the defendant's surrender date, it is recommended that the defendant participate in the Bureau of Prisons Inmate Financial Responsibility Program and provide a minimum payment of $25 per quarter towards the amount due. In the event due -- or not prior to the commencement -- in the event the amount due is not paid prior to the commencement of supervision, the defendant shall satisfy the amounts due in monthly installments of not less than $500 to commence 30 days after release.

As I said, the restitution amount will be determined at a later point in time and paid to the Clerk of Court, United States District Court, Eastern District of Pennsylvania.

AS I said, I feel it's important the Union be reimbursed. I believe restitution should come first, therefore, I will not fine the defendant in this case, because I want all money to be paid towards restitution.

The defendant shall notify the U.S. Attorney for this District within 30 days of any change of mailing address or residence that occurs while any portion of the restitution remains unpaid.

It is further ordered that the defendant shall pay to the United States a special assessment of $7,100, which is due based on the amount of counts, which shall also be due immediately.

Now, before I get into the defendant's appeal rights, there's a few issues. The forfeiture order calls for an amount

of $353,941, are you objecting to that?

MR. PAGANO: Judge, I believe it was filed yesterday. I haven't had an opportunity to review it with Mr. Dougherty but --

THE COURT: All right. I sat through the trial. I believe it's appropriate. I'm going to sign it, but you have the opportunity to contest it at a later point in time. After reviewing it, you can ask me to reconsider.

MR. PAGANO: Thank you, Judge.

THE COURT: All right. And, if necessary, we'll have a hearing. The second -- I have heard the Government's request, but considering the entire and tragic situation with Mr. Dougherty's wife, now is the day that he knows his fate, and I will allow him to report to begin serving his sentence on September the 4th, 2024, no later than 2:00 p.m. So, Tonya, here's the order. At some point in time, Mr. Dougherty and Mr. Pagano have to sign that.

Are there any other requests before I do the appeal rights?

MR. PAGANO: We have a request, Your Honor, that if the Court would, please, recommend or suggest SCI-Lewisburg?

THE COURT: All right, the Court will do that. The Court will grant that request.

MR. PAGANO: Thank you. And, as far as the appeal goes, I have not been retained for an appeal. It's my

understanding that Mr. Dougherty may qualify for counsel as was appointed before, but that's, of course, up to the Court.

THE COURT: All right. Well, that's all situations and decisions that will be made at a later point in time upon proper filings.

MR. PAGANO: Understood.

THE COURT: All right. Mr. Costello, anything you want to add?

MR. COSTELLO: No, Your Honor.

THE COURT: All right, Mr. Dougherty, you have the right to appeal the Court's sentence and also the verdict. You have the right to file an appeal within 14 days, pursuant to 18 U.S.C. 3742. If you are unable to pay the costs of an appeal, you may request the Clerk of Court to file a notice of appeal on your behalf. You were also represented by able and competent counsel who could advise you further of your appeal rights, do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Do either counsel want to put anything else on the record before we conclude?

Mr. Costello?

MR. COSTELLO: No, Your Honor.

THE COURT: Mr. Pagano?

MR. PAGANO: No, Your Honor. Thank you.

THE COURT: All right.

Court is adjourned. Thank you.

MR. PAGANO: Thank you, Your Honor.

(Proceedings concluded at 2:35 p.m.)

* * *

**C E R T I F I C A T I O N**

I, Jacqueline Mullica, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter on July 11, 2024 from 10:20 a.m. to 2:35 p.m.

/s/Jacqueline Mullica August 1, 2024

JACQUELINE MULLICA DATE

DIANA DOMAN TRANSCRIBING, LLC