**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA,**

v.

**JOHN DOUGHERTY**

CRIMINAL NO: 2:19-cr-00064-JLS-1

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 2025, upon consideration of Defendant John Dougherty's Emergency Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A), the response of the United States, and the record as a whole, the Motion is hereby **GRANTED**. Defendant John Dougherty shall be released from incarceration by the Federal Bureau of Prisons and shall be confined to his home at 200 N. 16th Street, Philadelphia, PA 19102, for the remainder of his sentence. Further, Defendant Dougherty shall comply with all terms and conditions set forth by the Bureau of Prisons and the United States Probation Office for the term of home confinement.

BY THE COURT:

_____,
HONORABLE JEFFREY L. SCHMEHL

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CRIMINAL NO: 2:19-cr-00064-JLS-1 |
| v. | |
| **JOHN DOUGHERTY** | |

## DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582

Defendant John Dougherty, Inmate # 77031-066, by and through undersigned counsel, respectfully moves this Court to grant a compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), and in support thereof submits the accompanying Memorandum of Law and exhibits.

### I.       PROCEDURAL HISTORY

1.       John Dougherty (sometimes referred to as "Dougherty") is a 65-year-old, nonviolent first-time offender sentenced by Judge Schmehl on November 14, 2023, to 72 months incarceration for public corruption offenses. His projected release date is October 2029.

2.       At Dougherty's sentencing hearing an issue was raised and considered by Judge Schmehl as to whether the health of his wife, Cecelia, who then, as now, suffers debilitating brain damage requiring constant nursing care, would justify a sentence of home confinement so as to allow Dougherty to aid and assist his wife.

3.     Judge Schmehl reviewed the then existing circumstances and decided incarceration was appropriate.

## II.     DEVELOPMENTS SINCE SENTENCING

4.     Since the November 2023 sentencing, however, the circumstances in Dougherty's and Cecelia's world have dramatically worsened such that, without the relief requested herein, Cecelia's life is at imminent risk.  These exigent circumstances are described in the accompanying memorandum of law and related exhibits at greater length, but briefly are as follows.

5.     Before his incarceration, Mr. Dougherty served as Cecelia's primary caregiver. Since his incarceration, despite heroic efforts of Dougherty's two adult daughters, most of Cecelia's care has been provided by private nurses paid for through a trust established by Dougherty shortly before incarceration.

6.     Of huge consequence is the fact that the trust fund (funded by whatever assets Dougherty had and certain charitable and golf fundraising proceeds) originally established to pay for Cecelia's nursing care is nearly depleted.

7.     Dougherty himself sold all his assets including the family home and placed the net proceeds in the trust. Dougherty has no assets remaining and is impecunious.

8.     Much of the care Cecelia needs and currently receives will not be adequately covered by Medicare or Medicaid once the trust funds run out, and there is completely inadequate private insurance coverage.

9.     When the trust funds run out of money later this year, without her husband's hands-on support, Cecelia's nursing care will for all intents and purposes stop. Without her husband's aid, Cecelia's death is not speculative; it would be imminent. *See* a true and correct copy of the Trust Fund Balance as of August 28, 2025, attached hereto as Exhibit A.

10.    As detailed more specifically in the accompanying memorandum, the trust was originally established in 2021, expressly for the purpose of paying for round-the-clock nursing care for Cecelia. The Dougherty home was sold, and the net proceeds placed in the trust.

11.    All other assets and entitlements the Dougherty's had were also liquidated and placed in the trust.

12.    While John Dougherty was still in the Philadelphia area, fundraisers including golf outings were viable and the net proceeds placed in the trust.

13.    At one point, the trust has cash of $641,741, but the private nursing care Cecelia receives costs upwards of $45,000 per month.  In Dougherty's absence, there is no viable fundraising possibilities, and the trust will simply run out of money. *See* Exhibit B.

14.    Further, and aside from the recent development of these dire circumstances, Dougherty has himself come to suffer worsening health conditions including a chronic foot infection with suspected osteomyelitis, antibiotic-resistant skin lesions, hypertension, degenerative hip pain, and limited mobility, that the Bureau of Prisons has been unable to adequately manage. These health issues, compounded by his age, place him at heightened medical risk in a custodial environment.

### III.    FACTUAL REALITIES

15.    The reality of Cecelia Dougherty's care and life has drastically altered since the time of Mr. Dougherty's sentencing.

16.    Mr. Dougherty is the only available and capable caregiver for his completely incapacitated wife, whose survival depends on his care. Mr. Dougherty's responsibilities prior to incarceration were included:

- Clean, disinfect, organize, and stock all supplies, braces, shower chair, wheelchairs, suction machines including canisters, preparation and dispensing materials.

- Manage insurance and subcontractors to maintain, repair and order supplies and medical equipment.
- Ordering all needed supplies and medications. Maintaining adequate stock including inventory of expiration dates, recalls, etc.
- Manage all scheduling of staff and ancillary support including changes for vacations, sickness, etc., while also filling in when short-staffed
- Communicate staff payroll and ensure all staff are paid for hours worked
- Organizing outings such as doctors' appointments, tests, labs etc., ensuring adequate staffing and accommodation
- Schedule physical therapy sessions, therapeutic yoga sessions, doctors' visits, ophthalmology appointments, Botox appointments, brace appointments, wheelchair appointments, etc.
- Submit certain but limited claims to insurance and follow up for payment to be reimbursed for out-of-pocket expenses
- Coordinate, drop-off lab and urine specimens as needed including following up on results to ensure medical team is aware and providing treatment if necessary.
- Communicate with physicians and interdisciplinary team.
- Clean and charge all equipment such as portable suctions, vital sign machines, and overhead lift
- Range of motion exercises intermittently throughout the day.
- Physical therapy facilitation utilizing stand machine or exercise bike on days physical therapist isn't scheduled
- Utilization of braces for hands and feet throughout day including monitoring for correct positioning and skin breakdown.
- Inventory emergency equipment such as manual lift and stair climber is working and available for use daily
- Monitor Vital Signs
- Prepare and administer medications
- Oral suction as needed for secretions
- Oral care utilizing swabs, Chlorhexidine and hydration as needed
- Monitor need for PRN medications and administer accordingly.
- Perform catheterization periodically as ordered
- Perform bowel routine as needed.
- Record intake and output including voids and bowel movements with type on chart and in notes
- Repositioning to avoid skin breakdown utilizing positioning support aids
- Ensure wheelchair inserts correctly inflated to avoid pressure points
- Perform stoma care for PEG tube.
- Morning/Evening Care including shower, teeth brushing, shaving, etc.
- Laundry including changing bed linens twice daily or as needed
- Emptying all trash and hampers as needed
- Monitor for episodes of incontinence changing adult brief or chuck as needed
- Showers as needed for incontinence throughout shift
- Ensure hospital bed and alternating pressure support mattress is functioning

- Monitoring for skin breakdown including follow-up communication with team and treatment

17.     Although Mr. Dougherty's daughters have made extraordinary efforts to assist their mother, the physical, emotional, and logistical demands of full-time caregiving make it impossible for either of them to serve as Cecelia Dougherty's primary caregiver.

18.     Mr. Dougherty's daughter Erin, despite her unwavering dedication, faces overwhelming personal, professional, and medical limitations that render her unable to serve as her mother's full-time caregiver.

- Erin is a cancer survivor, currently in remission from Non hodgkins lymphoma.
- She lacks the specialized medical training required to care for my wife's complex needs, including catheterization, IV medication management, PEG tube maintenance, and pressure injury prevention.
- Erin is the CEO of a public charter high school in Philadelphia. She cannot take leave, even briefly, without disrupting school operations. She manages over seventy staff members.
- Erin must travel up to seven times per year for her job. Any such travel would leave Cecelia completely unattended, a deadly risk for a ventilator-dependent quadriplegic who requires 24/7 supervision.
- Despite her executive title, Erin lives paycheck to paycheck and is burdened by over $25,000 in school debt. She cannot financially support private nursing once the trust is depleted.
- Her one-bedroom row home is not equipped, logistically or structurally, to support a quadriplegic patient. No hospital bed, no lifts, no sterile environment, no way to provide safe care.
- Due to frequent Philadelphia traffic and construction in or around Erin's neighborhood, it frequently takes  her an upward of 30-40 minutes to reach Cecelia's apartment. In the event of a medical crisis, Erin could not respond in time to prevent serious injury or death.
- Even now, Erin gives everything she can, over 10 hours per week in addition to her full-time job, to help care for her mother.
- Erin is also now the primary caregiver for my wife's elderly father, who recently underwent surgery for prostate removal and is in declining health.
- She is emotionally, physically, and logistically stretched beyond capacity.

19.      Mr. Dougherty's other daughter Tara, though deeply devoted, is financially overextended, professionally overwhelmed, and emotionally unable to serve as her mother's full-time caregiver without risking serious harm to both herself and Cecelia.

- Tara is a full-time in-house attorney working more than 50 hours a week, while also devoting more than 40 hours a week to caregiving for Cecelia. The strain is unbearable and unsustainable.
- Due to frequent Philadelphia traffic and construction in or around Tara's neighborhood, it frequently takes  her an upward of 30-40 minutes to reach Cecelia's apartment. In the event of a medical crisis, Tara could not respond in time to prevent serious injury or death.
- Like Erin, Tara has no clinical training to provide advanced medical care. Without professional nursing, her efforts, however loving, could place Cecelia in jeopardy.
- Tara lives paycheck to paycheck and carries over $250,000 in student loan debt. She cannot afford to supplement or replace the current nursing structure.
- Sadly, Cecelia's brain injury has caused her to develop acute anxiety when Tara is present for long periods. Cecelia often screams and becomes visibly distressed in her presence, a tragic psychological symptom of her condition. Tara cannot serve as a full-time caregiver without causing emotional harm to both herself and her mother.


20.      Cecelia's elderly father, once a limited source of support, is now medically incapacitated and permanently unable to contribute to her care in any way.

- Cecelia's father has contributed to her caretaking following Dougherty's incarceration. As of recently, he has undergone prostate removal surgery.
- Ever since, he has been unable to assist or contribute to Cecelia's care.
- Cecelia's father is in severely declining health.
- As of June 3, 2025, Cecelia's father was rushed to the hospital for an emergency following his prostate removal surgery.
- Cecelia's father is no longer able, and will never again be able, to assist in caring for Cecelia, leaving me as the only possible remaining caregiver.

21.      The medical funds that once sustained Cecelia's 24/7 care are rapidly depleting, and without Mr. Dougherty's release, there will soon be no resources left to keep her alive.

- In 2021, Mr. Dougherty's daughter Tara Chupka established The Cecelia Dougherty Trust to ensure ongoing funding for Cecelia's complex, 24/7 in-home medical care.
- To fund the trust, Mr. Dougherty and his family made extraordinary personal sacrifices:

- o In May 2022, Mr. Dougherty sold the family's longtime home at 1933 East Moyamensing Avenue in Philadelphia for $500,000. From the $227,524.95 in net proceeds, he contributed half directly to the trust.
- o That same year, Dougherty liquidated his Prudential/Empower retirement account, receiving $434,816.52 after taxes and penalties. Again, half was deposited into the trust.
- o The remaining portions of both sums were used to pay unavoidable obligations, including federal and state taxes, overwhelming legal fees, and essential living expenses.
- In 2022 and 2023, Mr. Dougherty's family also organized community golf outings to raise funds and awareness for Cecelia's care—but those efforts, though heartfelt, are no longer sustainable and have lost momentum.
- On or around September 15, 2024, shortly before Mr. Dougherty's incarceration, Tara was added to his financial accounts and granted Power of Attorney for both him and Cecelia, in anticipation of managing their affairs.
- Following his incarceration on October 1, 2024, the family began relying entirely on 6–8 rotating private nurses each month to provide the complex care Cecelia requires to survive.
- This level of nursing support has proven extraordinarily expensive, costing approximately $44,070 per month. While insurance offsets a portion, the remainder must be paid directly from the trust.
- As of June 2024, the trust held $641,741. By June 5, 2025, that balance had fallen to $349,187.71, despite careful management and resourceful planning.
- At the current rate of expenditure—and with no remaining personal savings, assets, or retirement funds to draw from—the trust will be fully depleted within 9 months or sooner, especially if complications or emergencies arise.
- Once those funds are exhausted, there will be no financial means left to pay for Cecelia's life-sustaining nursing care, placing her at imminent risk of death.

22. Mr. Dougherty's worsening condition includes:

- Delayed healing and wound separation following surgery on September 6, 2024.
- Ongoing foot infection confirmed by MRI, showing soft tissue abnormalities and possible bone involvement.
- Persistent bacterial and fungal cultures (Staphylococcus epidermis and Candida albicans), requiring multiple courses of antibiotics.
- Emergence of hives and open skin sores after extended antibiotic use, which have remained unresolved for over eight months.
- Increasing hip pain and swelling due to compensatory walking patterns, further impairing mobility.
- Absence of regular blood work and inconsistent infection monitoring by BOP medical staff.
- Risk of amputation confirmed by outside specialists, including infectious disease and orthopedic consultations.
- Systemic care delays and institutional deficiencies at FCI Lewisburg, as documented by the Department of Justice Office of the Inspector General.

## IV.    LIFE CARE PLAN FOR CECILIA

23.    Cecelia Dougherty will turn 65 years old on August 27, 2026, and as such will be eligible for Medicare.

24.    Medicare does <u>NOT</u> provide for in-home nursing care.

25.    Cecelia may also be "dual-eligible" for Medicaid coverage in the absence of Medicare benefits.

26.    But Cecelia will <u>NOT</u> be Medicaid eligible for in-home nursing care because she and John Dougherty currently receive and will continue to receive the following pension benefits monthly: IBEW 98: $3,237.09; IBEW International: $144.04; and NEBF (National Electrical Benefit Fund): $1,049.60; for a total of $4,430.73.

27.    Medicaid has strict eligibility requirements, which Cecelia Doughtery cannot meet for in-home nursing care, with a threshold eligibility requirement of having less than $2,901 in monthly income and assets of less than $8,000.

28.    Even if Cecelia could qualify for nursing care, Medicaid would only pay for such if Cecelia was transferred to a Medicaid approved facility, and even then, would receive for less care than John Dougherty can personally provide to his wife with home confinement.

29.    In this regard, Dougherty has obtained the medical needs and benefits analysis of Dr. Tim Osbon of Project Works (attached in full at Exhibit C) detailing at great length the medications and treatments Cecelia Doughterty must have and concluding (at page 15) that Cecelia will not qualify for the in-house care and treatment she currently receives through privately paid in-house nursing care.

30.    Equally as significant in the expert opinion of Dr. Osbon is that Cecelia has a life expectancy of another twenty-one (21) years.

31.     The clear reality is that if John Dougherty is not granted home confinement, Cecelia will not qualify for the care she now receives and so desperately depends on, and cannot reasonably be expected to live out her life expectancy.

## V.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

32.     Dougherty submitted a formal request for compassionate release to the Warden of FCI Lewisburg on June 6, 2025, which was denied with the only explanation:  "Inmate Dougherty does not meet the criteria as outlined in Program Statement 5050.50, Compassionate Release/Reduction in Sentence".

33.     Mr. Dougherty has therefore exhausted his administrative remedies and now turns to this Court for relief.

## VI.     CONCLUSION

34.     For Cecelia Dougherty, the Court's decision on this Emergency Motion will determine whether she lives or dies.

35.     For John Dougherty, the Court's decision will decide whether he may fulfill the most basic and urgent moral duty a husband can have: to be present for his declining wife when no one else can.

36.     Thus, John Dougherty seeks the following relief:

   a)  Immediate release from the custody of the Bureau of Prisons;

   b)  Conversion of the remainder of his sentence to home confinement;

   c)  Imposition of appropriate conditions of home confinement, including location monitoring via ankle bracelet and supervision;

d) Any additional conditions deemed appropriate by the Court to ensure the safety of the community and the continuity of Defendant's caregiving responsibilities.

37. Because of the exigent life and death circumstances presented in this matter, counsel for Dougherty respectfully requests an emergency evidentiary hearing to present all the evidence and to urge the relief being requested herein.

38. Dougherty herein incorporates by reference all facts, exhibits, and legal arguments set forth in the accompanying memorandum of law.

**WHEREFORE**, Defendant John Dougherty respectfully requests this Court to grant his request for an emergency evidentiary hearing and grant his Motion for Compassionate Release. Dougherty further respectfully requests that, following an evidentiary hearing, the Court enter an order substantially in the form submitted herewith, granting the compassionate release to home confinement outlined above and any other relief the Court deems just and proper.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

Dated: <u>August 28, 2025</u>            By:     <u>*/s/ George Bochetto*            </u>
GEORGE BOCHETTO, ESQUIRE
PA ID No. 27783
gbochetto@bochettoandlentz.com
1524 Locust Street
Philadelphia, PA 19102
215-735-3900
215-735-2455 fax
*Attorney for Defendant, John Dougherty*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CRIMINAL NO: 2:19-cr-00064-JLS-1 |
| v. | |
| **JOHN DOUGHERTY** | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR**
**COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582**

## I.    INTRODUCTION

John Dougherty (sometimes referred to as "Dougherty") is a 65-year-old, nonviolent first-time offender sentenced by Judge Schmehl on November 14, 2023, to 72 months incarceration for public corruption offenses. His projected release date is October 2029.

At Dougherty's sentencing hearing an issue was raised and considered by Judge Schmehl as to whether the health of his wife, Cecelia, who then, as now, suffers debilitating brain damage requiring constant nursing care, would justify a sentence of home confinement so as to allow Dougherty to aid and assist his wife.

Judge Schmehl reviewed the then existing circumstances and decided incarceration was appropriate.

Since the November 2023 sentencing, however, the circumstances in Dougherty's and Cecelia's world have dramatically worsened such that, without the relief requested herein,

Cecelia's life is at imminent risk.  These exigent circumstances will be described and documented hereinafter at great length, but briefly are as follows:

Before his incarceration, Mr. Dougherty served as Cecelia's primary caregiver. Since then, despite heroic efforts by Dougherty's two adult daughters and a dwindling ability to pay for a team of private nurses, Cecelia's condition has sharply deteriorated, both medically and emotionally. Further, of huge consequence is the fact that the trust fund (funded by whatever assets Dougherty had and certain charitable and golf fundraising proceeds) originally established to pay for Cecelia's nursing care is nearly depleted. Dougherty himself sold all his assets and placed the net proceeds in the trust. Dougherty has no assets remaining and is impecunious. Much of the care Cecelia needs and currently receives will not be adequately covered by Medicare or Medicaid once the trust funds run out, and there is completely inadequate private insurance coverage. When the trust funds run out of money later this year, without her husband's hands-on support, Cecelia's nursing care will for all intents and purposes stop. Without her husband's aid, Cecelia's death is not speculative; it would be imminent.

As detailed more specifically below, the trust was originally established in 2021, expressly for the purpose of paying for round-the-clock nursing care for Cecelia. The Dougherty home was sold, and the net proceeds placed in the trust. Whatever other entitlements and other asserts the Doughertys had were also liquidated and placed in the trust. While John Dougherty was still in the Philadelphia area, fundraisers including a golf outing were viable and the net proceeds placed in the trust. At one point, the trust had $641,741, but the private nursing care Cecelia receives costs upwards of $45,000 per month.   In Dougherty's absence, there is no viable fundraising possibilities, and the trust will simply run out of money.

Further, and aside from the recent development of these dire circumstances, Dougherty has come to suffer serious and worsening health conditions including a chronic foot infection with suspected osteomyelitis, antibiotic-resistant skin lesions, hypertension, degenerative hip pain, and limited mobility, that the Bureau of Prisons has been unable to adequately manage. These health issues, compounded by his age, place him at heightened medical risk in a custodial environment.

In enacting the First Step Act of 2018, Congress empowered courts to recognize that a sentence once appropriate may become unduly harsh in light of "extraordinary and compelling" circumstances. First Step Act of 2018, § 403(a, b), Pub. L. No. 115-391. Few cases illustrate that principle more urgently than this one. Dougherty now meets multiple, independently sufficient criteria for release under U.S.S.G. § 1B1.13: (1) he is the only available caregiver for his incapacitated spouse; (2) he suffers from serious medical conditions that cannot be properly treated in prison; (3) his age and medical profile eliminate any realistic risk of recidivism; and (4) his continued incarceration serves no meaningful penological purpose. Dougherty poses no danger to the community. He has a proposed release plan and a stable home environment where he can immediately resume life-sustaining care for his wife.

Dougherty submitted a formal request for compassionate release to the Warden of FCI Lewisburg on June 6, 2025, which was denied with the only explanatory basis as follows: "Inmate Dougherty does not meet the criteria as outlined in Program Statement 5050.50, Compassionate Release/Reduction in Sentence." Mr. Dougherty has therefore exhausted his administrative remedies and now turns to this Court for relief.

For Cecelia Dougherty, the Court's decision will determine whether she lives or dies.

For John Dougherty, the Court's decision will decide on this Emergency Motion whether he may fulfill the most basic and urgent moral duty a husband can have: to be present for his declining wife when no one else can.

Accordingly, for the reasons more fully set forth herein, Mr. Dougherty respectfully requests that this Court grant his motion for compassionate release.

## II.    DETAILED FACTS AND EXHIBITS OF WORSENING CONDITION

Since Mr. Dougherty's incarceration on October 1, 2024, every material condition relevant to this Motion has deteriorated—medically, emotionally, financially, and logistically. Cecelia Dougherty's physical and psychological health has entered rapid decline; her support system has collapsed; her care plan is on the verge of disintegration; and the one person capable of preserving her life remains confined. Meanwhile, Mr. Dougherty's own health has worsened substantially due to inadequate medical treatment in custody. What may have once been a close call at sentencing has become a life-threatening crisis.

Cecelia's condition today is far more fragile than it was at the time of sentencing. Since her husband's removal from the home, she has suffered from frequent anxiety attacks, muscle tensing, and near-catatonic distress. Her head nurse has expressed in no uncertain terms that it "will not be possible for her to survive" without Mr. Dougherty's return. *See* Exhibit D. During therapy sessions, Cecelia, unable to speak, recently spelled out the word "DIE," a chilling but accurate reflection of her deteriorating state. *See* Exhibit E. Her complex daily care, once managed solely by Mr. Dougherty, now requires a rotating team of six to eight nurses per month. The continuity, familiarity, and round-the-clock attention he provided cannot be replicated. The result is destabilization in every aspect of her health, and it clearly shows.

The support network around Cecelia has also collapsed. Her two daughters, Erin Dougherty and Tara Chupka, despite making extraordinary efforts, are now physically, emotionally, and financially depleted. Both have sworn that continuing with their efforts to help care for Cecelia is unsustainable. *See* Exhibits F and G. Cecelia's father, once a limited source of help, has now undergone prostate surgery and is medically incapacitated. *See* Exhibit F and G.

The financial foundation supporting Cecelia's care is nearly gone. In 2021, Mr. Dougherty's daughter Tara established "The Cecelia Dougherty Trust" to pay for necessary medical services. To fund it, Mr. Dougherty sold the family home at 1933 E. Moyamensing Avenue in May 2022 and contributed half the $227,524.95 net proceeds. Dougherty also liquidated his retirement account, contributing another substantial sum. Community fundraisers helped sustain the trust, but those efforts have since ceased. As of June 2024, the trust held $641,741. As of June 5, 2025, it had declined to $349,187.71. With private nursing care costing $44,070 per month and no further assets to draw from, the trust will be exhausted in fewer than nine months. Once that occurs, there will be no funding left to support Cecelia's care. *See* Exhibit B.

There are no institutional alternatives. Cecelia's cognition remains intact, and as such, she has been deemed ineligible for disability-based nursing homes. No skilled nursing facility has accepted her due to her high-acuity physical condition. The family has pursued every public and private alternative, including Medicaid eligibility, but no viable solution exists. The reality is simple: without Mr. Dougherty home to resume full-time caregiving, Cecelia Dougherty will die.

A short video taken in June 2025 provides a stark and honest portrait of Cecelia's daily condition. In it, two nurses—working in tandem—struggle to accomplish basic tasks that Mr. Dougherty performed alone for years. She is unresponsive, her body limp and vulnerable, her expressions dulled by disorientation and distress. The footage speaks to what the affidavits and

records confirm: the level of care required to keep her alive is immense, and only one person is capable of providing it. The video is available here:

https://vimeo.com/1090966025/83106d58a0?share=copy.

## CECELIA DOUGHERTY NOT ELIGIBLE FOR MEDICARE OR MEDICAID IN-HOME NURSING CARE

Cecelia Dougherty will turn 65 years old on August 27, 2026, and as such will be eligible for Medicare.

Medicare does NOT provide for in-home nursing care.

Cecelia would also be "dual-eligible" for Medicaid coverage in the absence of Medicare benefits.

But Cecelia will NOT be Medicaid eligible for in-home nursing care because she and John Dougherty currently receive and will continue to receive the following pension benefits monthly: IBEW 98: $3,237.09; IBEW International: $144.04; and NEBF (National Electrical Benefit Fund): $1,049.60; for a total of $4,430.73.

Medicaid has strict eligibility requirements, which Cecelia Doughtery cannot meet for in-home nursing care, with a threshold eligibility requirement of having less than $2,901 in monthly income and assets of less than $8,000.

Even if Cecelia could qualify for nursing care, Medicaid would only pay for such if Cecelia was transferred to a Medicaid approved facility, and even then, would receive for less care than John Dougherty can personally provide to his wife with home confinement.

In this regard, Dougherty has obtained the medical needs and benefits analysis of Dr. Tim Osbon of Project Works (attached in full at Exhibit C) detailing at great length the medications and treatments Cecelia Doughterty must have and concluding (*See* Exhibit C,  p. 15) that Cecelia will not qualify for the in-house care and treatment she currently receives through privately paid

in-house nursing care. Furthermore, Cecelia was recently denied for in-home nursing assistance by her insurance provider. *See* Exhibit H.

Equally as significant in the expert opinion of Dr. Osbon is that Cecelia has a life expectancy of another twenty-one (21) years.

The clear reality is that if John Dougherty is not granted home confinement, Cecelia will not qualify for the care she now receives and so desperately depends on, and cannot reasonably be expected to live out her life expectancy.

## JOHN DOUGHERTY'S MEDICAL CONDITION

Meanwhile, Mr. Dougherty's own medical condition has worsened while in custody. He now suffers from a post-surgical foot infection with suspected osteomyelitis, confirmed by imaging and bacterial cultures. He has endured wound separation, dehiscence, antibiotic resistance, and chronic skin ulcerations. The infection has spread to his hip, causing misalignment and mobility impairment. Despite repeated treatment requests, he has gone over six weeks without blood work, and his care remains inconsistent and delayed. *See* Exhibit I. These chronic and degenerative conditions diminish his ability to care for himself and will only accelerate without proper treatment.

In short, every relevant fact has shifted since sentencing—toward danger, instability, and irreversible harm. The caregiving structure is gone. The trust fund will soon be empty. The alternatives have been exhausted. Cecelia is deteriorating in real time, and Mr. Dougherty's health and age make continued incarceration not only unnecessary, but actively harmful. No further record is needed to show that these are extraordinary and compelling circumstances. They are unfolding right now, and without intervention, they will reach a tragic, yet preventable conclusion.

### III.    BACKGROUND OF THE COMPASSIONATE RELEASE LEGISLATION

On December 21, 2018, President Donald J. Trump signed the First Step Act ("FSA") into law, eliminating a significant barrier to judicial review of sentences and empowering courts to determine whether "extraordinary and compelling reasons" warrant a sentence reduction that is "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a). First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018). Under the First Step Act, this Court has jurisdiction to determine whether Mr. Dougherty's incarceration is "sufficient, but not greater than necessary" to achieve the purposes of sentencing under 18 U.S.C. § 3553(a).

#### a.  History of Compassionate Release

Congress enacted the Compassionate Release statute, 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act ("CCCA") of 1984. Pub. L. No. 98-473, §§ 224(a). Under § 3582(c), a district court may reduce a previously imposed term of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a), if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). At the time of its enactment, Congress limited the availability of sentence reductions to cases where the Director of the Bureau of Prisons ("BOP") filed a motion on the inmate's behalf; without such a motion, courts lacked authority to act. *Id.* While Congress did not define what qualifies as an "extraordinary and compelling reason," the legislative history makes clear that it anticipated sentencing courts would grant relief under this provision in appropriate and meritorious cases.

One of Congress's primary objectives in passing the Comprehensive Crime Control Act ("CCCA") of 1984 was to abolish federal parole and establish a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53, n.196 (1983). Yet even as it eliminated parole, Congress recognized that changed circumstances might still warrant

reevaluation of an inmate's sentence in exceptional cases. Rather than tasking a parole board to reassess every sentence based solely on rehabilitation, Congress empowered courts, through § 3582(c), to determine whether "there is justification for reducing a term of imprisonment" in individual cases. *Id.* at 56.

For Mr. Dougherty, whose wife is terminally incapacitated and whose continued incarceration places her life in immediate jeopardy, § 3582(c) serves precisely the function Congress intended: a "safety valve" to permit sentence modifications when extraordinary and compelling reasons arise—reasons that, before the abolition of parole, would have warranted early release. *Id.* at 121. This mechanism was designed to "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id.* (alterations added). In doing so, Congress sought to preserve "the sentencing power in the judiciary where it belongs," allowing federal courts to revisit sentences in the face of compelling humanitarian developments. *Id.*

In short, § 3582(c)(1)(A) entrusts this Court with the equitable authority to reduce Mr. Dougherty's sentence, a sentence that may have been lawful at the time it was imposed but, in light of profoundly changed circumstances, no longer serves the interests of justice.

### b. The Sentencing Commission Has Interpreted "Extraordinary and Compelling Reasons" Under § 3582(c)(1)(A) to Encompass Serious Medical Needs, Aging, Family Care Obligations, and Other Exceptional Circumstances

Congress assigned the U.S. Sentencing Commission the task of defining what qualifies as "extraordinary and compelling reasons" justifying a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A). *See* 28 U.S.C. § 994(t). The statute directed the Commission to outline the applicable criteria and offer illustrative examples, with only one express limitation: rehabilitation alone cannot serve as the sole basis for release. *Id.*

For many years, the Commission did not fulfill this obligation, which left the Bureau of Prisons (BOP) to create its own procedures and standards for evaluating requests for compassionate release. In 2007, the Commission eventually adopted a formal policy statement—U.S.S.G. § 1B1.13—that identified four broad categories that may justify release: (A) serious medical conditions; (B) advanced age-related deterioration; (C) family circumstances such as the death or incapacitation of a caregiver; and (D) a catchall category for other extraordinary reasons. *See* U.S.S.G. § 1B1.13(1); Application Note 1(A).

Despite these established categories, a 2013 report from the Department of Justice's Office of the Inspector General found that the BOP rarely submitted compassionate release motions, even in cases that clearly met the criteria. *See* U.S. DOJ Office of the Inspector General*, The Federal Bureau of Prisons' Compassionate Release Program* (Apr. 2013). In response, the Sentencing Commission revised its policy to clarify that the BOP should bring motions in all cases where a prisoner meets the eligibility standards. *See* U.S.S.G. § 1B1.13, App. Note 4.

The Commission's framework was always meant to be flexible and inclusive. The categories are not mutually exclusive and were designed to ensure that courts could revisit sentences in light of significant changes in health, age, caregiving responsibilities, or other compelling personal circumstances that arise after sentencing. *See* e.g., *United States v. Beck*, 425 F.Supp. 3d 573 ("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances."); *see also United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019)(nothing that §1B1.13 never "suggests that [its] list [of criteria] is exclusive").

        **c.**  **The First Step Act Restored Judicial Authority to Grant Compassionate Release After Widespread Criticism of the BOP's Failure to Act on "Extraordinary and Compelling Reasons."**

Prior to the enactment of the First Step Act (FSA), only the Bureau of Prisons (BOP) had authority to initiate a motion for sentence reduction under 18 U.S.C. § 3582(c)(1)(A). *See* P.L. 98-473 (H.J. Res. 648), P.L. 98-473, 98 Stat. 1837 (Oct. 12, 1984). Even when a prisoner clearly met the U.S. Sentencing Commission's criteria for "extraordinary and compelling reasons," courts were powerless to act unless the BOP filed a motion on the prisoner's behalf. This gatekeeping role created substantial problems in practice.

An investigation by the Department of Justice's Office of the Inspector General (hereinafter, "OIG") highlighted numerous deficiencies in the BOP's administration of compassionate release. The OIG found that the agency lacked clear internal guidance on eligibility criteria, failed to establish timelines for processing requests, provided insufficient information to incarcerated individuals about the program, and did not maintain a reliable tracking system. See *The Federal Bureau of Prisons Compassionate Release Program*, April 2013, OIG Report # I-2013-006 at i, iv. The report concluded that the "FBOP does not properly manage the compassionate release Program, resulting in inmates who may be eligible candidates for release not being considered." *Id.*; *see also* Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies in Overincarceration*, 21 Fed. Sent. Rptr. 167 (Feb. 2009).

In response to these failures, Congress reformed the compassionate release process through the First Step Act, signed into law on December 21, 2018. These statutory amendments were expressly aimed at "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018) (emphasis added). Under the FSA, courts now have the authority to act directly on compassionate release motions filed by defendants—provided certain conditions are met.

Specifically, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes this Court to reduce a term of imprisonment if: (1) the defendant has exhausted all administrative remedies or 30 days have passed since submitting a request to the warden; (2) "extraordinary and compelling reasons" justify the reduction; (3) the reduction is warranted in light of the sentencing factors set forth in 18 U.S.C. § 3553(a); and (4) the relief is consistent with applicable policy statements from the Sentencing Commission.

The Commentary to U.S.S.G. § 1B1.13 outlines what qualifies as "extraordinary and compelling reasons." Specifically, Application Note 1 to § 1B1.13 provides the following guidance:

(a) In General.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(b) Extraordinary and Compelling Reasons.—Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

(1) Medical Circumstances of the Defendant.—

    a. The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    b.  The defendant is—

        i.  suffering from a serious physical or medical condition,

        ii.  suffering from a serious functional or cognitive impairment, or

        iii.  experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    c.  The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

. . .

(3) Family Circumstances of the Defendant.—

    a.  The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

    b.  The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

    c.  The incapacitation of the defendant's parent when the defendant wpuld be the only available caregiver for the parent.

    d.  The defendant establishes that circumstances similar to those listed in paragraphs (3)(a) through (3)(c) exist involving any other immediate family

member or an individual whose relationship with the defendant is similar in

kind to that of an immediate family member, when the defendant would be the

only available caregiver for such family member or individual. For purposes of

this provision, "immediate family member" refers to any of the individuals

listed in paragraphs (3)(a) through (3)(c) as well as a grandchild, grandparent,

or sibling of the defendant.

.   .   .

(5) Other Reasons—The defendant presents any other circumstance or

combination of circumstances that, when considered by themselves

or together with any of the reasons described in paragraphs (1)

through (4), are similar in gravity to those described in paragraphs (1)

through (4).

U.S.S.G. § 1B1.13, (Policy Statement) (emphasis added).

Following the enactment of the FSA, Congress made clear its intent for the judiciary to

assume the role previously held by the BOP in evaluating compassionate release requests. Courts

were also empowered to grant sentence reductions based on the broad range of circumstances that

fall within the meaning of "extraordinary and compelling" as contemplated by the statute.

## IV.   <u>LEGAL STANDARD</u>

A defendant may move for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)

after "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau

of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of

such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). Once that

procedural threshold is met, the court may reduce a term of imprisonment if it finds that

"extraordinary and compelling reasons warrant such a reduction" and that such a reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). Generally, the defendant bears the burden to show that his circumstances meet this standard. *United States v. Heromin*, 2019 U.S. Dist. LEXIS 96520, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019); *United States v. Stowe*, 2019 U.S. Dist. LEXIS 166170, 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25, 2019).

In evaluating whether extraordinary and compelling reasons warrant release, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a). These include, among others, "the nature and circumstances of the offense and the history and characteristics of the defendant," whether the sentence "reflects the seriousness of the offense," promotes "respect for the law," and provides "adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a). Accordingly, compassionate release may only be granted where the defendant meets the threshold showing of extraordinary and compelling reasons, and where the totality of the circumstances—including the § 3553(a) factors—support such relief. *United States v. Finks*, No. 14-0368-3, 2021 U.S. Dist. LEXIS 228050, at *6 (E.D. Pa. Nov. 29, 2021). The Sentencing Commission's policy statement, though not binding on courts considering defendant-filed motions, remains informative in assessing whether a defendant's situation qualifies as "extraordinary and compelling." *Id.*

## V.    <u>PROCEDURAL HISTORY</u>

In 2021 and 2023, John Dougherty was convicted following two jury trials of several non-violent offenses. (ECF No. 251 and 629). On July 11, 2024, this Court sentenced Mr. Dougherty to 72 months of incarceration. (ECF No. 773.) He is currently serving his sentence at FCI Lewisburg and is 65 years old.

### a.  **Dougherty has Exhausted His Administrative Remedies**

On June 6, 2025, Dougherty submitted a formal request for compassionate release to the Warden Sage of FCI Lewisburg pursuant to 18 U.S.C. § 3582(c)(1)(A), citing multiple extraordinary and compelling grounds for relief. (Letter to Warden, attached as Exhibit J.) The Warden did not respond within the 30-day period required under the statute and ultimately issued a denial on July 15, 2025—more than five weeks after the request was received. Mr. Dougherty did not receive notice of the denial until July 16, 2025, when his counselor provided him with a copy of the Warden's denial. *See* Exhibit K.

Accordingly, Mr. Dougherty has fully satisfied the administrative exhaustion requirement under § 3582(c)(1)(A), both because more than 30 days lapsed without a timely response and because he has since received a formal denial. Having exhausted administrative remedies, and in light of the urgent and life-threatening circumstances described in his request, Mr. Dougherty now respectfully moves this Court for a reduction in sentence based on the authority granted under the First Step Act.

## VI.    ARGUMENT

### a.  Mr. Dougherty Has Satisfied the Legal Standard for Compassionate Release Based on His Role as the Sole Available Caregiver

Mr. Dougherty has met his burden of establishing "extraordinary and compelling reasons" for compassionate release under U.S.S.G. § 1B1.13(b)(3)(C). The record contains adequate and verifiable documentation showing that his wife, Cecelia Dougherty, is incapacitated and that he is the only available and qualified caregiver who can provide the round-the-clock care she requires to survive.

The Sentencing Guidelines do not provide a definition for incapacitation, but courts have looked to guidance from the Bureau of Prisons ("BOP") Program Statement § 5050.50. *United States v. Arroyo-Marrero*, No. 21-CR-43-CFC, 2025 WL 1615716, at *4 (D. Del. June 6, 2025);

*see also e.g.*, *United States v. Doolittle*, 2020 WL 4188160, at *2 (D.N.J. July 21, 2020). Section 5050.50 of the BOP Program Statement defines incapacitation as

> "a serious injury, or a debilitating physical illness and the result of the injury or illness is that the spouse or registered partner is completely disabled, meaning that the spouse or registered partner cannot carry on any self-care and is totally confined to a bed or chair; or [a] severe cognitive deficit (e.g., Alzheimer's disease or traumatic brain injury that has severely affected the spouse's or registered partner's mental capacity or function0, but may not be confined to a bed or chair."

Hugh J. Hurwitz, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), U.S. Dep't of Just. Fed. Bureau of Prisons 10 (2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf    [https://perma.cc/453F-EKFX] (hereinafter, "BOP Program Statement"). Here, Cecelia Dougherty meets both of these definitions. Cecelia "cannot carry on any self-care and is totally confined to a bed or chair" and has a "traumatic brain injury." BOP Program Statement § 5050.50 at 10. Therefore, Cecelia satisfies the BOP definition of "incapacitated."

Additionally, Mr. Dougherty has satisfied the burden of showing that he is the "only available caregiver" for his incapacitated wife, as required under BOP Program Statement § 5050.50 and as interpreted by federal courts. *See e.g.*, *United States v. Arroyo-Marrero*, 2025 WL 1615716, at *5. Courts rely on "BOP Program Statement § 5050.50 to determine whether a defendant is the 'only available caregiver.'" *United States v. Arroyo-Marrero*, 2025 WL 1615716, at *5. A defendant is the "only available caregiver" when "there is no other family member or adequate care option that is able to provide primary care for the spouse . . ." BOP Program Statement § 5050.50 at 10. To satisfy this burden, a "defendant must provide a 'statement and letters of documentation that the [defendant] is the only family member capable of caring for the spouse.'" *Doolittle*, 2020 WL 4188160, at *3; citing* BOP Program Statement § 5050.50 at 10.

Mr. Dougherty has submitted comprehensive documentation showing that, prior to his incarceration on October 1, 2024, he was solely responsible for Cecelia's full-time care, including physical assistance, medical management, and logistical coordination. Since his imprisonment, Cecelia's care has required six to eight skilled nurses per month, costing over $44,000—an unsustainable burden on the rapidly depleting Cecelia Dougherty Trust, which now holds only $294,972.87. *See* Exhibit A.

No other family member can assume his role. Erin Dougherty, a cancer survivor, is a full-time school CEO and the sole caregiver for Cecelia's elderly father. *See* Affidavit of Erin Dougherty, Exhibit G. Tara Chupka, a full-time attorney, already provides more than 40 hours per week in unpaid care. *See* Affidavit of Tara Chupka, Exhibit F. Neither has clinical training, and both live 30–40 minutes away from Cecelia. Institutional care is not an option due to Cecelia's intact cognition and profound physical limitations. Her head nurse has stated unequivocally that Cecelia "will not survive" without Mr. Dougherty.

Accordingly, Mr. Dougherty has met the standard under BOP Program Statement § 5050.50 to demonstrate that he is the "only available caregiver," and that "there is no other family member or adequate care option that is able to provide primary care for the spouse . . ." *Id.*

Lastly, the burden is on the defendant to "provide 'adequate information and documentation'" regarding their family member's incapacitation. *Arroyo-Marrero*, 2025 WL 1615716, at *4; citing *United States v. Walker*, 2024 WL 580152, at *3 n.2 (D.N.J. Feb. 13, 2024). This includes, but is not "limited to, a statement and verifiable medical documentation regarding [Cecelia's] incapacitation . . ." *Id.*

In *Arroyo-Marrero*, the Court held that the Defendant did not provide enough adequate documentation to show that his wife is incapacitated. *United States v. Arroyo-Marrero*, 2025 WL

1615716, at *5. The court deemed that "a one-paragraph letter from his wife's oncology social worker, [], and a document showing a list of his wife's medical visits and issues," did not show or prove that the Defendant's wife could not "carry on any self-care and is totally confined to a bed or chair." *Id.* Conversely, Mr. Dougherty has provided adequate documentation. Mr. Dougherty has submitted extensive medical records and physician letters documenting Cecelia's irreversible neurological decline, including quadriplegia, PEG tube dependence, and total immobility. She is bedridden 24/7 and requires help with all basic activities, including eating, toileting, and bathing. Her condition is corroborated by home video footage taken in June 2025: https://vimeo.com/1090966025/83106d58a0?share=copy.

The record overwhelmingly demonstrates that Cecelia is incapacitated and that Mr. Dougherty is her only viable caregiver. Cecelia's life is the definition of an extraordinary and compelling circumstance. The Sentencing Commission and Courts have explicitly recognized family member caregiving as a basis for release. *See e.g.*, *United States v. Fields*, 569 F. Supp. 3d 231, 243 (E.D. Pa. 2021); *United States v. Seals*, 509 F. Supp. 3d 259, 265 (E.D. Pa. 2020).

Furthermore, Mr. Dougherty has demonstrated that he alone is capable of providing the full-time, specialized care his wife requires to survive. With no viable alternatives and the imminent depletion of financial resources, his release is essential to prevent catastrophic harm.

Furthermore, in *United States v. Blanco*, the Court denied compassionate release despite the defendant's claim that he needed to care for his two adult daughters—one of whom was quadriplegic and non-verbal. *United States v. Blanco*, No. CR 18-424, 2021 WL 5112252, at *1, (E.D. Pa. Nov. 2, 2021). The court emphasized that the"[Defendant] ha[d] not been a caregiver for either child in recent years and it is evident that there are adults who are providing the necessary assistance. Further, it does not appear that the defendant has ever been a caregiver . . ." *Id.* In much

contrast, Mr. Dougherty was Cecelia's full-time caregiver for years prior to incarceration. He directly managed her PEG feeding, catheterization, hygiene, medication, equipment maintenance, mobility assistance, and emotional well-being. Since his imprisonment, Cecelia's care has relied solely on professional nurses paid through The Cecelia Dougherty Trust, which will soon be exhausted. Once depleted, there will be no caregivers left. Unlike the defendant in *Blanco*, whose children continued receiving care from their mother, Mr. Dougherty's wife has no such alternative. Cecelia's daughters, both working professionals with serious limitations, have already reached the breaking point. Institutionalization is also not feasible due to Cecelia's intact cognition and complex physical condition. Without Mr. Dougherty's return, her care will fail completely. Mr. Dougherty's unique and irreplaceable caregiving role, coupled with the absence of any adequate alternative, satisfies the standard for compassionate release. The consequences of continued incarceration will be immediate and life-threatening to Cecelia. *See* Exhibit L.

Mr. Dougherty's release would not only prevent Cecelia's likely death, but immediately restore continuity of care and extend the life of the Trust by eliminating the need for most paid nursing services. Mr. Dougherty has provided ample evidence of Cecelia's inability to take care of herself, as required by courts in this circuit. Granting this motion is not an act of leniency. It is the only means to prevent the death of a profoundly vulnerable woman who has no one else.

### b. Mr. Dougherty's Own Serious and Deteriorating Medical Conditions Warrant Compassionate Release under U.S.S.G. § 1B1.13(b)(1)(C)

Mr. Dougherty additionally qualifies for compassionate release under U.S.S.G. § 1B1.13(b)(1)(C) due to multiple chronic, painful, and degenerative conditions that substantially impair his ability to care for himself while incarcerated. When compared to other individuals granted release under similar or lesser circumstances—such as in *United States v. Parker*—Mr. Dougherty's case is even more compelling.

Mr. Dougherty presents a compelling and well-documented case for compassionate release based on serious, progressive, and permanent medical conditions that substantially impair his ability to provide self-care in prison. In order to be granted a compassionate release, a "[Defendant] must show that he suffers 'from a serious physical or medical condition,' 'serious functional or cognitive impairment,' or that he experiences 'deteriorating physical or mental health because of the aging process, that substantially diminishes [his] ability . . . to provide self-care' in prison." *United States v. Finks*, No. CR 14-0368-3, 2021 WL 5639543, at 3 (E.D. Pa. Nov. 29, 2021); *citing* United States Sentencing Commission, Guidelines Manual § 1B1.13.A. In *Finks*, the Court denied compassionate release where the defendant failed to identify any specific medical condition or impairment and declined COVID-19 vaccination. *Finks*, 2021 WL 5639543, at *1, *3. He relied solely on generalized COVID-19 risk and the need to assist an aging parent, without providing verifiable medical documentation. Conversely, Mr. Dougherty has provided extensive evidence of multiple chronic and worsening medical conditions—foot infection with risk of osteomyelitis and amputation, chronic ulcerations, impaired mobility, hypertension, and retinal deterioration—all supported by medical records and specialist recommendations. *See* Exhibit I. At age 65, his physical decline is undeniable and has been exacerbated by delays and gaps in treatment while incarcerated. Unlike the Defendant in *Finks*, Mr. Dougherty has never refused care. He has consistently sought medical treatment, followed all protocols, and cooperated with prison medical staff. Yet his conditions have progressed significantly—despite treatment—demonstrating both the seriousness of his health decline and the inability of the BOP to provide adequate care. While the defendant in *Finks* presented only speculative risks and was appropriately denied release, Mr. Dougherty presents concrete, verified, and escalating medical impairments that clearly meet the

standard for compassionate release. The contrast exemplifies the urgency and legitimacy of Mr. Dougherty's request.

Furthermore, Mr. Dougherty's deteriorating medical condition, spotless prison record, and nonviolent background present a far more compelling case for compassionate release than that granted in *United States v. Parker*. In *United States v. Parker*, No. CR 08-534, 2021 WL 1264171, at *1 (E.D. Pa. Apr. 6, 2021), this Court granted compassionate release to a 59-year-old defendant who suffered from "high blood pressure, high cholesterol, and chronic kidney disease" during the COVID-19 outbreak. The defendant had committed two armed robberies, accrued three disciplinary infractions while incarcerated, and was classified as a "career offender," yet the Court still held that "[Defendant's] medical conditions [were] an extraordinary and compelling reason for release." *Id.* at *3–4*.

Mr. Dougherty's case is significantly stronger than the Defendants in *Parker* on every relevant basis. Like Parker, Mr. Dougherty suffers from high blood pressure and chronic health issues, but unlike Parker, he also suffers from a serious post-surgical foot infection consistent with osteomyelitis, confirmed by cultures showing Staphylococcus epidermidis and Candida albicans. This condition has failed to improve despite 11 weeks of antibiotics, resulting in chronic hives, ulcerations, and ongoing systemic risk. *See* Exhibit I. He has not received bloodwork in over six weeks and is only now being referred to a dermatologist. His infection has spread to his hip, causing joint misalignment, inflammation, and decreased mobility. He requires cortisone injections and heat therapy for pain and is unable to exercise, which has caused his blood pressure to climb to 140/90 despite being on multiple medications. *See* Exhibit I. Mr. Dougherty has also experienced four retinal detachment episodes and is at risk for vision loss, yet has received no specialist follow-up. *See* Exhibit I.

Beyond these medical concerns, Mr. Dougherty stands in contrast to the Defendant in *Parker* in terms of conduct and history. Mr. Dougherty is a first-time, nonviolent offender with zero disciplinary infractions. He works in the Education Department assisting inmates with GED preparation, participates in parenting classes, offers mentorship and spiritual guidance, and practices his Catholic faith daily. He has taken full advantage of rehabilitative programming and poses no risk of recidivism.

Although Mr. Dougherty has served less time than the Defendant in *Parker*, his advanced age (65), complex and worsening medical profile, and impeccable institutional record make his need for release more urgent. His care cannot be provided in custody. As detailed in a February 2024 report from the DOJ Office of the Inspector General, FCI Lewisburg suffers from: (1) delayed testing and follow-ups; (2) gaps in cancer screening; (3) discontinued medications without review; and (4) over $28 million in unfunded medical infrastructure repairs.[1] These systemic issues have directly impeded Mr. Dougherty's care.

The Defendant in *Parkers* release was warranted despite violent offenses and infractions. Mr. Dougherty—older, sicker, peaceful, and exemplary in conduct—meets and exceeds that standard. His compassionate release is not only justified but imperative.

### c. Mr. Dougherty's Age, Rehabilitation, and Lack of Penological Justification for Continued Incarceration Support Release

In addition to his urgent medical needs and caregiving responsibilities, Mr. Dougherty's age**,** record of rehabilitation**,** and the absence of any legitimate penological purpose for his continued incarceration provide further extraordinary and compelling grounds for release.

#### i. Mr. Dougherty Is an Older Adult Experiencing Serious Physical Decline

---

[1]U.S. Department of Justice Office of Inspector General, DOJ OIG Releases an Inspection of the BOP's Federal Correctional Institution Lewisburg, DEPARTMENT OF JUSTICE (Sept. 26, 2024), https://oig.justice.gov/news/doj-oig-releases-inspection-bops-federal-correctional-institution-lewisburg

At 65 years old, Mr. Dougherty falls into a demographic group universally recognized as medically vulnerable and at higher risk for deteriorating physical and cognitive health. Under U.S.S.G. § 1B1.13(b)(1)(B), release may be warranted for inmates who are at least 65 years old, experiencing serious health decline due to aging, and have served at least 10 years or 75% of their sentence. While Mr. Dougherty has not yet served 75%, his overlapping medical and caregiving circumstances satisfy independent and sufficient bases for release.

Nonetheless, his age cannot be ignored. According to the National Institute of Corrections, older adults in custody age faster and present with more advanced illness than their non-incarcerated counterparts.[2] Mr. Dougherty has already shown signs of that accelerated decline—he walks with difficulty, experiences persistent joint pain, suffers from elevated blood pressure and deteriorating vision, and has developed skin ulcers from long-term antibiotic use. Each of these conditions reflects the biological burden of incarceration on a body in late middle age.

ii.  Mr. Dougherty Has Maintained an Exemplary Record of Rehabilitation

Since entering FCI Lewisburg, Mr. Dougherty has demonstrated a commitment to rehabilitation and service. He works in the Education Department, where he assists fellow inmates in preparing for their GED exams. He is also enrolled in parenting and substance abuse programs and has expressed interest in participating in the Residential Drug Abuse Program (RDAP) when space becomes available. Additionally, he remains active in his Catholic faith, providing spiritual guidance to others.

---

[2] *See* Office of the Assistant Secretary for Planning and Evaluation, *Aging, Reentry, and Health Coverage: Barriers to Medicare and Medicaid for Older Reentrants*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Feb. 2018), https://aspe.hhs.gov/reports/aging-reentry-health-coverage-barriers-medicare-medicaid-older-reentrants-0#:~:text=These%20include%20challenges%20around%20documentation,to%20health%20coverage%20and%20care.

There is no evidence of disciplinary infractions or behavioral issues. He has taken responsibility for his past conduct and shown consistent efforts to improve himself and support others in the limited ways possible while incarcerated. Federal courts recognize that rehabilitation, while not sufficient alone, weighs strongly in favor of compassionate release when combined with medical or family hardship. *See e.g.*, *United States v. Parker*, No. CR 08-534, 2021 WL 1264171, at *3 (E.D. Pa. Apr. 6, 2021).

iii.   <u>Continued Incarceration Serves No Valid Penelogical Purpose</u>

Under 18 U.S.C. § 3553(a), a term of imprisonment must be "sufficient, but not greater than necessary" to serve the purposes of sentencing. Mr. Dougherty's continued incarceration at this stage in his life—given his health, age, caregiving responsibilities, and rehabilitation—fails that test.

1.   *Retribution*: Mr. Dougherty has been incarcerated since October 2024. During this time, he has lost irreplaceable time with his medically fragile wife and endured life-altering physical deterioration. He has also suffered profound reputational, financial, and emotional consequences, having forfeited his career, sold his home, exhausted his savings and retirement accounts, and accumulated over $900,000 in legal debt. He has paid a steep personal price, beyond just the custodial sentence.

2.   *Deterrence*: As a former union leader with deep ties to the Philadelphia community, Mr. Dougherty's prosecution received substantial media coverage and public scrutiny. The message has already been sent and received: no one is above the law. Keeping

Mr. Dougherty in prison longer does not materially enhance general deterrence and may, in fact, undermine public confidence in the fairness of the justice system when the result is the likely death of his innocent, disabled wife.

3.  *Public Safety*: Mr. Dougherty presents no risk of future harm. He is a nonviolent, first-time offender with no history of substance abuse or physical aggression. He suffers from debilitating medical conditions that restrict his mobility and endurance. He has been barred from public service positions and remains subject to strict monitoring upon release. Moreover, his focus upon release will be entirely consumed by caring for his wife, managing medical care, and maintaining their home.

4.  *Rehabilitation & Reintegration*: Mr. Dougherty has a concrete release plan. He will return to the Franklin Tower Residences in Philadelphia, an apartment that has already been approved by the Probation Office and that includes a fully outfitted hospital room for his wife. He receives a combined pension of $4,430.73 per month, enough to cover the $3,900 rent and basic living expenses. He has no substance abuse history and no dependents beyond his wife. There is no reintegration challenge that cannot be managed by supervision conditions.

Compassionate release in this case would not minimize Mr. Dougherty's offense; it would simply recognize that the law is capable of mercy in the face of human fragility and familial obligation. Here, continued imprisonment may become punitive beyond what justice requires.

### d. The § 3553(a) Sentencing Factors Support Mr. Dougherty's Compassionate Release

Under 18 U.S.C. § 3582(c)(1)(A), the Court must consider whether a reduction in sentence would be consistent with the sentencing factors set forth in § 3553(a). These include the nature and circumstances of the offense, the defendant's history and characteristics, the need for the sentence imposed, and the types of sentences available. In Mr. Dougherty's case, all relevant factors weigh decisively in favor of granting relief.

i. <u>Nature and Circumstances of the offense and Mr. Dougherty's History and Characteristics (§ 3553(a)(1))</u>

Mr. Dougherty was convicted of nonviolent public corruption offenses. While serious, these offenses did not involve physical harm, threats, firearms, or drug trafficking. He has no prior criminal history and no record of violence. He is a first-time offender who was found guilty and further complied with the law.

Before his conviction, Mr. Dougherty was widely recognized as a labor leader and advocate for working-class families in Philadelphia. (Pre-Sentencing Report ("PSR"), p. 46—47.) As the longtime Business Manager of IBEW Local 98, he worked to improve wages, benefits, and safety for thousands of electricians and blue-collar workers. *Id.* He helped secure community reinvestment, supported youth sports leagues, and donated millions to public schools, food banks, and scholarship funds. Mr. Dougherty also has a long record of personal acts of compassion and service, particularly in assisting formerly incarcerated individuals with job placement and reentry.

His life has been one of civic engagement and public service, even if marred by the conduct that led to his conviction.

Now, at 65 years old, he is a physically diminished man whose defining role is that of a caregiver for his completely incapacitated wife. His character is not defined solely by his conviction; it is also defined by years of sacrifice, community leadership, and most urgently, his effort to return home to prevent his wife's death.

    ii. <u>Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (§ 3553(a)(2)(A))</u>

Mr. Dougherty's sentence has already served the core retributive goals of federal sentencing. His conviction was a high-profile matter that received extensive media coverage throughout Pennsylvania and beyond. He lost his position, forfeited his retirement funds, sold his family home, and has since incurred over $900,000 in legal debt. His life has been permanently altered. Continued incarceration at this stage, when he is his wife's only chance at survival, does not meaningfully advance justice. Rather, it begins to diverge from it. As courts have emphasized, punishment must always be proportionate not just to the crime, but to the circumstances of the defendant at the time of evaluation. See e.g., *Commonwealth v. Devers*, 546 A.2d 12, 13 (Pa. 1988).

Moreover, release would not mean freedom from consequence. Mr. Dougherty will remain under supervision, likely home confinement, and subject to strict conditions. His sentence, in functional terms, would still amount to a "life sentence" of round-the-clock caregiving and physical decline.

    iii. <u>Deterrence and Protection of the Public (§ 3553(a)(2)(B)–(C))</u>

General deterrence has been satisfied. Mr. Dougherty's conviction and sentencing sent a clear message about the consequences of public corruption. His name is permanently associated

with one of the most prominent federal corruption cases in recent Philadelphia history. There is no evidence that his early release would diminish public confidence in the justice system or encourage similar misconduct.

As for specific deterrence, Mr. Dougherty poses no risk of recidivism. He has no violent history, is in declining health, and his post-release responsibilities are all-consuming. The idea that a 65-year-old man—who cannot walk without pain, is partially blind, and is responsible for the care of a ventilator-dependent spouse—would pose a threat to public safety is not supported by any evidence or logic.

In the unlikely event the Court has any lingering concern, that risk can be fully mitigated through conditions of release, including electronic monitoring, strict geographic limitations, and ongoing medical and judicial oversight. *See* 18 U.S.C. § 3142(g).

### iv. Need to Provide Medical Care in the Most Effective Manner (§ 3553(a)(2)(D))

Mr. Dougherty's treatment cannot be effectively managed within the confines of the BOP. He has experienced extensive delays, inconsistent follow-up, and dangerous lapses in continuity of care. He has been left without basic bloodwork, cycled through conflicting antibiotic regimens, and endured worsening conditions without access to specialists.

Release would allow him to return to his established treatment network in Philadelphia, including his prior podiatrist, infectious disease specialist, and ophthalmologists at Wills Eye Hospital. He has the means and insurance coverage to pursue this care immediately upon release. Compassionate release under these circumstances not only fulfills the statutory directive to "provide needed medical care in the most effective manner," but promotes institutional safety as well.

### e. Mr. Dougherty Poses No Danger to the Community, and His Release Is Consistent with U.S.S.G. § 1B1.13

Under U.S.S.G. § 1B1.13, even where extraordinary and compelling reasons for release exist, a court must also determine whether the defendant poses "a danger to the safety of any other person or to the community." *See* § 1B1.13(2); 18 U.S.C. § 3142(g). Here, there is no factual or legal basis to conclude that Mr. Dougherty presents any danger whatsoever.

When analyzing if a Defendant poses a danger to the community, this court has assessed the nature of the crime, infractions while incarcerated, and the Defendant's further conduct while incarcerated. *See* e.g., *United States v. Parker*, No. CR 08-534, 2021 WL 1264171, at *3 (E.D. Pa. Apr. 6, 2021). In *Parker*, this court granted Defendant's Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)(i). Defendant was imprisoned due to two armed robberies, and was a "career offender," being convicted of other crimes in the past. *Parker*, No. CR 08-534, 2021 WL 1264171, at *4 (E.D. Pa. Apr. 6, 2021). This court analyzed Defendant's conduct since being incarcerated, and noted that Defendant was a "model prisoner, committing no infractions whatsoever" *Id.* at *3. Additionally, in considering if Defendant posed a danger to the community, this court additionally noted that the Defendant had "participated in several programs to better himself during his recent time behind bars . . . [and Defendant] has shown by his recent conduct that he is no longer a threat to public safety." *Id.* at *3. Lastly, this court noted that Defendants "two armed robberies . . . are clearly serious", but "[Defendant's] recent success in prison demonstrates that his release would not present a serious risk to others or the community." *Id.* at *4. Here, Mr. Dougherty is a nonviolent first-time offender with no history suggesting risk to public safety. His offenses, while serious, involved public corruption—not violence, weapons, drugs, or threats. He has no history of physical altercations, no prior arrests, and no indication of instability or aggression. His criminal record is limited to this case, and he has demonstrated

consistent good conduct before, during, and after sentencing. This Court has consistently analyzed Defendant's conduct while incarcerated to determine if a Defendant is going to pose a danger to society. Here, Dougherty poses no threat to society. He has helped Philadelphia for so long while contributing to charities and helping the needy prior to incarceration. While being incarcerated, Dougherty has been teaching other prisoners. He poses no threat to society and has shown this by his exemplary behavior and no infractions since being incarcerated, just like the Defendant in *Parker*.

Here, each factor weighs in favor of release. The offense was nonviolent. Mr. Dougherty has a long record of civic service and community support. He has no disciplinary infractions while incarcerated. He is now elderly and physically declining. Numerous courts have granted compassionate release to similarly situated defendants without finding them to be a danger.

Mr. Dougherty's physical condition severely limits any ability to reoffend. Even if his underlying offense had involved conduct with community-facing implications, Mr. Dougherty's current physical state would render future misconduct practically impossible. He suffers from a chronic foot infection with limited mobility and possible amputation risk, painful degenerative hip misalignment, high blood pressure and related cardiovascular concerns, deteriorating vision due to vitreous separation in his eye, and immune system sensitivity resulting in long-term dermatologic reactions. These conditions would require intensive at-home care, constant medical supervision, and physical limitations that drastically curtail independence. Mr. Dougherty cannot walk long distances, drive, or stand for long periods. He must focus daily on his wife's care and managing his own treatment plan. The notion that he poses a danger to the public is not supported by fact or reason.

The Warden did not deny release based on dangerousness. Importantly, the Warden's denial of Mr. Dougherty's compassionate release request made no mention of public safety or community risk. The denial did not focus on Mr. Dougherty posing any present or future threat to others. That silence is telling. If the very agency responsible for Mr. Dougherty's supervision does not view him as dangerous, then that finding should carry persuasive weight. Courts have repeatedly concluded that a defendant's deteriorating health, age, and situational constraints substantially reduce any risk of future harm.

Even if the Court harbors any residual hesitation, it has broad discretion to impose tailored release conditions that would eliminate risk altogether. Mr. Dougherty is willing to submit to any level of supervision this Court deems appropriate, including electronic ankle monitoring, full-time home confinement, geographic movement restrictions, prohibitions on employment outside the home, and regular reporting and check-ins with a probation officer. His release has already been explained by the U.S. Probation Office and includes verified housing, a caregiving schedule, access to medical care, and financial support through his pension and Social Security. (PSR, p. 44—50.).  He has no plans to engage in any activity other than caregiving.

### f. Denial of Compassionate Release Would Cause Irreparable Harm to a Third Party—Cecelia Dougherty

While Mr. Dougherty's own medical condition, age, rehabilitation, and lack of dangerousness are independently sufficient for relief, his motion presents something more urgent: the near certainty of death or catastrophic harm to a completely incapacitated third party—his wife, Cecelia Dougherty—if release is denied. This case demands not only a legal analysis, but moral reckoning.

First, Cecelia Dougherty is entirely dependent on Mr. Dougherty for survival. As set forth in extensive detail above and in the attached exhibits, Cecelia Dougherty is profoundly disabled.

Following a catastrophic brain bleed in 2017, she became quadriplegic, nonverbal, and fully reliant on medical devices and full-time support for every essential function. She requires nutrition and medication via PEG tube, bowel and bladder care, catheterization, repositioning, suctioning for secretions and airway clearance, physical therapy, range-of-motion exercises, regular hygiene, and interpretation of eye and hand signals as her only means of communication. For years, Mr. Dougherty managed this care himself—alone. He did not outsource it to aides, nurses, or institutions. He coordinated her entire life: ordering supplies, overseeing medication, cleaning and calibrating medical equipment, managing appointments, and providing her only meaningful social and emotional connection. Since his incarceration, her health has declined significantly. She has developed anxiety attacks, experienced episodes of screaming and tensing (potentially triggering another bleed), and has written the word "DIE" during therapy in reference to her husband's absence. Her own care team, including her head nurse, has stated unequivocally that she "will not survive" without Mr. Dougherty's return.

Second, her care is financially unsustainable without Mr. Dougherty. Cecelia's care is currently funded through a trust created by the sale of the couple's home and Mr. Dougherty's liquidated retirement savings. That trust—The Cecelia Dougherty Trust—once held over $641,000. As of June 2025, it has less than $350,000 remaining. At current costs of approximately $44,070 per month for skilled nursing care, that funding will be exhausted in fewer than nine months. When the money runs out, Cecelia will be left without care. There is no family member or facility that can replace Mr. Dougherty's skill, availability, or familiarity with her needs. Medicaid has been denied. Skilled nursing homes have rejected her due to her unique combination of physical fragility and cognitive awareness. In short, there is no Plan B.

Third, denial of release will result in her death. The outcome is not hypothetical. Without a full-time, clinically competent caregiver, Cecelia's feeding tube will become infected. Her catheter care will lapse. Her bedsores will worsen. Her airway could become blocked. One overlooked detail—one delay—can lead to sepsis, aspiration, or fatal cardiac distress. These are not remote risks; they are daily realities. Mr. Dougherty's release is not about convenience or comfort—it is about triage. The person most affected by this Court's decision is not a defendant seeking leniency, but a medically defenseless woman who has no one else.

## VII.   CONCLUSION

Mr. Dougherty's motion rests on multiple, independently sufficient grounds for compassionate release under 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13. First, he is the sole available caregiver to his quadriplegic, nonverbal wife, who will likely die without him. Her condition has deteriorated severely since his incarceration, the family trust sustaining her care is rapidly running out, and there is no alternative caregiver or facility able to meet her needs. Without Mr. Dougherty's hands-on, daily medical and emotional support, her life is in immediate danger.

Second, Mr. Dougherty suffers from chronic, serious medical conditions that have worsened under BOP supervision. These include a post-surgical foot infection with suspected osteomyelitis, antibiotic-resistant skin reactions, degenerative hip complications, dangerously elevated blood pressure, and retinal issues that threaten his vision. These conditions have gone untreated or inconsistently treated in custody, substantially impairing his ability to care for himself and making continued incarceration medically inappropriate.

Third, Mr. Dougherty is 65 years old, with declining health and no history of violence or risk of recidivism. He has demonstrated sincere rehabilitation and contributed meaningfully to the prison community through educational support and mentorship. His continued incarceration serves

no valid penological purpose—it does not meaningfully advance deterrence, retribution, or public safety. He has a stable and verified release plan, including housing, financial support, and full compliance with supervision conditions. And perhaps most importantly, his wife, who committed no crime, is facing a death sentence if this Court does not act. The Court has the discretion and authority to reduce Mr. Dougherty's sentence based on these extraordinary and compelling circumstances. Exercising that discretion here would not undermine justice; it would fulfill it.

Accordingly, Mr. Dougherty respectfully requests that the Court grant this motion and allow him to serve the remainder of his sentence at his home so as to care for his wife, Cecelia.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

Dated: <u>August 28, 2025</u>    By:    <u>/s/ George Bochetto</u>
GEORGE BOCHETTO, ESQUIRE
PA ID No. 27783
gbochetto@bochettoandlentz.com
1524 Locust Street
Philadelphia, PA 19102
215-735-3900
215-735-2455 fax
*Attorney for Defendant, John Dougherty*

# EXHIBIT A

 **THE CECELIA DOUGHERTY TRUST**  TARACHUPKA@GMAIL.COM

Last online session: **July 25, 2025**


View messages

## Accounts

Customize accounts

| Deposit | Available Balance | Current Balance |
|---|---|---|
| WSFS CORE CHECKING, *3878 | $294,877.95 | $294,972.87 |
| Total Deposit: | **$294,877.95** | **$294,972.87** |

🔔  News and Announcements

# EXHIBIT B

Cecelia Dougherty Medical Expenses
(not an exhaustive list)

| | |
|---|---|
| *Schuylkill Medical Associates LLC*<br>(yearly bill for Ceilie's primary care doctor/not covered by insurance) | $5,400.00 |
| *Microair Alternating Pressure Low Air Loss Mattress*<br>(current one is 5 years old/not sure when we will need to replace) | $2,845.00 |
| Hill-Rom HR 1000 Hospital Bed<br>              -recently has needed extensive repairs<br>              -more repairs | $14,101.00<br>$2,648.44<br>$1,663.60 |
| MOTOmed Viva 2 Light<br>(motorized exercise bike to prevent muscle atrophy) | $4,292.00 |
| EasyStand Evolv Large<br>              -(approx. price/used on a daily basis to transfer Ceilie)<br>              -requires repairing every few months | $6,000.00<br><br>$200-300 |
| Electric Chargeable/Manual Hoyer Lift to move Ceilie<br>(need in case of power outage) | $2,518.00 |
| Suction Machines<br>              -heavy duty (replaced approx. 1x per year)<br>              -portable  machines (2 machines; replaced when needed/1x<br>              so far) | <br>$175.99<br>$758.60 |
| Yankauers for Suction Machine<br>(ordered approx. every 3 months) | $119.69 |
| *Incontinence Supplies*<br>              -Underpads (ordered approx. every 2 months)<br>              -WypAll Power Clean Towels (ordered every month)<br>              -Molicare Briefs (ordered approx. every 3 months) | <br>$486.66<br>$96.18<br>$681.48 |
| Melatonin<br>(ordered approximately every 1-2 months) | $50.77 |
| Liquid/Children's Tylenol<br>(ordered approx. every 5 months) | $52.80 |
| Probiotics<br>(30 day supply) | $85.00 |

| | |
|---|---|
| Split Sponges for Feeding Tube<br>(ordered approximately every 2 months) | $51.60 |
| Oral Care Swabs<br>(ordered approximately every 4 months) | $171.66 |
| UtyMax for Urinary Tract Infections<br>(ordered approximately every 6 months) | $326.50 |
| Replacement Feeding Tubes<br>(ordered approximately every 3-4 months) | $79.13 |
| Occupational Therapy/Physical Therapy/ Vision Therapy<br>(some are reimbursed by insurance, most are not) | $150-2--00 per session |
| Latex Gloves<br>(ordered approximately every 4-6 months) | $380.64 |
| Jefferson Outpatient Testing Co-Pay:<br>(per visit) | $75.00 |
| Compleat Organic Blends<br>(additional feeding blend for emergency purposes/insurance has issue/shipment late)<br>(ordered approx. 2-3 times per year) | $164.97 |
| Distilled Water for Humidifier | $50-60 |
| Medical Staffing<br>            -April (approximate totals)<br>            -May (approximate totals) | $41,710.00<br>$43,960.00 |
| Other items on an as needed basis:<br>        -ace bandages<br>        -hand braces<br>        -humidifier and vapor pads<br>        -Claritin (daily use)<br>        -various Vitamins (daily use)<br>        - personal care items - body moisturizer, face moisturizer,<br>          Unscented laundry detergent, sunscreen<br>        -bottled water for feeding tube medications<br>        -Pepcid AC<br>        -heavy duty trash bag for soiled briefs<br>        -various medication copays<br>        -creams, lotions, etc. to prevent rashes and sores | |

# EXHIBIT C


PROJECTWORKS
Cost Projections

1000 Johnnie Dodds Blvd, Suite 103-342
Mt. Pleasant, SC 29464
843.834.4948

# Medical Cost Projection

| Claimant | Cecelia Dougherty | Date of Injury | March 15, 2017 |
|---|---|---|---|
| Date of Birth | August 27, 1961 | Requesting Attorney | Attorney Christopher Armstrong |
| Age | 63 | Date Report Prepared | August 20, 2025 |
| Life Expectancy | 21.0<br>Per CDC Volume 74, No. 6<br>(informational purposes only) | Cost Projection Specialist | Corrin Clayton,<br>RN, BSN, CNLCP, LCP-C |
| Fee Schedule | Usual/Customary | Total Medical Cost Projection | SEE CHART<br>pending economic analysis |

**General Information:** As requested, a Medical Cost Projection was prepared for Ms. Cecelia Dougherty based on medical records provided by Attorney Christopher Armstrong.

A Medical Cost Projection differs from a Life Care Plan in many ways. A Life Care Plan is based on a nursing needs analysis, collaboration and conferences with medical treatment team, and evaluations with specialty physicians for complete causal relationship of primary injuries, secondary conditions, and potential complications. A Life Care Plan follows the standard methodology recognized by state and federal courts and becomes the basis for expert testimony. A Life Care Plan is categorized as a testifying document containing life care planning opinion used in trial situations.

A Medical Cost Projection is a specialized report based on the current treatment plan as reported by the client and documented in medical reports, questionnaires, and/or depositions. A Medical Cost Projection outlines reasonable and conservative costs for the typical treatment associated with a specific medical condition, without collaboration or conferences with the medical treatment team. A Medical Cost Projection is categorized as a consulting document and used in non-trial situations such as demand letters and mediations.

**Incident Description:** per information received from review of medical records.
*Ms. Cecelia Dougherty experienced a right temporal intracranial hemorrhage secondary to arteriovenous malformation rupture on March 15, 2017.*

**Injury Related Conditions:** based on information received from review of medical records.
*Per Thomas Jefferson University 3/15/2017:*
- *Large right temporal ICH secondary to AVM rupture*

*Per Jefferson Hospital Neuroscience 9/23/2018:*
- *Cranioplasty*

*Per Jefferson Hospital Neuroscience 2/20/2021:*
- *Subacute ICH in the medial right temporal lobe with UTI and ileus*

*Per OL Physical Therapy 9/6/2021:*
- *Abnormalities of gait and mobility*
- *Reduced mobility*

*Per Christine Pluta, DO - Schuylkill Medical Associates 8/15/2024:*
- *Gastrostomy status*
- *Calculus of kidney*
- *Essential (primary) hypertension*
- *Homonymous bilateral field defects, left side*
- *Constipation*
- *History of UTI*
- *Hemiplegia following nontraumatic intracerebral hemorrhage*
- *Abnormal weight gain*
- *Orthostatic hypotension*
- *Pyogenic granuloma*
- *Dysphagia, oropharyngeal phase*

*Per Christine Pluta, DO - Schuylkill Medical Associates 2/17/2025:*
- *Constipation*
- *Calculus of kidney*
- *Gastrostomy status*
- *Retention of urine*
- *Hemiplegia following non-traumatic intracerebral hemorrhage affecting left non dominant side*
- *Essential (primary) hypertension*
- *Homonymous bilateral field defects, left side*
- *History of UTI*
- *Abnormal weight gain*
- *Orthostatic hypotension*
- *Pyogenic granuloma*
- *Dysphagia, oropharyngeal phase*
- *Hemiplegia following non-traumatic intracranial hemorrhage affecting right dominant side*

**Treatment History:** a chronology of provided medical records prepared to show past medical treatment for injury related conditions and a listing of records reviewed.

| Date | Provider | Notes |
|---|---|---|
| 3/15/2017 | Thomas Jefferson University Hospital | Hospital Admission 3/15/2017 to 4/3/2017. Pt. admitted emergently with diagnosis of large right temporal ICH secondary to AVM rupture requiring decompressive hemicraniectomy. Pt. discharged to Magee Rehabilitation Hospital with need for aggressive chest PT with suction. |
| 3/15/2017 | DIAGNOSTIC | XR Chest - Thomas Jefferson University Hospital. IMPRESSION: Lines/Tubes/Devices/ Hardware: Endotracheal tube is seen with tip in the right mainstem bronchus. Repositioning is required. Defibrillator pad overlying the right hemithorax. 2. Lungs: No focal consolidation or pulmonary edema. 3. Pleura: No pleural effusions or pneumothorax. 4. Heart and mediastinum: Top normal heart size. |
| 3/15/2017 | DIAGNOSTIC | CT Head - Thomas Jefferson University Hospital. IMPRESSION: 1. Acute large intraparenchymal hemorrhage centered in the right temporal lobe in the area of pt.'s known vascular malformation with layering subdural and scattered subarachnoid hemorrhage. There is 2.1cm of leftward midline shift with subfalcine herniation and crowding at the foramen magnum. 2. Trapping of the left lateral ventricle. |
| 3/15/2017 | DIAGNOSTIC | CT Spine, Cervical - Thomas Jefferson University Hospital. IMPRESSION: No fracture of the cervical spine. |
| 3/15/2017 | DIAGNOSTIC | XR Chest - Thomas Jefferson University Hospital. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Interval repositioning of the endotracheal tube, now 1.5cm from the carina. Defibrillator pad overlying the right hemithorax. 2. Lungs: Patchy atelectasis at the left lung base. The right lung is clear. No pulmonary edema. 3. Pleura: No pleural effusions or pneumothorax. 4. Heart and mediastinum: Top normal heart size. |
| 3/15/2017 | DIAGNOSTIC | XR Chest - Thomas Jefferson University Hospital. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: The endotracheal tube is in satisfactory position, approximately 3.5cm from the carina. Defibrillator pad overlying the right hemithorax. 2. Lungs: Patchy atelectasis at the left lung base. Right lung is clear. No pulmonary edema. 3. Pleura: No pleural effusions or pneumothorax. 4. Heart and mediastinum: Top normal heart size. |
| 3/15/2017 | Sabourin, Victor MD - Thomas Jefferson University Hospital | PROCEDURE: Decompressive right hemicraniectomy with evacuation. |
| 3/16/2017 | DIAGNOSTIC | CT Head - Thomas Jefferson University Hospital. IMPRESSION: Decompressive right hemicraniectomy with evacuation of extra-axial hemorrhage. Persistent parenchymal hematoma with intraventricular extension noted. Metallic material from prior presumed endovascular treatment of vascular malformation seen along the right temporal lobe. Improvement of leftward midline shift. |
| 3/16/2017 | DIAGNOSTIC | Transthoracic Echo - Thomas Jefferson University Hospital. IMPRESSION: 1. Normal left ventricular internal dimensions and wall thickness. 2. Overall low normal left ventricular systolic function with segmental wall motion abnormalities - base to mid inferoseptal and base to mid inferior appears slightly aneurysmal and akinetic; inferolateral hypokinesis; normal contraction of remaining walls. 3. Normal right ventricular size and function. 4. Mild tricuspid regurgitation. 5. Trivial pericardial effusion, mostly anterior to right atrium. 6. Right pleural effusion. |

| | | |
|---|---|---|
| 3/16/2017 | DIAGNOSTIC | XR Chest - Thomas Jefferson University Hospital. IMPRESSION: Lines/Tubes/Devices/ Hardware: ET tube tip in appropriate position. Enteric tube present, tip not seen on the is image. Right subclavian line tip projects over the SVC. Lunges: The apices are not visualized. Cannot evaluate for pneumothorax. No focal consolidation or pleural effusion. Heart and mediastinum: Within normal limits. |
| 3/16/2017 | DIAGNOSTIC | EKG - Thomas Jefferson University Hospital. IMPRESSION: Sinus bradycardia. Probable LVH with secondary repolarization abnormality. |
| 3/17/2017 | DIAGNOSTIC | Electroencephalogram - Thomas Jefferson University Hospital. IMPRESSION: Abnormal EEG due to: focal slow waves right fronto-central; focal sharp waves/spikes right frontal; diffuse slow waves. |
| 3/17/2017 | DIAGNOSTIC | XR Chest - Thomas Jefferson University Hospital. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: ET tube 5cm above the carina. There is an enteric tube coursing below the diaphragm with the tip out of the field-of-view. Right subclavian central venous catheter, the tip projecting over the SVC. 2. Lungs: No focal consolidation or pulmonary edema. 3. Pleura: No pneumothorax or pleural effusion. 4. Heart and mediastinum: Normal. |
| 3/17/2017 | DIAGNOSTIC | EKG - Thomas Jefferson University Hospital. IMPRESSION: Sinus bradycardia. Consider anterior infarct. Baseline artifact. |
| 3/17/2017 | DIAGNOSTIC | US Venous Duplex Bilateral Lower Extremities - Thomas Jefferson University Hospital. IMPRESSION: No femoropopliteal DVT. |
| 3/18/2017 | DIAGNOSTIC | XR Chest - Thomas Jefferson University Hospital. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Right subclavian central venous catheter, tip at mid SVC. There is an enteric tube coursing in the expected location thoracic esophagus, gastroesophageal junction, and proximal stomach. However, the caudal end of this tube excluded from this examination. Endotracheal tube, tip approximately 6.3cm above carina. 2. Lungs: Right lower lung parenchymal ill-defined atelectasis. Remaining lungs are clear. 3. Pleura: No pneumothorax or pleural effusion. 4. Heart and mediastinum: Normal. |
| 3/18/2017 | DIAGNOSTIC | EKG - Thomas Jefferson University Hospital. IMPRESSION: Sinus bradycardia. Borderline left axis deviation. Borderline abnormalities, inferior leads. |
| 3/19/2017 | DIAGNOSTIC | XR Chest - Thomas Jefferson University Hospital. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Stable lines and tubes with right subclavian central venous catheter with its tip at mid SVC, endotracheal tube tip 6cm above carina, and enteric tube coursing below the left hemidiaphragm. 2. Lungs: Stable bilateral lung parenchymal atelectasis, greater than the left. 3. Pleura: No pneumothorax or pleural effusion. 4. Heart and mediastinum: Normal. |
| 3/19/2017 | DIAGNOSTIC | EKG - Thomas Jefferson University Hospital. IMPRESSION: Sinus rhythm. Left axis deviation. Poor R wave progression, anterior leads. Low voltage precordial leads. |
| 3/20/2017 | DIAGNOSTIC | Electroencephalogram - Thomas Jefferson University Hospital. IMPRESSION: Abnormal EEG due to: focal slow waves right fronto-central; focal sharp waves/spikes right frontal; diffuse slow waves. This EEG shows focal cerebral dysfunction with cortical hyperexcitability along the known right temporal hemorrhage. In addition, it also shows diffuse cerebral dysfunction, which is non-specific with regard to etiology, occurring in toxic or metabolic encephalopathies. |

| 3/20/2017 | DIAGNOSTIC | EKG - Jefferson Health. IMPRESSION: Sinus rhythm. Borderline R wave progression, anterior leads. |
|---|---|---|
| 3/20/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Endotracheal tube, enteric tube, and right subclavian line in stable position. 2. Lungs: Bibasilar atelectasis. 3. Pleura: No pneumothorax or pleural effusions. 4. Heart & mediastinum: Normal. |
| 3/21/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Enteric feeding tube coursing below hemidiaphragms, with tip out of view. Endotracheal tip 5cm above carina. Right subclavian central venous catheter tip overlying SVC. 2. Lungs: Increasing opacity within the left base, concerning for infectious/inflammatory process. Bibasilar atelectasis, left more than right. 3. Pleura: No pneumothorax or pleural effusion. 4. Heart and mediastinum: Normal. |
| 3/22/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Endotracheal tube and right subclavian line in stable position. 2. Lungs: Ill-defined opacity at the left base likely represents compressive atelectasis versus pneumonia. 3. Pleura: Small left pleural effusion: There is no pneumothorax. 4. Heart & mediastinum: Normal. |
| 3/22/2017 | DIAGNOSTIC | MRI Brain - Jefferson Hospital Neuroscience. IMPRESSION: 1. Redemonstration of large hemorrhage in right cerebral hemisphere associated with the known AVM and right decompressive hemicraniectomy. 2. Punctate area of infarcts. No evidence of global hypoxic injury. |
| 3/23/2017 | DIAGNOSTIC | EKG - Jefferson Health. IMPRESSION: Sinus rhythm. Borderline left axis deviation. RSR in V1 or V2, probably normal variant. |
| 3/23/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Endotracheal tube and right subclavian line in stable position. 2. Lungs: Low lung volumes. Bibasilar atelectasis. Left retrocardiac opacity likely represents atelectasis versus pneumonia. 3. Pleura: Small left pleural effusion. There is no pneumothorax. 4. Heart and mediastinum: Normal. |
| 3/23/2017 | DIAGNOSTIC | US Venous Duplex Bilateral Lower Extremities - Jefferson Health. IMPRESSION: No right or left femoropopliteal deep venous thrombosis. The left popliteal vein was not visualized secondary to pt.'s positioning. |
| 3/24/2017 | DIAGNOSTIC | EKG - Jefferson Health. IMPRESSION: Probable sinus rhythm. Borderline left axis deviation. ABRN R Prog, consider ASMI or lead placement. Borderline abnormalities, diffuse leads. |
| 3/24/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Tracheostomy tube satisfactory position. Stable right subclavian catheter. NG tube is noted. 2. Lungs: Left retrocardiac opacity likely represents atelectasis. Right basilar atelectasis. 3. Pleura: Small left pleural effusion. There is no pneumothorax. 4. Heart and mediastinum: Normal. |
| 3/25/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Tracheostomy tube in satisfactory position. 2. Lungs: Bibasilar atelectasis. Similarly appearing left retrocardiac opacity likely represents dense atelectasis. Pneumonia is also possible in the appropriate clinical context. 3. Pleura: Stable small left pleural effusion. There is no pneumothorax. 4. Heart and mediastinum: Normal. |
| 3/26/2017 | DIAGNOSTIC | Transthoracic Echo - Jefferson Health. IMPRESSION: 1. Normal mitral valve. Mild mitral regurgitation. 2. Overall normal left ventricular |

| | | |
|---|---|---|
| | | systolic function with segmental wall motion abnormalities. There is basal to mid inferior thinning and akinesis. The inferolateral wall is severely hypokinetic. Normal contraction of remaining walls. Non-invasive estimate of LA pressure is normal. 3.. Left pleural effusion. |
| 3/28/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Stable tracheostomy tube. 2. Lungs: Bibasilar atelectasis, stable. 3. Pleura: Small bilateral pleural effusions, left greater than right. There is no pneumothorax. 4. heart and mediastinum: Normal. |
| 3/29/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Endotracheal tube, tip 5cm above carina. 2. Lungs: Stable bilateral asymmetric lower lung dominant pulmonary parenchymal opacification, left greater than right, suggest atelectasis. Pneumonia is possible. 3. Pleura: Moderate left and small right basal pleural effusion. No pneumothoraces. 4. Heart and mediastinum: Stable mild cardiomegaly. |
| 3/30/2017 | DIAGNOSTIC | US Duplex Bilateral Lower Extremities - Jefferson Hospital Neuroscience. IMPRESSION: No right or left femoropopliteal deep venous thrombosis. |
| 4/3/2017 | Magee Rehabilitation Hospital | Hospital Admission 4/3/2017 to 4/20/2017. Pt. admitted for rehabilitation. |
| 4/3/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lungs: Pulmonary vascular congestion. No focal consolidation. 2. Pleura: No pneumothorax or pleural effusion. 3. Heart and mediastinum: Top normal heart size. 4. Osseous structures: Within normal limits. 5. Lines/Tubes/Devices/ Hardware: Tracheostomy in satisfactory position. |
| 4/4/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Tracheostomy tube. 2. Lungs: Mild pulmonary vascular congestion. 3. Pleura: No pneumothorax or pleural effusions. 4. Heart and mediastinum: Top normal in size. |
| 4/20/2017 | Jefferson Hospital Neuroscience | Hospital Admission 4/20/2017 to 4/25/2017. Pt. admitted with wound breakdown. Pt. discharged to Magee Rehabilitation Hospital. |
| 4/20/2017 | DIAGNOSTIC | CT Head - Jefferson Health. IMPRESSION: 1. No extracranial collection. 2. Resolving hemorrhage within the right temporal lobe. 3. Embolization material and aneurysm clips in the region of previously noted AVM. |
| 4/20/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: Lines/Tubes/Devices/ Hardware: Tracheostomy device overlies the trachea at the level of the thoracic inlet. PEG tube overlies the left upper abdomen. Lungs: Mild linear subsegmental atelectasis at the lung bases. No consolidation or pulmonary edema. Pleura: No pneumothorax or pleural effusion. Heart and mediastinum: Stable. |
| 4/21/2017 | DIAGNOSTIC | US Venous Duplex Bilateral Lower Extremities - Jefferson Hospital. IMPRESSION: The left popliteal vein was not visualized for technical reasons. Otherwise, no femoropopliteal deep vein thrombosis. |
| 4/25/2017 | Magee Rehabilitation Hospital | Hospital Admission 4/25/2017 to 9/23/2018. Pt. admitted for inpatient rehabilitation. |
| 4/28/2017 | DIAGNOSTIC | EKG Tracemaster - Jefferson Hospital. IMPRESSION: Sinus rhythm. Late precordial R/S transition. LVH by voltage. |
| 5/8/2017 | DIAGNOSTIC | XR Abdomen - Jefferson Health. IMPRESSION: Feces within the rectum. There is a gaseous appearance of the colon without dilatation. There is a soft tissue density over the pelvis, which could be due to a filled urinary bladder or a pelvic mass. G-tube overlying the left upper quadrant. |

| | | |
|---|---|---|
| 5/8/2017 | DIAGNOSTIC | XR Ankle, Left - Jefferson Health. IMPRESSION: Satisfactory osseous alignment. No large-volume tibiotalar joint effusion. No acute fracture. Well-corticated ossicle inferior to the fibula likely a result of remote trauma. |
| 8/7/2017 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lungs: Normal. 2. Pleura: No pneumothorax or pleural effusions. 3. Heart and mediastinum: Normal. 4. Osseous structures: Within normal limits. 5. Lines/Tubes/Devices/ Hardware: Tracheostomy. |
| 4/3/2018 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Tracheostomy tube in stable position. 2. Lungs: No consolidation or pulmonary edema. 3. Pleura: No pneumothorax or pleural effusions. 4. Osseous structures: Mild thoracic dextrocurvature. 5. Heart & mediastinum: Top normal heart size. Uncoiled thoracic aorta. |
| 7/17/2018 | DIAGNOSTIC | CT Head - Jefferson Health. IMPRESSION: Posttreatment changes. Further encephalomalacia in the right temporal lobe with resolved blood products. |
| 8/23/2018 | DIAGNOSTIC | CT Stryker Sinus - Jefferson Health. IMPRESSION: Stable post AVM treatment changes with right craniectomy. |
| 9/23/2018 | Jefferson Hospital Neuroscience | Hospital Admission 9/23/2018 to 9/25/2018. Pt. admitted for cranioplasty. Pt. discharged to Magee Rehab Hospital. |
| 9/23/2018 | DIAGNOSTIC | XR Chest - Jefferson Health. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: Tracheostomy tube in place, unchanged since previous study. 2. Lungs: Atelectasis posterior to the cardiac silhouette of unknown cause. 3. Pleura: No pneumothorax or pleural effusions. 4. Heart and mediastinum: Stable since the previous study. 5. Osseous structures: Dextrocurvature of the thoracic spine. |
| 9/23/2018 | Rosenwasser, Robert MD - Jefferson Hospital | PROCEDURE: Cranioplasty/Stryker 2 with JP placed. |
| 9/24/2018 | DIAGNOSTIC | EKG - Jefferson Health. IMPRESSION: Sinus rhythm. Borderline R wave progression, anterior leads. Significant ECG contour changes. |
| 9/25/2018 | Magee Rehabilitation Hospital | Hospital Admission 9/25/2018 to 2/17/2019. Pt. admitted for inpatient rehabilitation. |
| 9/25/2018 | DIAGNOSTIC | US Venous Bilateral Lower Extremities - Jefferson Health. IMPRESSION: No femoropopliteal deep vein thrombosis. |
| 6/6/2019 | Jefferson Hospital Neuroscience | Hospital Admission 6/6/2019 to 6/9/2019. Pt. admitted with an intraparietal hemorrhage secondary to an AVM rupture that likely happened 2-3 weeks ago. Pt. discharged to Magee Rehabilitation Hospital with orders to have a repeat CT in 2 weeks. |
| 6/6/2019 | DIAGNOSTIC | CT Head - Thomas Jefferson University Hospital. IMPRESSION: 1. Postsurgical changes from prior AVM treatment. 2. Right temporoparietal parenchymal hemorrhage appears subacute, though is new from 7/17/2018, causing mass effect on the right lateral ventricle without midline shift. |
| 6/6/2019 | DIAGNOSTIC | ECG - Thomas Jefferson University Hospital. IMPRESSION: Possible accelerated junctional rhythm. Left axis deviation. Consider anterior infarct. Nonspecific ST and wave abnormality. |
| 6/7/2019 | DIAGNOSTIC | XR Chest - Thomas Jefferson University Hospital. IMPRESSION: 1. Lines/Tubes/Devices/ Hardware: None provided. 2. Lungs: The pt.'s left hand obscures the left lower lung field. The pt. is rotated to the left. Mild left basilar atelectasis. No consolidation or pulmonary edema in the visualized lung fields. 3. Pleura: No pneumothorax. No pleural effusion. 4. Heart and mediastinum: Within normal limits. |

| 6/7/2019 | DIAGNOSTIC | US Venous Bilateral Lower Extremities - Thomas Jefferson University Hospital. IMPRESSION: No femoropopliteal deep vein thrombosis. |
|---|---|---|
| 6/7/2019 | DIAGNOSTIC | CT Head - Thomas Jefferson University Hospital. IMPRESSION: No significant change in the right temporoparietal hemorrhage. |
| 6/24/2019 | DIAGNOSTIC | CT Head - Thomas Jefferson University Hospital. IMPRESSION: Expected further evolution with interval decrease in density of parenchymal hemorrhage in right temporoparietal region. No evidence of interval acute hemorrhage. No midline shift. |
| 6/27/2019 | Tan, Allison MD - Thomas Jefferson University Hospital | PROCEDURE: IR feeding tube change - gastrostomy. |
| 1/8/2021 | DIAGNOSTIC | US Venous Bilateral Lower Extremities - Thomas Jefferson University Hospital. IMPRESSION: No femoropopliteal deep vein thrombosis. |
| 1/8/2021 | DIAGNOSTIC | XR Chest - Thomas Jefferson University Hospital. IMPRESSION: 1. Lungs: Bibasilar atelectasis, left more than right. No definite pulmonary nodules are identified. If continued clinical concern, CT is more sensitive. 2. Pleura: No pneumothorax or pleural effusions or thickening. 3. Heart and mediastinum: Cardiomegaly. 4. Osseous structures: Osseous demineralization. S-shaped thoracolumbar curvature. 5. Lines/Tubes/Devices/ Hardware: None provided. 6. Dilated transverse colon and splenic flexure, likely chronic changes. No dilated small bowel loops within the partially visualized upper abdomen. |
| 2/19/2021 | DIAGNOSTIC | EKG - Thomas Jefferson University Hospital. IMPRESSION: Sinus or ectopic atrial tachycardia. Consider left atrial abnormality. Lateral leads are also involved. |
| 2/19/2021 | DIAGNOSTIC | CT Head - Thomas Jefferson University Hospital. IMPRESSION: 1. New 2.8cm hyperdense hemorrhage in the medial right temporal lobe in close proximity to hyperdense embolic material since 6/24/2019. 2. Encephalomalacia/gliosis in the right temporal lobe and insula, increased since 6/24/2019 with internal resolution of previously identified hyperdense medial right temporal lobe hemorrhage. Associated ex vacuo dilatation of the atrium of right lateral ventricle. |
| 2/19/2021 | DIAGNOSTIC | CT Chest/Abdomen/Pelvis - Jefferson Hospital. IMPRESSION: 1. No large, central PE. Evaluation of the peripheral pulmonary arteries is limited by streak artifact, respiratory motion artifact, and timing of the contrast bolus. 2. Dilated, fluid-filled esophagus with markedly dilated and fluid-filled stomach. Diffuse mildly dilated and fluid-filled small bowel with air-filled colon to the level of the distal descending/sigmoid. No transition point. Findings are likely related to ileus likely neurogenic rather than bowel obstruction. 3. Consolidation at the lung bases concerning for aspiration. |
| 2/20/2021 | Jefferson Hospital Neuroscience | Hospital Admission 2/20/2021 to 3/1/2021. Pt. admitted for subacute ICH in the medial right temporal lobe with UTI and ileus. Pt. given new diet and PEG tube feed recommendations. Cardiology would consider output SPECT and cardiac MRI. Ambulatory referral to OT/PT/SLP. Follow up with PCP, Dr. Weiner, and Dr. Debenham. |
| 2/20/2021 | DIAGNOSTIC | CT Head - Thomas Jefferson University Hospital. IMPRESSION: Similar appearance of the zone of hyperdensity in the medial right temporal lobe, which could be further characterized with MR imaging. |
| 2/20/2021 | DIAGNOSTIC | CTA Chest - Thomas Jefferson University Hospital. IMPRESSION: 1. No large, central PE. Evaluation of the peripheral pulmonary arteries is limited by streak artifact, respiratory motion artifact, and timing of the contrast bolus. 2. Dilated, fluid-filled esophagus with markedly dilated and fluid-filled |

| | | small bowel with air-filled colon to the level of the distal descending/sigmoid. No transition point. Findings are likely related to ileus likely neurogenic rather than bowel obstruction. 3. Consolidation at the lung bases concerning for aspiration. |
|---|---|---|
| 2/21/2021 | DIAGNOSTIC | CV Echocardiogram - Thomas Jefferson University Hospital. IMPRESSION: Normal left ventricular chamber size and wall thickness. Normal left ventricular systolic function without segmental wall motion abnormalities. The visually estimated left ventricular ejection fraction is 65+/-5%. Tissue duplex velocities are decreased; however, other supportive findings suggestive of diastolic dysfunction are absent. Left ventricular filling pressure is indeterminate. Normal right ventricular size. Low normal right ventricular function. The RV apical free wall appears hypokinetic compared to the basal and mid RV free wall. Tricuspid annular plane systolic excursion 2.3cm. Tricuspid annular systolic velocity 16cm/s. Right atrial size is at the upper limits or normal. Mild tricuspid regurgitation. No pulmonary hypertension. Estimated pulmonary arterial systolic pressure is 26mmHg assuming right atrial pressure of 3mmHg. RV segmental function appears abnormal. |
| 2/22/2021 | DIAGNOSTIC | EKG - Thomas Jefferson University Hospital. IMPRESSION: Sinus rhythm. Borderline AV conduction delay. Borderline left axis deviation. RSR in V1 or V2, probably normal variant. Borderline abnormalities, anterior leads. |
| 2/28/2021 | DIAGNOSTIC | XR Abdomen - Jefferson Hospital. IMPRESSION: Similar mildly dilated loops of small and large bowel throughout the abdomen compatible with ileus. Gastrostomy tube overlies the stomach. |
| 2/28/2021 | DIAGNOSTIC | XR Abdomen - Thomas Jefferson University Hospital. IMPRESSION: Similar mildly dilated loops of small and large bowel throughout the abdomen compatible with ileus. Gastrostomy tubes overlies the stomach. |
| 3/31/2021 | Trufant, Joshua MD - Thomas Jefferson University Hospital | PROCEDURE: Mohs micrographic surgery, 1 surgical stage with complex layered closure. |
| 9/6/2021 | OL Physical Therapy | Pt. attended 52 physical therapy visits between 9/6/2021 and 12/28/2021. Diagnoses: Abnormalities of gait and mobility; Reduced mobility. Modalities and treatment: therapeutic procedures, manual therapy, therapeutic activity. Billing records only. |
| 10/26/2021 | DIAGNOSTIC | US Renal - Thomas Jefferson University Hospital. IMPRESSION: Bilateral nonobstructing renal calculi. The largest calculi are on the left. |
| 1/18/2022 | DIAGNOSTIC | US Renal - Thomas Jefferson University Hospital. IMPRESSION: The bilateral kidneys demonstrate nonobstructing calculi. 0.7cm intravesical calculus. |
| 4/11/2022 | Trufant, Joshua MD - Thomas Jefferson University Hospital | PROCEDURE: Mohs micrographic surgery, 2 surgical stages with complex layered closure. |
| 6/8/2022 | DIAGNOSTIC | CT Abdomen/Pelvis - Thomas Jefferson University Hospital. IMPRESSION: Multiple bilateral nonobstructing renal stones. The largest stone which was previously present in the left renal pelvis on the study of 2/19/2021 is no longer present. No ureteral stone or bladder stone is present at this time. |
| 10/21/2022 | DIAGNOSTIC | US Renal - Thomas Jefferson University Hospital. IMPRESSION: Nonobstructive bilateral renal stones. 4mm stone in the urinary bladder. Findings suspicious for underlying medullary nephrocalcinosis. |

| | | |
|---|---|---|
| 1/23/2023 | Thomas Jefferson University Hospital | PROCEDURE: Bilateral ureteroscopy with stone removal. |
| 1/27/2023 | DIAGNOSTIC | EKG - Thomas Jefferson University Hospital. IMPRESSION: Sinus rhythm. RSR or QR pattern in V1 suggests right ventricular conduction delay. Left axis deviation. Consider anterior infarct. Low voltage QRS in precordial leads. Abnormal ECG. Significant changes have occurred. |
| 2/10/2023 | Kucer, Brian MD - Magee Rehabilitation Hospital | PROCEDURE: Botox injection, non-cosmetic. |
| 2/22/2023 | DIAGNOSTIC | US Renal - Thomas Jefferson University Hospital. IMPRESSION: No hydronephrosis. Bilateral renal stones. |
| 5/22/2023 | Kucer, Brian MD - Magee Rehabilitation Hospital | PROCEDURE: Botox injection, non-cosmetic. |
| 7/1/2023 | DIAGNOSTIC | XR Abdomen - Thomas Jefferson University Hospital. IMPRESSION: Gastrostomy tube overlying the left mid abdomen. Contrast injection through the gastrostomy tube opacifies the stomach and proximal small bowel. Top normal size stool and air filled ascending and air filled transverse colon, smaller to CT abdomen pelvis 6/8/2022. |
| 8/18/2023 | DIAGNOSTIC | CT Abdomen/Pelvis - Thomas Jefferson University Hospital. IMPRESSION: Bilateral renal stones, slightly decreased in size compared to prior examination. No hydronephrosis. Large amount of stool throughout the colon. Correlate clinically for constipation. |
| 9/7/2023 | Kucer, Brian MD - Magee Rehabilitation Hospital | PROCEDURE: Botox injection, non-cosmetic. |
| 12/7/2023 | Kucer, Brian MD - Magee Rehabilitation Hospital | PROCEDURE: Botox injection, non-cosmetic. |
| 3/12/2024 | DIAGNOSTIC | CT Abdomen/Pelvis - Thomas Jefferson University Hospital. IMPRESSION: Motion artifacts from breathing limits optimal evaluation. 1. Multiple nonobstructive bilateral renal calculi, appears progressed since prior CT from 8/13/2023. 2. 7mm nonobstructive calculus in the right renal pelvis. 3. Severe constipation with stercoral proctitis. |
| 4/26/2024 | Kucer, Brian MD - Magee Rehabilitation Hospital | PROCEDURE: Botox injections to left biceps, left flexor carpi radialis, left brachioradialis, left flexor digitorum superficialis, and bilateral soleus muscles. |
| 7/29/2024 | Kucer, Brian MD - Magee Rehabilitation Hospital | PROCEDURE: Botox injection, non-cosmetic. |
| 8/15/2024 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen at home for chronic and acute issues. G-tube needs to be changed - it has only been 2 months but it is losing integrity. Pt. is scheduled for stone removal in September. Pt. has been having BMs about 4-5 days per week with need for a suppository last week. No change in her CICs with good output. Pt. has been wearing prism glasses with eye follow up next week. ASSESSMENT: Gastrostomy status; Calculus of kidney; Essential (primary) hypertension; Homonymous bilateral field defects, left side; Constipation; History of UTI; Hemiplegia following nontraumatic intracerebral hemorrhage; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase. PLAN: Prescriptions provided for Nuvigil, Lorazepam, Keppra, Senna, and Augmentin. G-tube exchanged. Continue Nestle Compleat bolus feed for 100% nutritional needs with water flushes as directed. |
| 8/15/2024 | DIAGNOSTIC | PROCEDURE: Gastrostomy tube exchange - 22 French with 7-10mL. |
| 9/12/2024 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home for chronic and acute issues. Pt.'s mood is good today and she can make eye contact when directed. Pt. gazes to the left. Pt. needs pre-op labs and urine culture for upcoming |

| | | |
|---|---|---|
| | | surgery. Pt.'s husband is requesting post-op neuro ICU and has the instructions for pre-op instructions. Pt.'s skin is in excellent condition with G-tube intact. ASSESSMENT: Gastrostomy status; Calculus of kidney; Essential (primary) hypertension; Homonymous bilateral field defects, left side; Constipation; History of UTI; Hemiplegia following nontraumatic intracerebral hemorrhage; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase. PLAN: Prescriptions provided for Colace, Lexapro, Keppra, and Senna. Urine culture ordered. Of note, pt.'s husband is scheduled to leave for prison 1 week after her surgery which makes me very nervous for the pt.'s safety. I do not believe that she will have the will to live anymore. Pt. has verbalized that she wants to die at times and I fear she would not survive without him. |
| 9/19/2024 | DIAGNOSTIC | EKG - Thomas Jefferson University Hospital. IMPRESSION: Sinus rhythm. Left anterior fascicular block. |
| 10/3/2024 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home for chronic and acute issues. Pt.'s new power of attorney is present with paperwork and was met in the hallway. POA reports that she spoke with pt. last night who said she was feeling "sad, angry, scared". Pt. has not been agitated and has actually been quieter and slightly more solemn. Pt. had stents removed last week with urine culture pending. POA reports that when pt. had stone removal 2 weeks ago, anesthesiologist mentioned that there was a new change in EKG. POA will contact Coram regarding delivery of 22 French G-tube. The tube is intact today and does not need to be changed. ASSESSMENT: Gastrostomy status; Calculus of kidney; Essential (primary) hypertension; Homonymous bilateral field defects, left side; Constipation; History of UTI; Hemiplegia following nontraumatic intracerebral hemorrhage; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase. PLAN: Cardiology appointment scheduled with Dr. Shipon. Medications were reviewed with power of attorney. Changed tube feeds to Nestle Compleat and continue with Pro Source. Follow up in 2 months. |
| 10/14/2024 | DIAGNOSTIC | XR Abdomen - Thomas Jefferson University Hospital. IMPRESSION: No radiographic evidence of calculi. Chronic dilated air-filled sigmoid colon. Rectal stool burden fecal disimpaction. Gastrostomy tube overlies the abdomen. |
| 10/18/2024 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home with reports that she has been holding up surprisingly well with her husband gone. He calls her several times per day and she is calm with no agitation. Pt. continues her usual daily routine. Pt. had abdominal x-ray last week which showed fecal impaction. Pt. was treated and has been having BMs since. We are still in need of a company that will provide sterile straight cath kits with gloves. ASSESSMENT: Gastrostomy status; Calculus of kidney; Essential (primary) hypertension; Homonymous bilateral field defects, left side; Constipation; History of UTI; Hemiplegia following nontraumatic intracerebral hemorrhage; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase. PLAN: G-tube changed today and is OK to use. I prefer not to use Mats anymore for catheter supplies as they are difficult to reach and will send to CHC solutions for the CURE catheter kits. Start using the Bisacodyl suppository twice weekly in addition to regular bowel regimen. Renal ultrasound and Dr. Hubosky end of month. |

| | | |
|---|---|---|
| 10/18/2024 | Pluta, Christine DO - Schuylkill Medical Associates | PROCEDURE: Gastrostomy tube exchange - 22 French with 10cc balloon. |
| 10/28/2024 | DIAGNOSTIC | US Renal - Thomas Jefferson University Hospital. IMPRESSION: 1. Nonobstructing renal calculi. No hydronephrosis. 2. Subcentimeter left upper renal echogenicity, favored angiomyolipoma on correlation with CT 3/12/2024. |
| 11/7/2024 | Kucer, Brian MD - Magee Rehabilitation Hospital | PROCEDURE: Botox injection, non-cosmetic. |
| 11/15/2024 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home with no changes. Caregivers have been utilizing the new bowel regimen with more consistent results. Caregivers are also irrigating bladder twice daily per Dr. Hubosky. There are some abrasions on her feet, possibly from the straps. Pt. has excellent support systems. ASSESSMENT: Gastrostomy status; Calculus of kidney; Essential (primary) hypertension; Homonymous bilateral field defects, left side; Constipation; History of UTI; Hemiplegia following nontraumatic intracerebral hemorrhage; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase; Retention of urine. PLAN: Continue with twice daily bladder irrigations; will order irrigation kits. Continue current bowel regimen. Follow up in 1 month. |
| 11/19/2024 | DIAGNOSTIC | EKG - Thomas Jefferson University Hospital. IMPRESSION: Sinus rhythm. 1st degree AV block. LAFBA, LAD. |
| 12/10/2024 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home. Spoke with pt. privately to ask if she feels depressed and how she is coping with her husband's absence. Pt. seems to be taking it very well; she denies depression but sometimes does feel sad. Things are more solemn and the house is quieter with much less activity. Pt. has had no issues with G-tube or clean intermittent catheterization and has no skin breakdown. ASSESSMENT: Gastrostomy status; Calculus of kidney; Essential (primary) hypertension; Homonymous bilateral field defects, left side; Constipation; History of UTI; Hemiplegia following nontraumatic intracerebral hemorrhage; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase. PLAN: Prescriptions provided for Nuvigil for somnolence and Lorazepam for anxiety. G-tube change due next month. |
| 1/13/2025 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home with no issues. Pt. needs G-tube change today. Pt. did yoga and the stand machine today. Clean intermittent catheterizations are going well. ASSESSMENT: Gastrostomy status; Calculus of kidney; Essential (primary) hypertension; Homonymous bilateral field defects, left side; Constipation; History of UTI; Hemiplegia following nontraumatic intracerebral hemorrhage; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase. PLAN: G-tube changed and is ok for use. Apply Mupirocin and Clobetasol around the tube twice daily for 7 days, then use Mupirocin daily. Order abdominal x-ray. May need to increase suppository use to 3 times per week. |
| 1/13/2025 | Pluta, Christine DO - Schuylkill Medical Associates | PROCEDURE: Gastrostomy tube exchange - 22 French with 10cc balloon. |
| 2/17/2025 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home for chronic and acute issues. Pt. has had huge BMs since increasing bowel regimen and nurse states that she is more drained from all the stooling and at times does not want to do the stand machine. Pt. has CT due next month and pt. says that she does not want it. We discussed backing off on them since she is |

| | | |
|---|---|---|
| | | asymptomatic and would hate to expose her to unnecessary radiation. Pt. has increased Rosacea on her face. She has been more irritable lately, especially around 5pm when her husband calls. She seems to enjoy hearing from him before bed, but the 5pm call triggers her. Pt. has severe dysarthria with good comprehension. She did not have any questions today. She has a left temple lesion. ASSESSMENT: Constipation; Calculus of kidney; Gastrostomy status; Retention of urine; Hemiplegia following non-traumatic intracerebral hemorrhage affecting left non dominant side; Essential (primary) hypertension; Homonymous bilateral field defects, left side; History of UTI; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase; Hemiplegia following non-traumatic intracranial hemorrhage affecting right dominant side. PLAN: Decrease suppository to twice weekly. Repeat abdominal x-ray in 1-2 months. Pt. has dermatology appointment in March. Continue redirection and Ativan for evening agitation. |
| 3/14/2025 | Thomas Jefferson University Hospital | PROCEDURE: Skin biopsy to forehead x3. |
| 3/19/2025 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home. She had 3 biopsies of her forehead on Friday with results pending. Dr. Hubosky advised that we can hold off on the CT scan until the summer. Pt. did go outside 2 days ago and may go out today as well. Her afternoon agitation and outbursts are manageable by most of the caregivers. She is venting and absolutely allowed to do so. ASSESSMENT: Constipation; Calculus of kidney; Gastrostomy status; Retention of urine; Hemiplegia following non-traumatic intracerebral hemorrhage affecting left non dominant side; Essential (primary) hypertension; Homonymous bilateral field defects, left side; History of UTI; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase; Hemiplegia following non-traumatic intracranial hemorrhage affecting right dominant side. PLAN: G-tube to be changed at next visit. |
| 4/15/2025 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home with caregivers present. She had an elevated temperature last night that responded to Tylenol with no report of fever today. Caregiver states that urine was amber colored this morning. Pt. denies feeling irritable and denies abdominal pain. Her Mohs surgery has been postponed. Pt. is getting new ankle braces next week. Pt. needs bilateral foot drop braces to prevent further foot drop, minimize pain from ankle contractures, and allow her to participate in rehabilitation exercises. Pt. in need of G-tube change today, but they do not have a 22 French. We called Coram and requested a new one. We were reminded to call every 3 months to get it delivered. Pt.'s current tube is starting to lose its integrity. ASSESSMENT: Constipation; Calculus of kidney; Gastrostomy status; Retention of urine; Hemiplegia following non-traumatic intracerebral hemorrhage affecting left side; Essential (primary) hypertension; Homonymous bilateral field defects, left side; History of UTI; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase; Hemiplegia following non-traumatic intracranial hemorrhage affecting right dominant side. PLAN: Prescription left for urine culture to take with sample to LabCorp. G-tube on order and once it arrives, I will return to insert it. New bilateral foot drop ankle brace fitting next week. |
| 5/13/2025 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home with no further fevers since last UTI treated. Pt.'s nurse reports she is eliminating good amounts with BMs |

| | | every other day. Pt. went to the Center City office to be fitted for foot drop braces and they are on order. Pt. had Mohs procedure yesterday on forehead. G-tube changed last month. Pt.'s nurse is requesting if we can try Metamucil instead of MiraLax to help with stool consistency. ASSESSMENT: Constipation; Calculus of kidney; Gastrostomy status; Retention of urine; Hemiplegia following non-traumatic intracerebral hemorrhage affecting left side; Essential (primary) hypertension; Homonymous bilateral field defects, left side; History of UTI; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase; Hemiplegia following non-traumatic intracranial hemorrhage affecting right dominant side; Squamous cell carcinoma of face. PLAN: Change to Metamucil and continue Colace, Senna, and suppository. Order G-tube in July. Order abdominal x-ray to check stool burden. Follow up in 1 month. |
|---|---|---|
| 6/17/2025 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home with caregivers reporting the Metamucil did not work and they went back to MiraLax after 2 weeks. X-ray did not show a heavy stool burden. Pt. is healing well from Mohs procedure. ASSESSMENT: Constipation; Calculus of kidney; Gastrostomy status; Retention of urine; Hemiplegia following non-traumatic intracerebral hemorrhage affecting left side; Essential (primary) hypertension; Homonymous bilateral field defects, left side; History of UTI; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase; Hemiplegia following non-traumatic intracranial hemorrhage affecting right dominant side; Squamous cell carcinoma of face. PLAN: No changes made today. Pt. due for CT of abdomen to monitor for renal stones. Schedule fitting for foot braces. G-tube change due in July. |
| 7/15/2025 | Pluta, Christine DO - Schuylkill Medical Associates | HV-follow-up. Pt. seen in home and is due for G-tube change. Pt. is awaiting a new brace for left arm. She received her new ankle braces from Lawall. Pt.'s mood reported to be stable for the most part but she still gets agitated sometimes in the afternoon/evening. ASSESSMENT: Constipation; Calculus of kidney; Gastrostomy status; Retention of urine; Hemiplegia following non-traumatic intracerebral hemorrhage affecting left side; Essential (primary) hypertension; Homonymous bilateral field defects, left side; History of UTI; Abnormal weight gain; Orthostatic hypotension; Pyogenic granuloma; Dysphagia, oropharyngeal phase; Hemiplegia following non-traumatic intracranial hemorrhage affecting right dominant side; Squamous cell carcinoma of face; Hordeolum externum of right upper eyelid. PLAN: Prescriptions provided for Erythromycin ointment with warm compresses. G-tube changed and ready to use. G-tube to be changed every 3 months and as needed. Will discuss CT scan with Dr. Hubosky. |
| 7/15/2025 | Pluta, Christine DO - Schuylkill Medical Associates | PROCEDURE: Gastrostomy tube exchange - 22 French with 10cc balloon. |

**Current Medical Status and Treatment:** a telephone interview with Tara Chupka was completed on behalf of Ms. Dougherty on August 12, 2025, and followed standard intake assessment methodology. Topics discussed included: physical status, functional limitations, current treating providers, recent diagnostics, planned or considered surgery, status of physical therapy programs, equipment needs, current medications, and planned or considered injections. Additionally, if appropriate, information regarding spinal cord stimulator, home attendant care needs, and home/vehicle modifications was obtained. Information obtained during the intake assessment is included in the future medical cost projection chart.

## Future Medical Cost Projection

**General Information:** cost projection specialists follow a standard methodology in determining future medical needs and costs for a future medical cost projection, which differs from life care planning methodology. The cost projection includes information obtained in medical records, discussed during client intake assessment, or as advised by treating providers. Additional projections are determined through standard of care treatment or case management protocol.

**Specific Considerations:** Medicare generally does not cover items or services considered non-medical, routine, or primarily for comfort and convenience, including custodial/24-hour in-home attendant care. Coverage is limited to certain situations when specific medical criteria are met.

**Basis of Cost Factoring:** costs have been researched using American Hospital Directory, Physician's Fee and Coding, goodrx.com, actual billing records, Find-a-code, MedLife/Medata, and reliable internet sources. Generic pricing for medications has been used if generic drugs are currently used. Mid-range pricing is used if costs are based on Physician's Fee and Coding. The appropriate state or federal fee schedule is utilized when applicable. Costs have not been reduced to present day value or factored for inflation.

Life expectancy is per CDC National Vital Statistics or per specific state code of law. A final opinion on life expectancy should be determined by an economic analyst, treating physician, or certified insurance actuary.

**Summary:** Ms. Dougherty requires lifelong medical treatment resulting from injuries received in this accident. For details on projected future medical treatment, please see Cost Projection on the next page, which is a conservative and reasonable estimate of the future medical needs/costs for client. This Medical Cost Projection should be updated periodically as new information becomes available.

**Cecelia Dougherty**
**Usual/Customary Fee Schedule**

*A Medical Cost Projection is a consulting report. In the event trial testimony is anticipated, it is recommended this Medical Cost Projection be converted to a Life Care Plan.*

| CATEGORY/ CPT CODE | MEDICAL TREATMENT | YEARLY/ TOTAL # | UNIT COST | YEARLY COST | LIFETIME COST |
|---|---|---|---|---|---|
| | | | YEARS OF LIFE EXPECTANCY: | | 21.0 |
| Diagnostics, 74019 | X-ray abdomen | 1 | $674.00 | $674.00 | $14,154.00 |
| Diagnostics, 74170 | CT abdomen | 0.2 | $4,421.00 | $884.20 | $18,568.20 |
| Diagnostics, 70551 | MRI brain | 0.2 | $5,067.00 | $1,013.40 | $21,281.40 |
| Laboratory, 85025 | CBC | 2 | $158.00 | $316.00 | $6,636.00 |
| Laboratory, 80053 | CMP | 2 | $448.00 | $896.00 | $18,816.00 |
| Laboratory, 36415 | Venipuncture | 2 | $49.00 | $98.00 | $2,058.00 |
| Physician, 99214 | Primary Care: lab work/eval, monitor/treat condition | 2 | $396.04 | $792.08 | $16,633.68 |
| Physician, 99214 | Physical Medicine & Rehabilitation: monitor/treat condition | 2 | $396.04 | $792.08 | $16,633.68 |
| Physician, 99214 | Urology: monitor/treat condition | 2 | $396.04 | $792.08 | $16,633.68 |
| Physician, 99214 | Gastroenterology: monitor/treat condition | 2 | $396.04 | $792.08 | $16,633.68 |
| Physician, 99214 | Neurology: monitor/treat condition | 4 | $396.04 | $1,584.16 | $33,267.36 |
| Physician, 96132, 96133x9 | Neuropsychology evaluation | 1 only | $4,700.38 | n/a | $4,700.38 |
| Counseling, 90834 | Cognitive-Behavioral Therapy: chronic pain management | 10 only | $505.34 | n/a | $5,053.40 |
| Equipment | Emergency evacuation chair | 0.1 | $1,195.00 | $119.50 | $2,509.50 |
| Equipment | Prism glasses | 0.2 | $19.98 | $4.00 | $84.00 |
| Equipment | Barrier cream, 6pk | 12 | $32.87 | $394.44 | $8,283.24 |
| Equipment | Wipes, 720pk | 12 | $37.99 | $455.88 | $9,573.48 |
| Equipment | Briefs, 72pk | 36 | $55.99 | $2,015.64 | $42,328.44 |
| Equipment | I & O catheter kit, 50pk | 24 | $224.03 | $5,376.72 | $112,911.12 |
| Equipment | Suction machine | 0.2 | $248.95 | $49.79 | $1,045.59 |
| Equipment | Suction tubing | 52 | $7.99 | $415.48 | $8,725.08 |
| Equipment | Yankauer suction devices | 52 | $7.61 | $395.72 | $8,310.12 |
| Equipment | Compression socks | 2 | $9.99 | $19.98 | $419.58 |
| Equipment | Non-custom left leg brace | 0.5 | $44.65 | $22.33 | $468.93 |
| Equipment | Non-custom right leg brace | 0.5 | $44.65 | $22.33 | $468.93 |
| Equipment | Non-custom left arm brace | 0.5 | $21.97 | $10.99 | $230.79 |
| Equipment | Hospital bed with mattress | 0.1 | $5,298.00 | $529.80 | $11,125.80 |
| Equipment | Moto-med bike | 0.2 | $10,995.00 | $2,199.00 | $46,179.00 |
| Equipment | Power wheelchair with standing ability | 0.2 | $15,738.00 | $3,147.60 | $66,099.60 |
| Equipment | Manual wheelchair | 0.2 | $549.00 | $109.80 | $2,305.80 |
| Equipment | Shower chair | 0.2 | $181.00 | $36.20 | $760.20 |
| Equipment | Hoyer lift sling | 1 | $159.00 | $159.00 | $3,339.00 |
| Equipment | Hoyer lift | 0.2 | $2,518.00 | $503.60 | $10,575.60 |
| Equipment | Wheelchair accessible van allowance, to include maintenance | 0.1 | $60,000.00 | $6,000.00 | $126,000.00 |
| Medications | Omega 3 60/month | 12 | $28.99 | $347.88 | $7,305.48 |
| Medications | Enalapril 10mg 30/month | 12 | $27.33 | $327.96 | $6,887.16 |
| Medications | Nuvigil 150mg 30/month | 12 | $568.08 | $6,816.96 | $143,156.16 |
| Medications | Lexapro 25mg 30/month | 12 | $61.04 | $732.48 | $15,382.08 |
| Medications | Claritin 30/month | 12 | $7.49 | $89.88 | $1,887.48 |
| Medications | Flonase daily | 12 | $52.62 | $631.44 | $13,260.24 |
| Medications | Pepcid 20mg 60/month | 12 | $18.42 | $221.04 | $4,641.84 |
| Medications | Keppra 100mg/5ml twice daily | 12 | $38.28 | $459.36 | $9,646.56 |
| Medications | Baclofen 10mg 90/month | 12 | $51.40 | $616.80 | $12,952.80 |
| Medications | Colace 25ml twice daily | 12 | $6.04 | $72.48 | $1,522.08 |
| Medications | Senna 10mg daily | 12 | $17.37 | $208.44 | $4,377.24 |
| Medications | Ativan 0.5mg PRN | 4 | $50.21 | $200.84 | $4,217.64 |
| Medications | Simethicone gas relief 30/month | 12 | $19.99 | $239.88 | $5,037.48 |
| Medications | Vitamin C 500mg 60/month | 12 | $10.99 | $131.88 | $2,769.48 |
| Medications | Miralax daily | 12 | $21.96 | $263.52 | $5,533.92 |
| Medications | Bisacodyl suppositories 10mg 90/month | 12 | $29.99 | $359.88 | $7,557.48 |
| Medications | Melatonin 24mL daily | 12 | $13.95 | $167.40 | $3,515.40 |
| Medications | Vitamin D 1000iu 30/month | 12 | $22.97 | $275.64 | $5,788.44 |
| Medications | Vitamin B12 1000mcg 30/month | 12 | $14.95 | $179.40 | $3,767.40 |
| Medications | Magnesium 400mg 30/month | 12 | $19.99 | $239.88 | $5,037.48 |
| Medications | Complete Organic Blends food supplement | 12 | $47.99 | $575.88 | $12,093.48 |
| Medications | Pro Source 2 packets daily | 12 | $55.20 | $662.40 | $13,910.40 |
| Medications | Prune juice 5g daily | 12 | $14.99 | $179.88 | $3,777.48 |
| Medications | Jarro Dophilos 50 billion CFU probiotic | 12 | $48.49 | $581.88 | $12,219.48 |
| Therapy, 97110, 97530, 97535 | Physical therapy | 12 | $315.77 | $3,789.24 | $79,574.04 |

| | | | | | |
|---|---|---|---|---|---|
| Injections, 64612, J0585x200 | Botox for muscle spasm, additional TBD | 6 only | $5,660.21 | n/a | $33,961.26 |
| Procedure | Gastronomy tube change (outpatient) | 4 | $4,783.46 | $19,133.84 | $401,810.64 |
| **Total for Medical Treatment** | | | | | **$1,474,403.88** |
| **In-Home Care Consideration** | | | | | |
| In-Home Care | In-home attendant care, 24 hours/day | 8736 | $34.00 | $297,024.00 | $6,237,504.00 |

**Cecelia Dougherty**
**Physician Statement**

| Category | Medical Treatment | Rationale for Inclusion | Physician: review and confirm items considered, add commentary or additional information |
|---|---|---|---|
| **Injury Date:** | 3/15/2017 | **Based on review of medical records and client interview** | **Conditions: Neurological** |
| Diagnostics | X-ray abdomen | Based on diagnosis of abdominal condition, allowance for one x-ray considered annually for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Diagnostics | CT abdomen | Based on diagnosis of abdominal condition, allowance for CT considered every five years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Diagnostics | MRI brain | Based on diagnosis of neurological condition, allowance for MRI considered every five years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Laboratory | CBC | Based on current use of daily medications and NSAIDs, liver and kidney function testing considered annually for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Laboratory | CMP | Based on current use of daily medications and NSAIDs, liver and kidney function testing considered annually for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Laboratory | Venipuncture | Based on current use of daily medications and NSAIDs, liver and kidney function testing considered annually for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Physician | Primary Care: lab work/eval, monitor/treat condition | Based on need for liver and kidney function studies, evaluations to monitor results of laboratory testing considered yearly for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Physician | Physical Medicine & Rehabilitation: monitor/treat condition | Based on diagnosis of neurological condition, evaluations to monitor condition considered biannually for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Physician | Urology: monitor/treat condition | Based on diagnosis of urological condition, evaluations to monitor condition considered biannually for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Physician | Gastroenterology: monitor/treat condition | Based on diagnosis of gastroenterological condition, evaluations to monitor condition considered biannually for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Physician | Neurology: monitor/treat condition | Based on diagnosis of neurological condition, evaluations to monitor condition considered quarterly for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Physician | Neuropsychology evaluation | Based on diagnosis of TBI, loss of consciousness, & displayed symptomatology of cognitive-behavioral deficits | Agree - Tim Osbon, MD, MS, CLCP |
| Counseling | Cognitive-Behavioral Therapy: chronic pain management | Based on diagnosis of chronic pain, standard protocol, counseling services recommended | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Emergency evacuation chair | Based on current use, standard replacement considered every ten years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Prism glasses | Based on current use, standard replacement considered every five years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Barrier cream, 6pk | Based on current use, standard replacement considered monthly for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Wipes, 720pk | Based on current use, standard replacement considered monthly for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Briefs, 72pk | Based on current use, standard replacement considered three times monthly for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | I & O catheter kit, 50pk | Based on current use, standard replacement considered twice monthly for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Suction machine | Based on current use, standard replacement considered every five years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Suction tubing | Based on current use, standard replacement considered weekly for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Yankauer suction devices | Based on current use, standard replacement considered weekly for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Compression socks | Based on current use, standard replacement considered twice annually for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Non-custom left leg brace | Based on current use standard replacement considered every other year for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Non-custom right leg brace | Based on current use standard replacement considered every other year for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Non-custom left arm brace | Based on current use standard replacement considered every other year for lifetime | Agree - Tim Osbon, MD, MS, CLCP |

| Equipment | Hospital bed with mattress | Based on current use standard replacement considered every ten years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
|---|---|---|---|
| Equipment | Moto-med bike | Based on current use standard replacement considered every five years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Power wheelchair with standing ability | Based on current use standard replacement considered every five years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Manual wheelchair | Based on current use standard replacement considered every five years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Shower chair | Based on current use standard replacement considered every five years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Hoyer lift sling | Based on current use standard replacement considered annually for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Hoyer lift | Based on current use standard replacement considered every five years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Equipment | Wheelchair accessible van allowance, to include maintenance | Based on current use standard replacement considered every ten years for lifetime | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Omega-3 60/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Enalapril 10mg 30/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Nuvigil 150mg 30/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Lexapro 25mg 30/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Claritin 30/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Flonase daily | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Pepcid 20mg 60/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Keppra 100mg/5ml twice daily | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Baclofen 10mg 90/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Colace 25ml twice daily | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Senna 10mg daily | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Ativan 0.5mg PRN | Based on current formulary, periodic/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Simethicone gas relief 30/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Vitamin C 500mg 60/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Miralax daily | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Bisacodyl suppositories 10mg 90/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Melatonin 24mL daily | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Vitamin D 1000iu 30/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Vitamin B12 1000mcg 30/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Magnesium 400mg 30/month | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Complete Organic Blends food supplement | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Pro Source 2 packets daily | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Prune juice 5g daily | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Medications | Jarro Dophilos 50 billion CFU probiotic | Based on current formulary, monthly/lifelong consideration | Agree - Tim Osbon, MD, MS, CLCP |
| Therapy | Physical therapy | Based on recommendations noted in medical records, 12 PT sessions annually are considered for worsening of condition or symptomatic flare-ups | Agree - Tim Osbon, MD, MS, CLCP |
| Injections | Botox for muscle spasm, additional TBD | Based on recommendations noted in medical records, six injections are considered | Agree - Tim Osbon, MD, MS, CLCP |
| Procedure | Gastronomy tube change (outpatient) | Based on recommendations noted in medical records, G-tubes changes four times annually | Agree - Tim Osbon, MD, MS, CLCP |

| In-Home Care | In-home attendant care, 24 hours/day | Based on current regimen | Agree - Tim Osbon, MD, MS, CLCP |
|---|---|---|---|
| | | | It is my opinion, to a reasonable degree of medical certainty, Ms. Cecelia Dougherty requires at least this level of medical care related to injuries resulting from the March 15, 2017 incident. |
| | | Physician Name (Print) | Tim Osbon, MD, MS, CLCP |
| | | Signature | |
| | | Date | August 20, 2025 |

# EXHIBIT D



December 4, 2023

To The Honorable Judge Jeffrey L. Schmehl,

I am the primary home care physician for Cecelia Dougherty, wife of John Dougherty. I have been caring for Cecelia since 2019 and have worked closely with John over the past 4 years. I am the sole owner and sole practitioner of Schuylkill Medical Associates, which is a house call practice specializing in the care of home bound patients who are severely ill. I have over 15 years of experience in caring for the home bound.

Cecelia has what is called an anoxic brain injury from an intracranial hemorrhage. This brain injury has left her a quadriplegic and dependent on 24 hour skilled care for survival. She resides at home with around the clock caregivers and highly specialized equipment. John not only is her primary caregiver but manages all of her medical equipment and supplies, manages her health insurance bills and referrals, coordinates her medical appointments and transportation, and handles the scheduling of caregivers and therapists. He is the only one who knows and understands every nuance of her care because he has dedicated the past 6 years of his life to learning every detail involved in her life sustaining medical regimen.

Cecelia has a feeding tube for all of her nutrition and medication. John manages her medication and is the only one who can pick up emergency medication if needed from a 24 hour pharmacy in the middle of the night.

Cecelia requires around the clock urinary catheterization, has chronic kidney stones and frequent urinary tract infections that can be life threatening. John can detect the slightest changes in her behavior that are indicative of an infection. He has prevented her from being hospitalized on many occasions.

Cecelia also suffers from recurrent bowel obstructions and requires close supervision of her bowel patterns to prevent hospitalization.

Cecelia's medical equipment such as her hospital bed, hoyer lift, stand machine, wheelchair, and foot braces, are constantly in need of repairs or maintenance. John communicates with the all of the medical



Schuylkill Medical Associates, LLC
"Charting a new course in geriatric home care."

equipment companies to schedule repairs.  If any one piece of equipment remains broken for a prolonged period, Cecelia's health is in jeopardy.

Cecelia has speech, ocular, and physical therapists that treat her on an ongoing basis.  John coordinates all of their visits and can interpret her needs based on her eye movements, hand movements or lip movements.

It has become clear to me that, despite all of the skilled medical personnel involved in Cecelia's care, her husband, John, is the reason that she remains alive with quality of life.  I truly believe that without John present, Cecelia's physical and mental health would suffer to such an extreme, that it would not be possible for her to survive at home.

Sincerely,

Christine Pluta, DO
Medical Director



Schuylkill Medical Associates, LLC
"Charting a new course in geriatric home care."

To Whom It May Concern,

I am the primary home care physician for Cecelia Dougherty and have been supervising her care with her husband, John, for the past several years.
Cecelia will be undergoing kidney surgery for stone removal on September 19th, as stated in the previous letter.
She will have general anesthesia and then be monitored in the neuro ICU until discharge.
Her post operative recovery will take up to 2 months, since she will have ureteral stents placed to allow for stone sediment drainage. These stents put her at a high risk of infection and sepsis.
Cecelias head nurse will be on vacation for 4 weeks after the surgery which leaves large gaps in her care schedule.

Cecelia already has a shorter life expectancy than most given her anoxic brain injury and aneurysms. She is at high risk for secondary infections and recurrent aneurysms. Without John in her life, I believe her life expectancy will be much shorter. Cecelia is co-dependent on John both emotionally and physically and will have no motive to live without his presence. She is non verbal and communicates the best with her husband. John oversees all of her care and trains any new staff. He is the only person who knows every nuance of her care needs.

For Cecelias survival, I ask that John be allowed to remain home, not only during the postoperative period, but indefinitely. From a medical perspective, John's absence will ultimately lead to a cascade of events that have a high likelihood of causing an untimely death of his wife.

Sincerely,

Christine Pluta, DO
Medical Director

Phone: 866-206-2866 • Fax: 609-208-3233
310 Whitehorse Ave. Hamilton, NJ 08610

# EXHIBIT E

icusign Envelope ID: C05ABB96-C72D-425D-ACCA-5D9067A1092D

BRIGHTSIDE
COUNSELING LLC

# Brightside Counseling Follow-Up Update

**09/25/2024**

John Dougherty has demonstrated consistent engagement in his weekly therapy sessions, actively participating in discussions and interventions tailored to his complex emotional and psychological needs. His therapy has focused on managing heightened anxiety, largely stemming from the overwhelming responsibilities as his wife Cecelia's primary caregiver. John's involvement in her recent surgery was pivotal, as he remained by her side throughout the process, providing critical emotional and physical support. His presence has been shown to directly impact her health outcomes, with Cecelia's well-being highly dependent on his continuous care and advocacy.

Several distressing incidents further underscore the gravity of Cecelia's dependence on John. During a conversation about the potential impact of John's absence in preparation for his upcoming sentencing, Cecelia unequivocally stated that she believed she would not survive without him and wrote down the word "DIE". This was starkly evident during an episode in which she became extremely agitated, mistakenly believing that John had passed away due to his brief absence. On another occasion, Cecelia entered a near-catatonic state, characterized by physical stiffness and emotional withdrawal in response to his absence. Medical intervention was required, with a nurse from a nearby hospital having to be called to help calm her down. These instances clearly illustrate the profound psychological and emotional reliance Cecelia has on John, highlighting the irreplaceable role he plays in maintaining her stability and quality of life.

John has also faced moral and ethical dilemmas regarding the visibility of his caregiving efforts. Despite advice from his previous legal counsel to publicly demonstrate the extent of his

Docusign Envelope ID: C05ABB96-C72D-425D-ACCA-5D9067A1092D

BRIGHTSIDE
COUNSELING LLC

role in Cecelia's care, he found this suggestion degrading and refused to exploit his wife's condition for legal sympathy. He remains deeply committed to preserving her dignity and privacy, although this decision has contributed to a sense of isolation, as many are unaware of the immense emotional and physical toll caregiving has had on him.

Given the enormity of John's caregiving responsibilities, compounded by the psychological toll and unresolved trauma he continues to experience, it is imperative that he remains engaged in his therapeutic treatment. John has expressed his determination to fulfill his legal obligations, and when the time comes, participation in the **Residential Drug Abuse Program (RDAP)** will provide him with the structured support necessary to mitigate the risk of relapse. The RDAP program, coupled with ongoing therapy, will equip John with tools to manage the mounting pressures of caregiving, while addressing his anxiety, panic attacks, and the stress that threaten to overwhelm him. Developing effective coping mechanisms to prevent caregiver burnout will be crucial to his long-term well-being.

Furthermore, it is recommended that John continues in his caregiving role, as his presence has been essential to both Cecelia's quality of life and his own mental health. Recently, Cecelia has experienced further health setbacks, including cardiac complications and a nosocomial infection, further highlighting the critical nature of John's involvement. When the time comes for John to pay his debt to society in whichever manner that shows, there should be a comprehensive transition plan for Cecelia's care. This plan should incorporate external support systems aimed at alleviating some of John's considerable caregiving responsibilities, ensuring that his mental health is preserved as a priority. Failure to implement such a plan may result in a further deterioration of both John's and Cecelia's health. Therefore, sustained efforts are

Docusign Envelope ID: C05ABB96-C72D-425D-ACCA-5D9067A1092D


BRIGHTSIDE
COUNSELING LLC

essential to address the severe caregiver strain that John is experiencing, as well as to provide the

necessary resources for his continued mental health support during this challenging period.

Submitted,

DocuSigned by:


F800F4117A864F2...

Alphonso Nathan, MS, LPC

Vice President

Brightside Counseling LLC

# EXHIBIT F

### AFFIDAVIT OF TARA CHUPKA

I, Tara Chupka, hereby state the following to be true and correct, to the best of my knowledge, and I am aware that these statements are subject to 42 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

1.      My name is Tara Chupka and I am an adult over 21 years of age and of sound mind.

2.      I am currently 41 years old. I was born on January 28, 1984.

3.      I am the adopted daughter of Cecelia Dougherty and John Dougherty. I make this affidavit in support of my father's motion for compassionate release.

4.      I currently reside in Pennsylvania and am employed full-time as in-house counsel for a private company. My work hours are generally from 7:00 a.m. to 5:00 p.m., and I do not have the flexibility to work remotely.

5.      I earn approximately $150,000 annually, and after taxes, my take-home pay is about $120,000. I am a homeowner with a monthly mortgage of approximately $1,600. Additionally, I carry more than $250,000 in student loan debt, much of which remains from law school and was temporarily deferred during the COVID-19 pandemic. These loans significantly strain my financial capacity.

6.      I live approximately 45 minutes away from my mother, Cecelia Dougherty. Despite my full-time job, I travel to her home multiple times each week after work to assist in her care. This assistance has drastically increased since my father's incarceration.

7.      Since his incarceration, I now provide nearly 40 hours per week in direct and indirect caregiving support. This burden is unsustainable. I am physically and emotionally exhausted. The level of care my mother requires is beyond what I can continue to provide,

especially while maintaining my full-time legal career. It is taking a serious toll on my mental and physical health, and I fear I cannot continue this pace much longer.

8.      I am not married and do not currently have a partner. The stress, public scrutiny, and emotional toll of the last several years, especially stemming from my father's high-profile legal case, have affected my personal life significantly. I attribute my lack of a significant relationship in part to the overwhelming obligations I have taken on for my mother and the intense media attention surrounding my family.

9.      I have sought psychiatric support for the past five to six years due to chronic stress and emotional strain. I see Dr. Franklin Maleson, a psychiatrist, who initially saw me on a weekly basis and now sees me monthly for continued treatment.

10.     My mother, Cecelia Dougherty, was diagnosed with a debilitating neurological condition in March 2017. Since then, her condition has deteriorated significantly. She requires around-the-clock care and cannot be left alone for even short periods.

11.     She now requires multiple daily catheterizations, a PEG tube for feeding, and assistance with every aspect of her hygiene and physical mobility. She is incontinent and uses adult diapers. Her body must be regularly repositioned to prevent bedsores, and she uses orthopedic boots and braces to avoid limb contractures.

12.     In addition to direct care, I manage medical logistics. I am responsible for tracking and managing feeding supplies, hydration supplements, adult diapers, gloves, and other sanitary materials. I also assist with overseeing her medication intake and ensure that prescriptions are filled and picked up, often at odd hours or from multiple pharmacies, due to medication timing and insurance complications.

13.     My mother was previously emotionally and psychologically stable while my father was at home. Since his incarceration, her anxiety has intensified. She now consumes Ativan at a far higher rate, approximately one bottle per month, whereas she previously used thirty pills across three months.

14.     The absence of my father has taken a devastating emotional and physical toll on my mother. She becomes noticeably happier and more alert when she speaks to him on the phone. His absence diminishes her engagement, and when he is unable to call due to limited minutes, she often shuts down emotionally.

15.     Her communication is now limited to blinking or eye movement. When she is fatigued or unwell, she cannot communicate at all, leaving her vulnerable and isolated in the absence of experienced caregivers.

16.     Tragically, due to the nature of her neurological condition and brain injury, my presence often causes her extreme distress. She screams uncontrollably when I approach, and it takes hours to calm her down. This reaction is heartbreaking and makes it impossible for me to provide certain forms of care.

17.     My sister Erin and I have done everything we can to support our mother, but our capacity is limited. Both of us work full time and are not medically trained. The professional nurses we rely on are overburdened, sometimes unresponsive, and frequently cancel shifts without warning.

18.     I live paycheck to paycheck, despite my income. I have a Fidelity investment account with roughly $20,000, but that amount is rapidly depleting due to emergency costs and supplemental caregiving needs.

19.     There have been multiple occasions when I've had to leave work abruptly due to a nurse canceling. My mother cannot be left unattended. Medical professionals have informed us that if she is ever found alone, it may trigger a mandatory report to Adult Protective Services.

20.     My mother's current care is primarily funded through a private trust, "The Cecelia Dougherty Trust," established to cover medical expenses. I serve as the trustee of the trust and have personally overseen its funding and management.

21.     To fund the trust, our family made extraordinary sacrifices. In May 2022, my father sold our longtime family home at 1933 East Moyamensing Avenue in Philadelphia for $500,000. Of that amount, my father received $227,524.95 in net proceeds. My father immediately contributed half of those proceeds into The Cecelia Dougherty Trust, with the remaining half being used to pay necessary and unavoidable expenses, including federal and state taxes, and legal fees stemming from my father's defense, much of which remain unpaid.

22.     That same year, my father closed out his Prudential/Empower retirement account, which resulted in a net distribution of $434,816.52. He contributed half of that amount to the trust as well, while the other half was used to cover additional legal expenses, outstanding debts, and essential living costs. These payments were not discretionary; they were critical to sustain my family during an incredibly difficult time.

23.     As of June 2024, the balance of The Cecelia Dougherty Trust stood at $641,741. That balance has since declined to $354,568. Cecelia's 24/7 in-home nursing care costs approximately $44,070 per month. At this rate, the trust will be exhausted in less than 9 months.

24.     While insurance offsets some costs, a significant portion remains out-of-pocket and must be paid directly from the trust. At this burn rate, the trust will be completely exhausted in less than 15 months, possibly sooner if emergencies, complications, or last-minute nurse

cancellations require premium replacement staff. Once depleted, our family will have no financial means to afford the nursing staff required to safely manage her condition.

25.     We have explored other care options, including skilled nursing homes, long-term care, and acute facilities. However, due to her cognitive alertness but profound physical disability, no local facilities are equipped or willing to admit her. Her condition falls into a difficult gray area, too dependent for independent living but too mentally aware for conventional nursing homes.

26.     My grandfather, Cecelia's father, has contributed to Cecelia's caretaking since my father has been incarcerated. As of recently, my grandfather underwent prostate surgery removal following his cancer diagnosis. As of June 3rd, 2025, my grandfather was rushed to the hospital following complications after his prostate removal. My grandfather is no longer able, and will never be again able, to assist in caring for Cecelia, leaving my father, John, as our only possible remaining caregiver.

27.     My father's presence in the home prior to his incarceration was essential to my mother's health and well-being. He clothed her, fed her, bathed her, repositioned her, administered medications, ordered and tracked her prescriptions, catheterized her, brushed her teeth, managed insurance claims, scheduled and attended her appointments, and coordinated every detail of her care with tireless devotion.

28.     His absence has been catastrophic. He is the only person who ever managed her care safely and consistently. If he does not return home, my mother will die. That is not speculation, it is a certainty.

29.     The weight on me would be lifted in ways I can hardly describe if my father were home. It would restore some hope to this situation. Erin and I are doing everything we can, but

we are out of time, out of options, and nearly out of money. There is no one else in our family who can care for Cecelia. No one.

      30.     I affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

AFFIANT:

Date: 6/4/25

_Tara Chupka_
Tara Chupka, Esq.

# EXHIBIT G

# AFFIDAVIT OF ERIN DOUGHERTY

I, Erin Dougherty, hereby state the following to be true and correct, to the best of my knowledge, and I am aware that these statements are subject to 42 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

1. My name is Erin Dougherty and I am an adult over 21 years of age and of sound mind.

2. I am currently 44 years old. I was born on July 13, 1980.

3. I am the daughter of Cecelia Dougherty and John Dougherty. I make this affidavit in support of my father's motion for compassionate release.

4. I am currently employed full-time as the CEO of the Philadelphia Electrical and Technology Charter High School.

5. My job is intense and unrelenting. I oversee all school operations, manage a staff of over seventy employees, develop the budget, oversee compliance, and respond to emergencies and student/family needs. I cannot work remotely, and the nature of my job does not allow for flexibility.

6. In February 2025, the building I helped establish through a $27 million bond suffered a catastrophic flood, requiring me to coordinate emergency responses, manage restoration contractors, and deal with city agencies, on top of my normal workload. This crisis has consumed all of my time and emotional reserves.

7. I am married to Amy Howlett, who works full-time as a behavioral specialist for adults with disabilities. Her role is demanding and not flexible. Amy also supports her aging parents, her mother has battled three types of cancer: lung, kidney, and breast cancer, and her father is diabetic. She has no

additional capacity to assist with the care of my mother.

8. I live approximately in a different neighborhood in Philadelphia. Due to frequent Philadelphia traffic and construction, it takes me an upwards of 30-40 minutes to drive to my mother's apartment. I travel there as often as possible, but it is never enough. I am constantly juggling crises from work, home, and now with my grandfather, who is 85 years old and recently had prostate surgery and a bladder cleansing. As of very recently, my grandfather was admitted to the hospital on an emergency basis following his surgery. He used to help with my mother's care, but he is now too ill and frail, he needs care himself. I now help care for him as well, further reducing the time and energy I can devote to my mother.

9. Since my father's incarceration, the full burden of care for my mother has fallen on my sister Tara and I. I have gone from helping her a few hours a week to spending upwards of 40 hours weekly managing her care, medications, and emergencies, all while maintaining a full-time job.

10. My mother suffers from a rare and debilitating neurological condition. She is completely paralyzed, non-verbal, and cannot care for herself at all. She requires around-the-clock care including catheterizations, PEG tube feedings, suctioning, stoma care, medication administration, skin breakdown prevention, and repositioning every few hours.

11. She also needs orthotic boots and braces to prevent contractures, thickening agents to avoid aspiration, and 19 medications and supplements daily, many of which must be picked up from different pharmacies on varying refill schedules. These responsibilities are enormous, even with 24/7 nursing care.

12. But our nurses frequently cancel or are unavailable. The night nurse was recently in a bad accident and couldn't work for days. When that happens, it falls to me and Tara to step in, and cover extended shifts without notice.

13. Despite our best efforts, my mother's condition is deteriorating. She used to use only 30 Ativan pills every three months for anxiety. Since my father left, she goes through an entire bottle every month for her anxiety. Her spirit has dimmed. When my father calls, she lights up. When he doesn't, she becomes emotionally vacant.

14. Before incarceration, my father did everything for my mother. He catheterized her, brushed her teeth, fed her, dressed her, rotated her body, administered medications, managed her prescriptions, coordinated insurance, dealt with doctors, and bathed her. His care was relentless, loving, and expert. We cannot replicate it.

15. Tara and I are overwhelmed. Tara works full time as in-house counsel and is deeply in debt. I too live paycheck to paycheck. My salary is around $160,000 but I only net around $130,000 after taxes. My mortgage is nearly $2,000 a month. Amy and I each have car payments. She owes $35,000 in student loans. I have under $10,000 in savings and thousands of dollars owed in credit card debt.

16. The private trust that funds my mother's nursing care, The Cecelia Dougherty Trust, created by Tara, is nearly depleted. At a medical bill rate of $44,070 per month for Cecelia, it will be gone in less than 9 months. Once it's gone, there is no way we can pay for the 24/7 care that keeps her alive.

17. We have exhausted every possible option: Medicaid, nursing homes, long-term care. No one will take her. She is too cognitively aware for dementia facilities and too physically dependent for standard nursing homes.

18. Previously, my grandfather, Cecelia's father, has contributed to Cecelia's caretaking since my father has been incarcerated. As of recently, my grandfather underwent prostate surgery removal following his cancer diagnosis. As of June 3rd, 2025, my grandfather was rushed to the hospital following complications after his prostate removal. My grandfather is no

longer able, and will never be again able, to assist in caring for Cecelia, leaving my father, John, as our only possible remaining caregiver.

19. If my father is not released, my mother will seriously deteriorate resulting in a potentially fatal outcome. She cannot be left alone, not even for 30 seconds. She cannot call out, she cannot move, and she cannot be institutionalized. He is the only person who has ever been able to care for her properly. He knows her language, her signals, and every single detail of her routine.

20. This is not a crisis that will happen someday, it is happening now. We are drowning. The money is running out. The nurses are pulling away. Our health is fraying, as I am in remission from Lymphoma and my doctors have advised me to care for my personal health. We cannot do more.

21. I affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

AFFIANT:

Date: June 4, 2025

_____

Erin Dougherty

# EXHIBIT H

3050

# Independence ✚

Personal Choice

March 3, 2025

CECELIA DOUGHERTY
200 N 16th St Apt 622
Philadelphia, PA 19102-1219

Member Name:          CECELIA DOUGHERTY
Member ID:            120178342001
Provider:             Bayada Home Health Care
Reference #:          2504901985

## Your Request for coverage has been denied

Dear Cecelia Dougherty or Member's Authorized Representative,

A physician has completed a review of the information provided to us requesting coverage
of the service(s) or item(s). Based on our review, these service(s) or item(s) below are not
approved because it does not satisfy the criteria for establishing medical necessity and
appropriateness.

| | |
|---|---|
| Place of Service/Service: | Home/Private Duty Nursing |
| Service Requested From: | 3/1/2025 |
| Service Requested To: | 8/30/2025 |
| Total Unit(s): | 4368 Hours |
| Procedure Code: | S9124 |
| Procedure Description: | Nursing care, in the home; by licensed practical nurse, per hour |

| | |
|---|---|
| Place of Service/Service: | Home/Private Duty Nursing |
| Service Requested From: | 3/1/2025 |
| Service Requested To: | 8/30/2025 |
| Total Unit(s): | 4368 Hours |
| Procedure Code: | S9123 |
| Procedure Description: | Nursing care, in the home; by registered nurse, per hour (use for general nursing care only, not to be used when cpt codes 99500-99602 can be used) |

Medical Policy Reviewed: Commercial Medical Policy
Medical Policy Number: 02.01.02d
Medical Policy Title: Private Duty Nursing

Benefits underwritten or administered by QCC Insurance Company or Independence Assurance
Company, subsidiaries of Independence Blue Cross — independent licensees of the Blue Cross
and Blue Shield Association.

3050



We received a request for nursing care in the home (private duty nursing or PDN). The request is for 4,368 hours from March 1, 2025, through August 30, 2025. You have permanent damage from a stroke, and you cannot care for yourself.  You also have a special tube for feeding (Gastric tube also called G-tube). This request cannot be approved.  The need for private duty nursing can be re-evaluated near the end of this period. A nurse to give tube feedings that are simple and not new is considered not medically necessary. A nurse to give medications is considered not medically necessary. Trained caregivers can provide these services. A nurse in the home to accommodate the caregiver's work schedule is considered not medically necessary.

The above criteria was used to make this determination. If a medical policy was used to make this determination, please go to the Health Plan's website and search for Medical Policies to access this policy. If you would like a copy of the specific guideline used to make this determination, send a written or faxed request to this address: Request for Criteria, Precertification Department, 1901 Market Street, 30th floor, Philadelphia, PA 19103. Fax: 215-761-9507. E-mail precertpolicyrequest@ibx.com

Please refer to your benefit booklet or member handbook that states benefits for service(s) or item(s) are provided only when such service(s) or item(s) are determined to be medically necessary and appropriate.

Medical Necessity and Appropriateness is defined as a need for service(s) or item(s) that a Provider exercising prudent clinical judgment, would provide to a member for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms and that are:
- in accordance with generally accepted standards of medical practice;
- clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the member's illness, injury or disease; and
- not primarily for the convenience of the member, physician, or other health care provider, and not more costly than an alternative service or sequence of service(s) at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that member's illness, injury or disease.

No benefits will be provided unless it is determined that the service or item is Medically Necessary and Appropriate.

The prescribing physician has the right to a peer-to-peer discussion. This is not an appeal but an opportunity to discuss the determination with the physician who rendered this decision or to provide additional information. If you, as the physician, wish to speak with a physician regarding this determination, please call (in area), 215-241-0494, (out of area) 1-888-814-2244 or please go to the Health Plan's website and search for Peer to Peer for our easy-to-use Peer-to-Peer request form.

If you have any questions regarding this determination, please contact Member Services at the number on the back of the member ID card.

3050

Sincerely,

Utilization Management

Determination also sent to:
Bayada Home Health Care

Enclosure(s):    Member Appeal Rights description
                 Notice of Nondiscrimination Practices with Language Translation

# EXHIBIT I

Dougherty, John (MRN 743807226) DOB: 04/25/1960                    Encounter Date: 11/05/2024

**Dougherty, John**                                                MRN: 743807226

| Office Visit 11/5/2024 | Provider: Albright, Thomas R, DPM (Podiatry) |
|---|---|
| SH Foot & Ankle Lewisburg | Primary diagnosis: Osteomyelitis of ankle or foot, acute, left (HCC) |
| | Reason for Visit: Foot Exam |

Albright, Thomas R, DPM (PODIATRIST)
Podiatry
Encounter Date: 11/5/2024
Signed

**Progress Notes**

**SUBJECTIVE:**
John Dougherty presents today with chief complaint of a possible bone infection in his left heel. The patient had surgery a little more than 6 weeks ago on his left foot to remove a posterior spur and also a plantar spur with fasciotomy. Patient stated that the incision on the back of the heel healed up but the incision on the inside of the heel has not been doing well. He has been on antibiotics for 6 weeks or more and was transferred here recently.

**No Known Allergies**
Current Outpatient Prescriptions

| Medication | Sig |
|---|---|
| • albuterol 90 MCG inhl | Take 2 puffs every 4 hours as needed for wheezing |
| • atorvastatin (LIPITOR) 20 mg oral tablet | Take 20 mg by mouth at bedtime |
| • famotidine (PEPCID) 20 mg oral tablet | Take 20 mg by mouth daily before a meal |
| • losartan (COZAAR) 100 mg oral tablet | Take 100 mg by mouth daily |

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Essential hypertension | |
| • Hyperlipidemia | |

**History reviewed. No pertinent surgical history.**
Family History
Family history unknown: Yes

Social History

Socioeconomic History
• Marital status:          Unknown
Tobacco Use
• Smoking status:          Unknown
Vaping Use
• Vaping status:           never used
Substance and Sexual Activity
• Alcohol use:             Defer
• Drug use:                Defer

**EXHIBIT J**

**From: John Dougherty**
Inmate #: 77031-066 (13KL-1)
FCI Lewisburg
2400 ROBERT F. MILLER DRIVE
LEWISBURG, PA 17837

**June 6, 2026**
**Via Email and Certified Mail**

**To: Warden Sage**
FCI Lewisburg
2400 ROBERT F. MILLER DRIVE
LEWISBURG, PA 17837

Dear Warden Sage,

Allow this letter to serve as my formal request for a motion for Compassionate Release pursuant to 18
U.S.C. § 3582(c)(1)(A), because my brain damaged wife will die soon if I am not allowed to care for her
as I did for many years leading up to my incarceration in November 2024. My wife requires around the
clock care and attention (as detailed below with more specific facts) which in my absence has been
provided by 24/7 private nursing and the assistance of my two daughters. But for the reasons described at
length below, this arrangement is financially unsustainable and my adult daughters have no ability to do
more than they already do. Thus, when the money runs out for 24/7 nursing care, my wife will die if I am
not there to care for her.

## 1. U.S.S.G. § 1B1.13(b)(3)(B), (C), and (D) — Incapacitation of a Spouse or Family Member Requiring Caregiving

My wife, Cecelia Dougherty, is completely and permanently incapacitated (*See* Exhibit A). She
suffers from severe neurological and physical conditions that require 24/7, highly specialized care. I am
the only available and capable caregiver with the history, knowledge, and skill to provide her the care that
she needs to survive. Prior to my incarceration, I was the primary caregiver for Cecelia, to support not
only her physical but also her mental wellbeing. Since my incarceration on October 1st 2024,  we have
had to rely on 24/7 nursing care at my expense which will soon run out (addressed more in detail below).
Numerous medical providers have written letters describing Cecelia's decline in health following my
incarceration, and describing my full caregiving duties prior to incarceration (*See* Exhibit C, D, E, and F).

You will also be able to view a short video of her, taken in June of 2025, at the following link:

https://vimeo.com/1090966025/83106d58a0?share=copy

Listed below is my wife's incapacitated condition and circumstances providing proof that I am
the only available caretaker to aid my wife.

A. Medical and Functional Incapacitation of My Wife:
   ● In March 2017, Cecelia suffered a catastrophic brain bleed.

- As a result, she is a quadriplegic, fully paralyzed and unable to speak or eat (*See* Exhibit A).
- She lives at home and requires 24/7 intensive medical and nursing support.
- She receives nutrition and medication via PEG feeding tube.
- She has experienced multiple strokes, recurring brain bleeds, and aneurysms.
- She has ongoing chronic kidney issues, frequent UTIs, and recently required kidney surgery on September 19, 2024.
- She requires urinary catheterization, bowel care, and frequent repositioning to prevent skin breakdown.
- She has recurrent bowel obstructions, which, if not monitored, lead to hospitalization.
- Her body is dependent on multiple complex medical devices, including:
    - Hoyer lift
    - Stand machine
    - Hospital bed
    - Suction machines
    - Foot and arm braces
    - Wheelchair and wheelchair inserts
    - Alternating pressure mattress
- Cecelia's current head nurse stated she will pass away without my presence and support.
- Cecelia has expressed her awareness and emotional distress at my absence—she wrote the word "DIE" during a counseling session.
- She has experienced cardiac complications and nosocomial infections during my incarceration.
- Cecelia is unable to verbally communicate. She relies on me to interpret her eye, lip, and hand movements to express her medical and emotional needs.

B. I was Cecelia's primary emotional and physical caretaker prior to my incarceration, my daily caregiving responsibilities were as follows:

- Clean, disinfect, organize, and stock all supplies, braces, shower chair, wheelchairs, suction machines including canisters, preparation and dispensing materials.
- Manage insurance and subcontractors to maintain, repair and order supplies and medical equipment.
- Ordering all needed supplies and medications. Maintaining adequate stock including inventory of expiration dates, recalls, etc.
- Manage all scheduling of staff and ancillary support including changes for vacations, sickness, etc., while also filling in when short-staffed
- Communicate staff payroll and ensure all staff are paid for hours worked
- Organizing outings such as doctors' appointments, tests, labs etc., ensuring adequate staffing and accommodation
- Schedule physical therapy sessions, therapeutic yoga sessions, doctors' visits, ophthalmology appointments, Botox appointments, brace appointments, wheelchair appointments, etc.
- Submit claims to insurance and follow up for payment to be reimbursed for out-of-pocket expenses
- Coordinate, drop-off lab and urine specimens as needed including following up on results to ensure medical team is aware and providing treatment if necessary.
- Communicate with physicians and interdisciplinary team.

- Clean and charge all equipment such as portable suctions, vital sign machines, and overhead lift
- Range of motion exercises intermittently throughout the day.
- Physical therapy facilitation utilizing stand machine or exercise bike on days physical therapist isn't scheduled
- Utilization of braces for hands and feet throughout day including monitoring for correct positioning and skin breakdown.
- Inventory emergency equipment such as manual lift and stair climber is working and available for use daily
- Monitor Vital Signs
- Prepare and administer medications
- Oral suction as needed for secretions
- Oral care utilizing swabs, Chlorhexidine and hydration as needed
- Monitor need for PRN medications and administer accordingly.
- Perform catheterization periodically as ordered
- Perform bowel routine as needed.
- Record intake and output including voids and bowel movements with type on chart and in notes
- Repositioning to avoid skin breakdown utilizing positioning support aids
- Ensure wheelchair inserts correctly inflated to avoid pressure points
- Perform stoma care for PEG tube.
- Morning/Evening Care including shower, teeth brushing, shaving, etc.
- Laundry including changing bed linens twice daily or as needed
- Emptying all trash and hampers as needed
- Monitor for episodes of incontinence changing adult brief or chuck as needed
- Showers as needed for incontinence throughout shift
- Ensure hospital bed and alternating pressure support mattress is functioning
- Monitoring for skin breakdown including follow-up communication with team and treatment

C. My Wife's Emotional and Psychological health has significantly declined since my incarceration, including:

- Suffering from frequent anxiety attacks leading to severe body tensing and screaming. Medical providers are concerned that these episodes could cause another brain bleed.
- Cecelia is no longer able to speak, and her only verbal communication has been the word "DIE," written during counseling, referring to her belief that she will pass due to me being incarcerated for the past year.
- Cecelia's nurse, since 2019, stated that my wife will not survive without my care.
- I have two daughters (Erin, 44 and Tara, 41) who have made extraordinary (but unsustainable) efforts to care for Ceilia since my incarceration, but it is impossible for them to continue doing so.

D. Why my two daughters can not serve as my wife's caregiver

As explained in the affidavits of my two daughters (attached), Erin Dougherty and Tara Chupka, there is no other realistic alternative for the care of my wife other than my release. Neither of my daughters can serve as Cecelia's full-time caregiver without jeopardizing their lives and their own stability.

- Erin Dougherty (*See* Affidavit of Erin Dougherty)
  - Erin is a cancer survivor, currently in remission from Non hodgkins lymphoma.
  - She lacks the specialized medical training required to care for my wife's complex

needs, including catheterization, IV medication management, PEG tube maintenance, and pressure injury prevention.
- ○ Erin is the CEO of a public charter high school in Philadelphia. She cannot take leave, even briefly, without disrupting school operations. She manages over seventy staff members.
- ○ Erin must travel up to seven times per year for her job. Any such travel would leave Cecelia completely unattended, a deadly risk for a ventilator-dependent quadriplegic who requires 24/7 supervision.
- ○ Despite her executive title, Erin lives paycheck to paycheck and is burdened by over $25,000 in debt. She cannot financially support private nursing once the trust is depleted.
- ○ Her one-bedroom row home is not equipped, logistically or structurally, to support a quadriplegic patient. No hospital bed, no lifts, no sterile environment, no way to provide safe care.
- ○ Due to frequent Philadelphia traffic and construction in or around Erin's neighborhood, it frequently takes  her an upward of 30-40 minutes to reach Cecelia's apartment. In the event of a medical crisis, Erin could not respond in time to prevent serious injury or death.
- ○ Even now, Erin gives everything she can, over 10 hours per week in addition to her full-time job, to help care for her mother.
- ○ Erin is also now the primary caregiver for my wife's elderly father, who recently underwent surgery for prostate removal and is in declining health.
- ○ She is emotionally, physically, and logistically stretched beyond capacity.
- Tara D. Chupka (*See* Affidavit of Tara Chupka)
  - ○ Tara is a full-time in-house attorney working more than 50 hours a week, while also devoting more than 40 hours a week to caregiving for Cecelia. The strain is unbearable and unsustainable.
  - ○ Due to frequent Philadelphia traffic and construction in or around Tara's neighborhood, it frequently takes  her an upward of 30-40 minutes to reach Cecelia's apartment. In the event of a medical crisis, Tara could not respond in time to prevent serious injury or death.
  - ○ Like Erin, Tara has no clinical training to provide advanced medical care. Without professional nursing, her efforts, however loving, could place Cecelia in jeopardy.
  - ○ Tara lives paycheck to paycheck and carries over $250,000 in student loan debt. She cannot afford to supplement or replace the current nursing structure.
  - ○ Sadly, Cecelia's brain injury has caused her to develop acute anxiety when Tara is present for long periods. Cecelia often screams and becomes visibly distressed in her presence, a tragic psychological symptom of her condition. Tara cannot serve as a full-time caregiver without causing emotional harm to both herself and her mother.

E. Cecelia's Father Is No Longer a Viable Caregiver Due to Medical Limitations
- Cecelia's father has contributed to her caretaking following my incarceration. As of recently, he has undergone prostate removal surgery.
- Ever since, he has been unable to assist or contribute to Cecelia's care.
- Cecelia's father is in severely declining health.
- As of June 3, 2025, Cecelia's father was rushed to the hospital for an emergency following his prostate removal surgery.
- Cecelia's father is no longer able, and will never again be able, to assist in caring for Cecelia, leaving me as the only possible remaining caregiver.

You will also be able to view a short video of him taken in June of 2025, at the following link: https://vimeo.com/1090964357/a89f5eff76?share=copy

    F. <u>Funds for Cecelia's Care are Running Out</u>
- Prior to my incarceration, Tara was added to my accounts on or around September 15, 2024 in preparation for my surrender. Tara currently has my Power of Attorney as well as Cecelia's.
- As of right now, Cecelia has 6-8 nurses caring for her a month. The expenses for such nursing care are understandably extraordinary and funds are running low. Soon, there will be no funds left.

       The video below offers a heartbreaking but honest glimpse into the daily reality of my wife Cecilia's. In the video, you will see what our family has lived with every day: Cecilia is fully paralyzed, unable to move or speak beyond blinking her eyes and gripping lightly with her right hand. She cannot feed herself. She cannot administer her medications. She cannot dress or bathe herself, or even be repositioned without full physical assistance. As seen in the footage, two nurses work together just to perform basic tasks such as changing her clothing, cleaning her, using a Hoyer lift to move her from her bed to a chair, and managing her hygiene and medical equipment. While it typically takes two trained professionals to provide this care, I did it alone for years before my incarceration. I fed her, administered her medications, catheterized her, handled her PEG tube and hygiene, and gave her the dignity she deserves.

       Now, those responsibilities fall entirely on paid nurses, but that cannot last. The money in The Cecilia Dougherty Trust is running out, and fast. When it is gone, there will be no way to pay for the 24/7 care that keeps her alive. Without nursing support, and without me at home, Cecilia will die. It is that simple. My release would allow me to resume my role as her primary and most trusted caregiver. I would remain in the home, day and night, fully committed to giving her safety, stability, and peace in whatever time she has left. Please see for yourself what her care entails, and why I am pleading for the opportunity to be by her side once again:

https://vimeo.com/1090966025/83106d58a0?share=copy

    Despite the toll her illness has taken, Cecilia still lights up at the sound of my voice. She cannot speak, but when I call, she smiles, a rare moment of peace and joy in her otherwise fragile and isolated world. Though she is often hesitant and anxious around unfamiliar caretakers, she finds comfort in me. She wants me home. She needs me home. And she knows, just as I do, that without me, she may not survive. Her condition has already advanced, and without the physical care and emotional stability I provided before my incarceration, it is rapidly declining. Of the 300 minutes I am allowed each month, I spend nearly every one, over 280, on calls with my wife. These calls are her only lifeline to hope, and my only way of giving her a small measure of comfort from afar. I ask you to witness one of those moments for yourself. The following video shows a brief call between us, a glimpse into the love, dependency, and heartbreak that defines our separation:

https://www.dropbox.com/scl/fi/cvyapuk5xqh9gk9jp374i/B58B29CF-1A8E-40F5-BEB8-C7391E7516FA.mov?rlkey=p8j7gjlrhgugzbjemepkw66il&st=j2oomh9h&dl=0

    My sole focus on release will be to make sure that I am there for my wife. She needs me and I want to be there to do whatever I need to do to make sure that she is taken care of and living the most comfortable life she can. Without my daily, hands-on care, Cecelia's condition has visibly declined, both medically and emotionally, and her current care arrangement is inadequate to meet the complexity of her needs.

Cecelia's father and daughters are her only family other than me. There is absolutely nobody else who can take care of her. Cecelia's 85 year old father needs nearly as much care as my wife does, and our daughters have exhausted every resource they can to try and take care of their mother. They are physically and financially unable to continue taking care of her without my help. My presence is not optional. It is essential to sustaining her life and preventing further irreversible harm. This qualifies as a compelling reason for compassionate release under U.S.S.G. § 1B1.13(b)(3)(B), (C), and (D).

## 2. U.S.S.G. § 1B1.13(b)(1)(C) — Medical Condition Requiring Long-Term or Specialized Medical Care Not Adequately Provided

Since my incarceration, I have developed a serious medical condition involving a potentially limb-threatening infection in my foot. Despite my requests and external consultations, the BOP has fbeen unable to provide timely and adequate care, putting me at continued risk of osteomyelitis and amputation.

A. <u>My Medical History and Ongoing Issues:</u>
   - August 29, 2024: Advised to seek surgery for chronic foot condition.
   - September 6, 2024: Underwent surgery with post-op instructions to remain non-weight bearing.
   - September 16, 2024: At follow-up, incisions had not adhered and showed significant delay in healing.
   - September 31, 2024: Wound edges separated (dehiscence); skin breakdown; prescribed antibiotics.
   - October 1, 2024: Emergency recommendation made due to suspected osteomyelitis. On-site x-ray showed "subtle cortical erosion," indicating possible bone infection (*See* Exhibit B).
     - Told that IV antibiotics (up to 6 weeks) and PICC line insertion would be needed if the infection was confirmed.
   - November 5, 2024: Culture performed by outside podiatrist (*See* Exhibit B).
   - November 19, 2024: MRI performed.
   - November 20, 2024: Delayed receipt of results (finalized 11/7). Culture revealed:
     - Staphylococcus epidermis and Candida albicans.
     - Continued antibiotics for 11 weeks straight.
   - November 25, 2024: MRI showed bone marrow edema and soft tissue abnormality; could be osteomyelitis, and diagnosis is not excluded.
B. <u>Additional Medical Developments and Ongoing Concerns:</u>
   - As of recently, I was treated for osteomyelitis with a mix of antibiotics including Clindamycin Hyclate (300mg) and Doxycycline (100mg daily), after cultures showed resistance patterns.
   - The antibiotics were changed multiple times due to my body's resistance, and I was also placed on multiple rounds of Prednisone.
   - The foot infection was severe, with swelling and profuse drainage when I first arrived, the UPMC foot specialist I saw was highly concerned.
   - After initial care, I was sent to a foot surgeon, who referred me to an infectious disease specialist.

- I was instructed to soak and dress the wound three times daily with antibacterial soap and later told to stop soaking but continue daily dressing changes.
- After antibiotics were stopped following a 6-month run, I developed severe hives and skin sores, believed to be a reaction to the prolonged medication exposure.
- These sores have persisted for over 8 months, and I am now being referred to a dermatologist.
- I was seen today by a PA and confirmed I still have ongoing skin issues.
- I have not had blood work in the past 6-8 weeks, but prior testing was being done monthly to monitor my infection status and inflammatory response.
- The foot condition has now affected my hip, resulting in serious swelling and alignment issues. I am being treated with heat therapy, cortisone, and Advil, with a cortisone injection scheduled for June 20th, 2025.
- Because of the foot and hip pain, I am unable to exercise, which is contributing to rising blood pressure and worsening physical condition overall.
- I have had four episodes of vitreous gel separation ("retina breaking off") in my right eye since my arrival.
- I was previously being treated for this issue at Penn Eye Associates and Wills Eye Hospital just weeks before my incarceration, both hospitals flagged my detached retina as a serious concern.
- I now have a large floater in my right eye, following this past week; I was told this could require emergency surgery if the retina detaches.
- I am on multiple blood pressure medications and a 20mg statin daily, but my blood pressure is creeping toward 140/90, likely due to the high-sodium diet inmates are placed on and inability to remain physically active here.

C. Additional Institutional Limitations Documented by DOJ Office of the Inspector General:

- A February 2024 inspection of FCI Lewisburg by the Department of Justice Office of the Inspector General documented understandable limitations in the medical care and safety of inmates at FCI Lewisburg. Such limitations are inherent in any institutional incarceration setting, but nevertheless do pose certain risks. I, myself, have experienced these limitations. The DOJ Office of the Inspector General found the following:
    - Delayed medical monitoring and missed testing.
    - Limitations to provide colorectal cancer screenings to over 50% of eligible inmates.
    - Delays in colonoscopy scheduling, with some inmates waiting over a year.
    - Discontinuation of antidepressants for inmates without clinical visits.
    - No cut-down tools provided to correctional officers despite suicide risk.
    - Some non-functional security cameras, including in critical restraint rooms.
    - Facility maintenance deficiencies totaling $28 million in unfunded repairs, including medical and HVAC systems.

These limitations highlight Lewisburg's unfortunate but realistic inability to provide adequate long term medical care and support my condition. Along with the findings of the DOJ, my course of treatment at FCI Lewisburg reflects a delayed diagnosis, inconsistent follow ups, and limitations of Lewisburg to

provide immediate care to my diagnosis. My medical deterioration under BOP supervision constitutes additional extraordinary and compelling grounds for release under § 1B1.13(b)(1)(C).

## 3. Our Financial Circumstances are Quickly Deteriorating and Will Prevent Necessary Nursing Care for Cecelia

The financial resources required to sustain my wife Cecelia's intensive, 24/7 nursing care are rapidly running out. In 2021, my daughter Tara Chupka established The Cecelia Dougherty Trust to ensure we had a dedicated financial vehicle to cover the immense and ongoing cost of my wife's complex medical needs. Tara remains the trustee of this fund.

To fund the trust, our family made extraordinary sacrifices. On May 25, 2022, I sold our longtime family home at 1933 East Moyamensing Avenue in Philadelphia for $500,000. Of that amount, Cecelia and I received $227,524.95 in net proceeds. I immediately contributed half of those proceeds into The Cecelia Dougherty Trust. The remaining half was used to pay necessary and unavoidable expenses, namely, federal and state taxes, and overwhelming legal fees stemming from my defense, much of which remain unpaid. These were not discretionary costs, they were obligations I had no choice but to pay. That same year, I closed out my Prudential/Empower retirement account, which resulted in a net distribution of $434,816.52. Again, I contributed half of that amount to the trust, while the other half was used to cover additional legal expenses, outstanding debts, and living costs during this extended legal process. These payments were essential to sustain my family and fulfill my obligations.

Despite my best efforts, I have been left with virtually no personal savings. As of today, I am nearly penniless. I continue to owe over $900,000 in legal fees (*See* Exhibit H), and I have no remaining retirement funds or assets to draw from. Every available financial resource that I could possibly use to support Cecelia has already been tapped. In addition to these contributions, our family organized fundraising golf outings in both 2022 and 2023 in Cecelia's name to raise awareness and secure support for her care. These events were driven by love and desperation. While the outings were attended by many in our community, interest has since waned. It is heartbreaking to admit, but outside of our immediate family, most people have stopped asking about Cecelia. Our fundraising efforts, though heartfelt, are no longer sustainable.

Cecelia's medical expenses are staggering. Her 24/7 in-home nursing care costs approximately $44,070 per month (*See* Exhibit G). While some costs are offset by insurance, a substantial portion remains out-of-pocket and must be paid directly from the trust or from my own account, which is dwindling due to Cecelia's medical costs. As of June 2024, the balance of The Cecelia Dougherty Trust stood at $641,741. That balance has since declined to $ 349,187.71 as of June 5, 2025 (*See* Exhibit H). At this rate, the trust will be completely exhausted in less than 9 months, possibly sooner if there are complications, emergencies, or last-minute nursing cancellations that require replacement staff at premium rates.

We have explored every possible alternative: Medicaid, long-term care institutions, and skilled nursing homes. None are equipped or willing to accept her. Cecelia is cognitively aware but physically immobile. She cannot be placed in dementia care because her mind remains intact, but her extreme

physical condition exceeds what most facilities can manage. We are trapped in a medical no-man's-land with no viable institutional option available.

Before I was incarcerated, I provided Cecelia with all of her daily care. I was her caregiver, her nurse, her advocate, her husband. I cleaned her, brushed her teeth, administered her medications, catheterized her, managed her feeding tube, repositioned her to prevent pressure wounds, and kept up with all her medical supplies. I coordinated her appointments, filed her insurance claims, and ensured every hour of every day she had the attention and care she deserved.

Since my absence, that care has become fragmented, and Cecelia's health has visibly declined. We now rely entirely on paid nurses, and once the trust is depleted, there will be no one left to care for her. Without me at home, and without the funding I worked tirelessly to secure, Cecelia will die. Her condition is medically fragile, emotionally painful, and deeply personal. My return would immediately restore her most trusted and effective caregiver. It would also extend what remains of the trust by removing the need for round-the-clock paid nursing staff. Most importantly, it would give Cecelia the chance to live the rest of her life in her home, with dignity, security, and the person who has always been by her side.

## 4. U.S.S.G. § 1B1.13(b)(1)(B) — Serious Deterioration in Physical or Mental Health Due to Aging

- I have just turned 65 and now qualify as an older inmate.
- My condition has worsened significantly with age.
- I suffer from chronic foot disease and post-surgical complications that BOP cannot manage effectively, which was proven not only by my own medical records but additionally the DOJ Investigation of Lewisburg.
- My mobility is reduced; infection risk is high and I face a possible loss of limb, according to BOP doctors.
- These conditions are age-related and ongoing.
- In addition, not being able to care for my wife and knowing how fast she is deteriorating, I have suffered immense amounts of depression and anxiety.

## 5. U.S.S.G. § 1B1.13(b)(5) — Other Extraordinary and Compelling Circumstances

Additional circumstances, including my prison record, highlight my exemplary rehabilitation, and in combination with the above, further support my request:

- Cecelia's emotional and psychological health has deteriorated significantly since my incarceration. She suffers severe anxiety attacks, accompanied by dangerous physical tension that could cause another brain bleed.
- My supporting prison rehabilitation:
  - Employed in the Education Department, helping inmates prepare for the GED.
  - Active in BOP parenting classes.

- ○ Participate in all substance abuse programs; on waitlist for Residential Drug Abuse Program.
- ○ Provide mentorship and spiritual guidance; practicing devout Catholic faith.
- I have a stable release plan in place, including secure housing, a strong support system, and a monthly combined pension of $4,430.73 to ensure payment of the rent on our housing. My sole focus upon release will be to return home and resume my role as Cecelia's primary caregiver, her survival depends on it.

## 6. First-Step Act Considerations Warrant My Compassionate Release

In addition to the qualifying grounds outlined above under 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13, I believe my request is further supported by the policy goals and reforms introduced by the **First Step Act**, enacted in December 2018. This law was designed to expand the use of compassionate release and ensure that inmates with meritorious claims—especially those with severe medical needs, family caregiving obligations, or other extraordinary circumstances—receive meaningful review and relief.

Section 603(b) of the First Step Act makes it clear that Congress intended to "increase the use" of compassionate release by allowing incarcerated individuals to file motions directly, shifting the gatekeeping role away from the Bureau of Prisons. This change was enacted to promote rehabilitation, reduce over-incarceration, and ensure that sentence reductions are available when continued confinement no longer serves a justifiable purpose.

Federal courts interpreting the First Step Act have recognized its purpose and applied it accordingly. As stated in *United States v. Rodriguez*, 451 F. Supp. 3d 392, *United States v. Adeyemi*, 470 F. Supp. 3d 489, and *United States v. Somerville*, 463 F. Supp. 3d 585, courts are empowered, and indeed encouraged, to make independent determinations about what constitutes "extraordinary and compelling" reasons for release, especially in light of evolving humanitarian circumstances.

Although the U.S. Sentencing Commission has not yet updated its policy statements to reflect the reforms of the First Step Act, the amendments make clear that medical deterioration, incapacitated family members, and other compelling hardships, such as those I have documented here in detail, can and should warrant a sentence reduction when appropriate. Granting this request would be consistent with both the reasons stated above and spirit of the First Step Act. My case reflects precisely the type of circumstance Congress had in mind: an aging inmate facing deteriorating health, whose incapacitated wife will not survive without his care, and whose continued incarceration serves no rehabilitative, deterrent, or public safety purpose.

## 7. My Record of Service and Continued Value to Society

I respectfully submit I am not a threat to society in any capacity. For decades, I devoted my life to serving the people of Philadelphia, particularly the working-class families who have long struggled for economic fairness, dignity, and opportunity. As the Business Manager of IBEW Local 98, I led efforts that directly improved the lives of thousands of workers. I worked tirelessly for fair wages, healthcare benefits, and workplace safety, basic rights that every working person deserves.

Beyond the labor arena, I remained deeply engaged in civic life. I supported countless initiatives that addressed food insecurity, affordable housing, education, and addiction recovery. I personally donated and helped direct millions of dollars to support youth sports teams, school supply drives, tuition scholarships, and neighborhood revitalization. These weren't public relations gestures—they were expressions of my deep-rooted belief in community and responsibility to others.

I also extended my support to individuals trying to recover from addiction or incarceration. I helped people find union jobs, gain financial stability, and reunite with their families. My efforts aligned with the very goals the justice system now seeks to promote: rehabilitation, redemption, and the idea that people are more than their worst mistakes.

Today, I am 65 years old, in deteriorating health, and my only focus is on returning home to care for my lingering wife. I pose no danger to anyone. My past is one of building, serving, and uplifting others, and that will continue if I am granted release. Compassionate release is not just justified in my case; it is consistent with everything I have stood for throughout my life.

## 8. Proposed Release Plan

If this request for compassionate release is granted, I am fully prepared to comply with any conditions deemed appropriate by the Bureau of Prisons, including the use of electronic ankle monitoring and full-time home confinement. I understand the seriousness of these terms and consent without reservation to being supervised through an ankle monitor and whatever other reporting or surveillance conditions may be imposed.

Upon release, I will immediately resume my role as the sole, full-time caregiver for my wife, Cecelia Dougherty. This would eliminate the need for multiple paid medical nurses, whose services are no longer financially sustainable and whose absence places Cecelia at even greater medical risk. Returning home would restore continuity of care and significantly reduce the strain on our dwindling resources.

As documented in my Presentence Investigation Report (June 6, 2024) by Probation Officer Megan A. Maier, I have adequate and stable housing at the Franklin Tower Residences, located at 200 North 16th Street, Apartment #622, Philadelphia, PA. During a home inspection conducted on March 14, 2024, the probation officer confirmed the following:

- The apartment is a 3-bedroom, 2.5-bathroom unit, appropriately furnished and well maintained.
- The third bedroom is fully outfitted as a hospital room for Cecelia Dougherty, clean and in working order.
- I sleep on the living room couch to remain close to and available for my wife's needs.
- A large, private storage space on the same floor is stocked with necessary medical supplies and equipment.
- There were no signs of contraband, weapons, or unsafe conditions.

The PSR explicitly states that the residence "appears suitable for post-conviction supervision purposes" and that I have "few re-entry needs" given the stability of my housing and the readiness of my

home environment. The rent is near $3,900 a month, which I can continue to pay from my pension and social security benefits upon release.

In addition, since my incarceration, I've developed a serious foot infection that has only worsened with delays in care. If released, I will immediately begin treatment with my podiatrist to monitor for osteomyelitis. I understand I may need IV antibiotics or surgery, and I am prepared to do whatever is required to treat this issue and prevent limb loss. I will also follow up with my primary care doctor and any specialists needed to monitor my recovery and maintain my overall health.

My proposed release would not only reunite me with my critically ill wife but would also place me under strict monitoring while allowing me to resume essential, life-sustaining duties in a safe, secure, and supervised setting.

## 9. 18 U.S.C. § 3553(a) Factors Warrant my Release

In addition to the extraordinary and compelling reasons detailed above, the sentencing factors outlined in 18 U.S.C. § 3553(a) also support my compassionate release. At this stage of my life—65 years old, in declining health, and facing no risk of recidivism—the purposes of sentencing have been fulfilled. A further term of incarceration no longer promotes respect for the law, provides just punishment, or serves any deterrent purpose. I have already served a significant portion of my sentence, maintained exemplary conduct while incarcerated, and continued to contribute to the rehabilitation of others by assisting with educational programming. Given my serious medical condition, my role as sole caregiver to my incapacitated wife, and my longstanding record of service to the community, the § 3553(a) factors weigh heavily in favor of granting compassionate release.

My case has also received intense and sustained media coverage both before, during, and after trial, much of it rooted in my decades of public service. The high-profile nature of my prosecution was driven in large part by my prior civic contributions, public works, labor advocacy, charitable giving, and community leadership,rather than any threat I pose to society. The attention I received was not because I endangered the public, but because of the scale of my previous good works and prominence in the city of Philadelphia. That visibility has already served the goals of deterrence and accountability and should now serve as a reason for compassionate consideration.

1. **The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))**
   - I have no history of violence, have maintained a record of good conduct while incarcerated, and have demonstrated deep remorse for my offense.
   - I have never been convicted of a violent crime, nor committed any acts of violence since being imprisoned.
   - At 65, I have shown sustained efforts at rehabilitation through:
     - Working in the Education Department assisting inmates with GED preparation.
     - Participating in parenting and substance abuse classes.
     - Providing spiritual mentorship as a practicing Catholic.
   - My criminal conduct, while serious, was non-violent, and my risk of reoffending is minimal due to my age, health, and caregiver responsibilities.

- My life before and during incarceration reflects a consistent commitment to service—first to my family, and now to my fellow inmates.

2. **The need for the sentence imposed (§ 3553(a)(2))**

(A) **To reflect the seriousness of the offense**: I have paid a steep price, both legally and personally. My suffering has extended well beyond the sentence itself. Since my incarceration, I have lost my union position, faced public disgrace, and endured daily national media attention. I have already been punished extensively through reputational damage, loss of livelihood, and prolonged surveillance and investigation. I have exhausted all available funds on legal fees and have sold my home along with enduring wide and continuing public scrutiny, but more importantly, I just want to be there to care for my wife. I am financially ruined as a result of my trials and incarceration.

(B) **To afford adequate deterrence**: My fall from a high-profile leadership role, lengthy incarceration, and public shaming has sent and will continue to send a strong deterrent message.

(C) **To protect the public from further crimes**:

- I am fully amenable to strict conditions of release, including home confinement and electronic monitoring.
- I am willing to remain confined within my apartment building, solely focused on my wife's care, with no contact with the broader community beyond what is necessary for medical and legal support.

(D) **To provide needed medical care**:

- The BOP has faced understandable but realistic limits in medical care. I have experienced this first hand with the care I have received to treat my serious post-surgical foot condition.
- I continue to suffer the risk of permanent damage or amputation.
- Release would allow me access to consistent, specialized treatment.
- Release would allow me to ameliorate the anxiety and depression I have suffered because I can not care for my wife.

**The kinds of sentences available under § 3553(a)(3)**

- Compassionate release paired with strict home confinement or supervised release with electronic monitoring is an available and appropriate alternative.
- Such a sentence ensures public safety, honors rehabilitation, and respects the life-or-death caregiving emergency.

**The need to avoid unwarranted sentence disparities (§ 3553(a)(6))**

- Other defendants with similar medical and familial hardship circumstances have received compassionate release.

- ○ *See United States v. Fields*, 569 F. Supp. 3d 231, *United States v. Rodriguez*, 451 F. Supp. 3d 392 (E.D. Pa. 2020), *United States v. Adeyemi*, 470 F. Supp. 3d 489, (E.D. Pa. 2020)
- Granting my petition would align with evolving standards of justice and compassion recognized in similar cases.

**The need to provide restitution under § 3553(a)(7))**

- I have no means or opportunity to earn restitution in my current condition but would be more stable financially outside of prison, potentially allowing me to make partial restitution as deemed feasible and realistic.

I request that this letter be deemed a formal and complete submission of my request for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Given the urgent and life-threatening circumstances described above, I ask for a compassionate release. I meet all four qualifying categories under § 1B1.13. No other caregiver can provide what I did and must now do again. My release is not only justified but urgently necessary.

I have never posed a threat to public safety and do not now. My past conduct has reflected a life of public service and dedication to others. At age 65, facing serious health concerns, my only focus is on reuniting with my wife and supporting her final stage of life. There is no risk to society in allowing me to return home, only a moral reason necessary to keep my wife  alive.

Despite the toll my wife's illness has taken, Cecilia still lights up at the sound of my voice. She cannot speak, but when I call, she smiles, a rare moment of peace and joy in her otherwise fragile and isolated world. Though she is often hesitant and anxious around unfamiliar caretakers, she finds comfort in me. She wants me home. She needs me home. And she knows, just as I do, that without me, she may not survive. Her condition has already advanced, and without the physical care and emotional stability I provided before my incarceration, it is rapidly declining. Of the 300 minutes I am allowed each month, I spend nearly every one, over 280, on calls with my wife. These calls are her only lifeline to hope, and my only way of giving her a small measure of comfort from afar. I ask you to witness one of those moments for yourself. The following video shows a brief call between us, a glimpse into the love, dependency, and heartbreak that defines our separation:

https://www.dropbox.com/scl/fi/cvyapuk5xqh9gk9jp374i/B58B29CF-1A8E-40F5-BEB8-C7391E7516FA.mov?rlkey=p8j7gjlrhgugzbjemepkw66il&st=j2oomh9h&dl=0

Respectfully,
**John Dougherty**
Inmate #: 77031-066 (13KL-1)

# EXHIBIT A



# EXHIBIT B

## Johns Prison Medical Record

11/5/2024 9:18:51 AM                    UPMC FAX                         Page 2

Dougherty, John (MRN 743807226) DOB: 04/25/1960                Encounter Date: 11/05/2024

### Dougherty, John                                              MRN: 743807226

Office Visit 11/5/2024            Provider: Albright, Thomas R, DPM (Podiatry)
SH Foot & Ankle Lewisburg        Primary diagnosis: Osteomyelitis of ankle or foot, acute, left (HCC)
                                 Reason for Visit: Foot Exam

                                                      Albright, Thomas R, DPM (PODIATRIST)
                                                                                  Podiatry
                                                                Encounter Date: 11/5/2024
**Progress Notes**                                                                  Signed

### SUBJECTIVE:
John Dougherty presents today with chief complaint of a possible bone infection in his left heel. The patient had surgery a little more than 6 weeks ago on his left foot to remove a posterior spur and also a plantar spur with fasciotomy. Patient stated that the incision on the back of the heel healed up but the incision on the inside of the heel has not been doing well. He has been on antibiotics for 6 weeks or more and was transferred here recently.

### No Known Allergies
Current Outpatient Prescriptions

| Medication | Sig |
|---|---|
| • albuterol 90 MCG inhl | Take 2 puffs every 4 hours as needed for wheezing |
| • atorvastatin (LIPITOR) 20 mg oral tablet | Take 20 mg by mouth at bedtime |
| • famotidine (PEPCID) 20 mg oral tablet | Take 20 mg by mouth daily before a meal |
| • losartan (COZAAR) 100 mg oral tablet | Take 100 mg by mouth daily |

**Past Medical History:**
Diagnosis                                                             Date
 • Essential hypertension
 • Hyperlipidemia

### History reviewed. No pertinent surgical history.
Family History
Family history unknown: Yes

Social History

Socioeconomic History
 • Marital status:          Unknown
Tobacco Use
 • Smoking status:          Unknown
Vaping Use
 • Vaping status:           never used
Substance and Sexual Activity
 • Alcohol use:             Defer
 • Drug use:                Defer

# EXHIBIT C



Schuylkill *Medical Associates*, LLC
"Charting a new course in geriatric home care."

To Whom It May Concern,

I am the primary home care physician for Cecelia Dougherty and have been supervising her care with her husband, John, for the past several years.

Cecelia will be undergoing kidney surgery for stone removal on September 19th, as stated in the previous letter.

She will have general anesthesia and then be monitored in the neuro ICU until discharge.

Her post operative recovery will take up to 2 months, since she will have ureteral stents placed to allow for stone sediment drainage. These stents put her at a high risk of infection and sepsis.

Cecelias head nurse will be on vacation for 4 weeks after the surgery which leaves large gaps in her care schedule.

Cecelia already has a shorter life expectancy than most given her anoxic brain injury and aneurysms. She is at high risk for secondary infections and recurrent aneurysms. Without John in her life, I believe her life expectancy will be much shorter. Cecelia is co-dependent on John both emotionally and physically and will have no motive to live without his presence. She is non verbal and communicates the best with her husband. John oversees all of her care and trains any new staff. He is the only person who knows every nuance of her care needs.

For Cecelias survival, I ask that John be allowed to remain home, not only during the postoperative period, but indefinitely. From a medical perspective, John's absence will ultimately lead to a cascade of events that have a high likelihood of causing an untimely death of his wife.

Sincerely,

Christine Pluta, DO
Medical Director

Phone: 866-206-2866 • Fax: 609-208-3233
310 Whitehorse Ave. Hamilton, NJ 08610

# EXHIBIT D



**GLOBAL NEUROSCIENCES INSTITUTE**
CLINICAL EXCELLENCE | RESEARCH | INNOVATION

Erol Veznedaroglu, MD, FACS, FAANS, FAHA
*Professor*
*Robert A. Groff Chair, Department of Neurosurgery*
*Director, Drexel Neurosciences Institute*
*Drexel University College of Medicine*

G. Peter Gliebus, MD, FAAN
*Associate Professor*
*Chair, Department of Neurology*
*Drexel Neurosciences Institute*
*Drexel University College of Medicine*

**Neurosurgery**
Erol Veznedaroglu, MD, FACS, FAANS, FAHA
Kenneth Liebman, MD, FACS, FAANS
*Director, Cerebrovascular Division*
Mandy J. Binning, MD, FAANS
*Director, Stroke Programs*
Efkan Colpan, MD
Zakaria Hakma, MD, FACS, FAANS
*Director, Spine Programs*
Tina C. Loven, DO
*Director, Pediatric Neurosurgery*
Atom Sarkar, MD, PhD, FAANS
*Director, Stereotatic, Functional &*
*Epilepsy Surgery*
Scott Stranger, MD, FACS, FAANS, CPE

**Subspecialty Neurology**
Rima Alkasem, MD
Curtis Allumbaugh, MD
S. Ausim Azizi, MD, PhD, FANA, FAAN
Craig Bogen, MD
Jill H. Farmer, DO
AnnMarie A. Gaskin, MD
G. Peter Gliebus, MD
Paul Shneidman, MD
David H. Sirken, DO, MSMEd, FAAN, FACP
Knltor Tufenkjian, MD
Kesha A. Wilford, MD

**Neurologic Emergency Room**
Karen Greenberg, DO
Patrick Sullivan, DO
John D'Ambrosio, DO
Evan Kingsley, MD
Mark Mathason, DO
William Sproule, MD

**Neuropsychology**
Jennifer Gallo, PhD
Kathryn Lester, PsyD, ABPP-CN

**Neuro-Pharmacology**
Natalie Gofman, PharmD, BCPS, BCCCP

**Neuro-Anesthesia**
Katherine Vekuler, MD

**Neurosciences Research**
Christina Maxwell, PhD, MTR

**Advanced Practitioners**
Danielle Brown, MSPAS, PA-C
*Director, Physician Assistant Services*

Dear Honorable Judge Schmehl,

Cecelia Dougherty has been under my care for over 25 years, I have taken care of her Neurosurgical needs beginning with her acute rupture of a large Arterio-Venous Malformation in her brain. Since this time, she has had numerous life threatening medical and neurologic emergencies including two new bleeds in her brain.

During a procedure to remove several very large stones in her ureter, kidney and infection in her blader on 9/19 /24, she sustained a myocardial infarction with elevated troponins and changes on her EKG. What should have been an outpatient procedure, landed her in a ICU setting. Although the Dr. considered the procedure successful, due to her weakened immune state, Cecelia contracted a significant infection (pseudomonas aeruginosa) which now requires additional medication and monitoring. These events have been correlated with Cecelia having a concerning increased heart rate and heart symptoms were also show in Troponin T Gen 5 Stat blood testing. There is now a need for cardiac intervention to find the root cause of these symptoms and issues. This is all on top of the post-operative urology follow up appointments that are required to remove the kidney stents and monitor her overall urology issues.

With the addition of these most recent complications, it is in my professional opinion that Cecelia is multiple weeks away from any type of recovery. From my experience and ongoing care, I am very certain she will have setbacks without her husband as primary caregiver. The only individual who Cecelia responds to is her husband. She is going to require multiple doctors' appointments and likely multiple different medical tests.

Given the cardiac nature I am particularly concerned about his absence and the stress it will induce. I am writing this of my own accord and in my capacity as her physician and surgeon. I am happy to discuss directly with you if you have questions I can answer.

Sincerely,
Erol Veznedaroglu MD FACS FAHA FAANS
Robert A Groff Chair Neurosurgery
Drexel University College of Medicine
President CEO Global Neuroscience Institute

# EXHIBIT E



Schuylkill **M**edical **A**ssociates, LLC*
"Charting a new course in geriatric home care."

December 4, 2023

To The Honorable Judge Jeffrey L. Schmehl,

I am the primary home care physician for Cecelia Dougherty, wife of John Dougherty. I have been caring for Cecelia since 2019 and have worked closely with John over the past 4 years. I am the sole owner and sole practitioner of Schuylkill Medical Associates, which is a house call practice specializing in the care of home bound patients who are severely ill. I have over 15 years of experience in caring for the home bound.

Cecelia has what is called an anoxic brain injury from an intracranial hemorrhage. This brain injury has left her a quadriplegic and dependent on 24 hour skilled care for survival. She resides at home with around the clock caregivers and highly specialized equipment. John not only is her primary caregiver but manages all of her medical equipment and supplies, manages her health insurance bills and referrals, coordinates her medical appointments and transportation, and handles the scheduling of caregivers and therapists. He is the only one who knows and understands every nuance of her care because he has dedicated the past 6 years of his life to learning every detail involved in her life sustaining medical regimen.

Cecelia has a feeding tube for all of her nutrition and medication. John manages her medication and is the only one who can pick up emergency medication if needed from a 24 hour pharmacy in the middle of the night.

Cecelia requires around the clock urinary catheterization, has chronic kidney stones and frequent urinary tract infections that can be life threatening. John can detect the slightest changes in her behavior that are indicative of an infection. He has prevented her from being hospitalized on many occasions.

Cecelia also suffers from recurrent bowel obstructions and requires close supervision of her bowel patterns to prevent hospitalization.

Cecelia's medical equipment such as her hospital bed, hoyer lift, stand machine, wheelchair, and foot braces, are constantly in need of repairs or maintenance. John communicates with the all of the medical



Schuylkill *Medical Associates*, LLC*
"Charting a new course in geriatric home care."

equipment companies to schedule repairs. If any one piece of equipment remains broken for a prolonged period, Cecelia's health is in jeopardy.

Cecelia has speech, ocular, and physical therapists that treat her on an ongoing basis. John coordinates all of their visits and can interpret her needs based on her eye movements, hand movements or lip movements.

It has become clear to me that, despite all of the skilled medical personnel involved in Cecelia's care, her husband, John, is the reason that she remains alive with quality of life. I truly believe that without John present, Cecelia's physical and mental health would suffer to such an extreme, that it would not be possible for her to survive at home.

Sincerely,

Christine Pluta, DO
Medical Director

# EXHIBIT F

cusign Envelope ID: C05ABB95-C72D-425D-ACCA-5D9067A1092D

Brightside
Counseling LLC

## Brightside Counseling Follow-Up Update

**09/25/2024**

John Dougherty has demonstrated consistent engagement in his weekly therapy sessions, actively participating in discussions and interventions tailored to his complex emotional and psychological needs. His therapy has focused on managing heightened anxiety, largely stemming from the overwhelming responsibilities as his wife Cecelia's primary caregiver. John's involvement in her recent surgery was pivotal, as he remained by her side throughout the process, providing critical emotional and physical support. His presence has been shown to directly impact her health outcomes, with Cecelia's well-being highly dependent on his continuous care and advocacy.

Several distressing incidents further underscore the gravity of Cecelia's dependence on John. During a conversation about the potential impact of John's absence in preparation for his upcoming sentencing, Cecelia unequivocally stated that she believed she would not survive without him and wrote down the word "DIE". This was starkly evident during an episode in which she became extremely agitated, mistakenly believing that John had passed away due to his brief absence. On another occasion, Cecelia entered a near-catatonic state, characterized by physical stiffness and emotional withdrawal in response to his absence. Medical intervention was required, with a nurse from a nearby hospital having to be called to help calm her down. These instances clearly illustrate the profound psychological and emotional reliance Cecelia has on John, highlighting the irreplaceable role he plays in maintaining her stability and quality of life.

John has also faced moral and ethical dilemmas regarding the visibility of his caregiving efforts. Despite advice from his previous legal counsel to publicly demonstrate the extent of his

Docusign Envelope ID: C05ABB96-C72D-425D-ACCA-5D9067A1092D

BRIGHTSIDE
COUNSELING LLC

role in Cecelia's care, he found this suggestion degrading and refused to exploit his wife's condition for legal sympathy. He remains deeply committed to preserving her dignity and privacy, although this decision has contributed to a sense of isolation, as many are unaware of the immense emotional and physical toll caregiving has had on him.

Given the enormity of John's caregiving responsibilities, compounded by the psychological toll and unresolved trauma he continues to experience, it is imperative that he remains engaged in his therapeutic treatment. John has expressed his determination to fulfill his legal obligations, and when the time comes, participation in the **Residential Drug Abuse Program (RDAP)** will provide him with the structured support necessary to mitigate the risk of relapse. The RDAP program, coupled with ongoing therapy, will equip John with tools to manage the mounting pressures of caregiving, while addressing his anxiety, panic attacks, and the stress that threaten to overwhelm him. Developing effective coping mechanisms to prevent caregiver burnout will be crucial to his long-term well-being.

Furthermore, it is  recommended that John continues in his caregiving role, as his presence has been essential to both Cecelia's quality of life and his own mental health. Recently, Cecelia has experienced further health setbacks, including cardiac complications and a nosocomial infection, further highlighting the critical nature of John's involvement. When the time comes for John to pay his debt to society in whichever manner that shows,there should be a comprehensive transition plan for Cecelia's care. This plan should incorporate external support systems aimed at alleviating some of John's considerable caregiving responsibilities, ensuring that his mental health is preserved as a priority. Failure to implement such a plan may result in a further deterioration of both John's and Cecelia's health. Therefore,  sustained efforts are

Docusign Envelope ID: C05ABB96-C72D-425D-ACCA-5D9067A1092D

BRIGHTSIDE
COUNSELING LLC

essential to address the severe caregiver strain that John is experiencing, as well as to provide the

necessary resources for his continued mental health support during this challenging period.

Submitted,

DocuSigned by:

*[signature]* LPC/IK

F800F4117A864F2...

Alphonso Nathan, MS, LPC

Vice President

Brightside Counseling LLC

# EXHIBIT G

## Cecelia Dougherty Medical Expenses
(not an exhaustive list)

| | |
|---|---|
| *Schuylkill Medical Associates LLC*<br>(yearly bill for Ceilie's primary care doctor/not covered by insurance) | $5,400.00 |
| *Microair Alternating Pressure Low Air Loss Mattress*<br>(current one is 5 years old/not sure when we will need to replace) | $2,845.00 |
| Hill-Rom HR 1000 Hospital Bed<br>　　　　　　-recently has needed extensive repairs<br>　　　　　　-more repairs | $14,101.00<br>$2,648.44<br>$1,663.60 |
| MOTOmed Viva 2 Light<br>(motorized exercise bike to prevent muscle atrophy) | $4,292.00 |
| EasyStand Evolv Large<br>　　　　　-(approx. price/used on a daily basis to transfer Ceilie)<br>　　　　　-requires repairing every few months | $6,000.00<br><br>$200-300 |
| Electric Chargeable/Manual Hoyer Lift to move Ceilie<br>(need in case of power outage) | $2,518.00 |
| Suction Machines<br>　　　　　-heavy duty (replaced approx. 1x per year)<br>　　　　　-portable machines (2 machines; replaced when needed/1x<br>　　　　　so far) | $175.99<br>$758.60 |
| Yankauers for Suction Machine<br>(ordered approx. every 3 months) | $119.69 |
| *Incontinence Supplies*<br>　　　　　-Underpads (ordered approx. every 2 months)<br>　　　　　-WypAll Power Clean Towels (ordered every month)<br>　　　　　-Molicare Briefs (ordered approx. every 3 months) | $486.66<br>$96.18<br>$681.48 |
| Melatonin<br>(ordered approximately every 1-2 months) | $50.77 |
| Liquid/Children's Tylenol<br>(ordered approx. every 5 months) | $52.80 |
| Probiotics<br>(30 day supply) | $85.00 |

| | |
|---|---|
| Insurance for Handicap Van (2024-2025 total price) | $4,635.56 |
| Lysol type wipes (ordered as needed) | $11.79 |
| Split Sponges for Feeding Tube (ordered approximately every 2 months) | $51.60 |
| Oral Care Swabs (ordered approximately every 4 months) | $171.66 |
| UtyMax for Urinary Tract Infections (ordered approximately every 6 months) | $326.50 |
| Replacement Feeding Tubes (ordered approximately every 3-4 months) | $79.13 |
| Occupational Therapy/Physical Therapy/ Vision Therapy (some are reimbursed by insurance, most are not) | $150-2--00 per session |
| Latex Gloves (ordered approximately every 4-6 months) | $380.64 |
| Jefferson Outpatient Testing Co-Pay: (per visit) | $75.00 |
| Compleat Organic Blends (additional feeding blend for emergency purposes/insurance has issue/shipment late) (ordered approx. 2-3 times per year) | $164.97 |
| Distilled Water for Humidifier | $50-60 |
| Medical Staffing       -April (approximate totals)       -May (approximate totals) | $41,710.00 $43,960.00 |
| Other items on an as needed basis:       -ace bandages       -hand braces       -humidifier and vapor pads       -Claritin (daily use)       -various Vitamins (daily use)       - personal care items - body moisturizer, face moisturizer,         Unscented laundry detergent, sunscreen       -bottled water for feeding tube medications       -Pepcid AC       -heavy duty trash bag for soiled briefs       -various medication copays       -creams, lotions, etc. to prevent rashes and sores | |

# EXHIBIT H



FDIC FDIC-Insured - Backed by the full faith and credit of the U.S. Government



WSFS CORE CHECKING *3878

$349,187.71

Available Balance

Mobile Privacy

© 2025 Wilmington Savings Fund Society, FSB | Member FDIC
NMLS#417673 | Equal Housing Lender
Privacy Policy


Accounts


Deposit




Recent


More

# EXHIBIT K



**U.S. Department of Justice**
Federal Bureau of Prisons
*United States Penitentiary*
*2400 Robert F. Miller Drive*
*P. O. Box 1000*
*Lewisburg, PA 17837*

July 15, 2025

MEMORANDUM FOR J. SAGE, WARDEN

FROM:        C. Emerson, Unit Manager

SUBJECT:     Dougherty, John Reg. No. 77031-066
             Program Statement 5050.50, <u>Request for</u>
             <u>Compassionate Release/Reduction in Sentence:</u>
             <u>Procedures for Implementation of 18 U.S.C.</u>
             <u>§§3582(c)(1)(A) and 4205(g)</u>

On July 15, 2025, the Unit Team reviewed inmate Dougherty's
request for a Compassionate Release/Reduction in Sentence. The
Unit Team reviewed the request pursuant to the above Program
Statement.

Inmate Dougherty is a 65-year old inmate who is requesting a
Compassionate Release under the criteria of: Death or
Incapacitation of a Family Member/Caregiver.

A review into this matter indicates inmate Dougherty is
presently 65-years old and has served 15.8% of his 72-month
sentence imposed by the Eastern District of Pennsylvania for
Conspiracy to Embezzle Labor Union and Employee Benefits,
Embezzlement of Labor Union Assets and Aiding and Abetting,
Falsification of Labor Union Annual Report and Aiding and
Abetting, Falsification of Labor Union Financial Records, Making
and Subscribing to False Federal Income Tax Returns, Conspiracy
to Commit Honest Services Fraud and Federal Program Bribery, and
Honest Services Wire Fraud and Aiding and Abetting. Medical
staff have classified Dougherty as a Care Level 2, stable
chronic care level inmate; he is classified as regular duty
status with no medical restrictions.

Upon initial review, it is the Unit Team's recommendation that
inmate Dougherty's request be **denied** for the following
reason(s):

Inmate Dougherty does not meet the criteria as outlined in
Program Statement 5050.50, Compassionate Release/Reduction in



**U.S. Department of Justice**
Federal Bureau of Prisons
*United States Penitentiary*
*2400 Robert F. Miller Drive*
*P. O. Box 1000*
*Lewisburg, PA  17837*

Sentence. Upon review of the documentation provided by inmate
Dougherty, at the time of his sentencing, the Honorable Jeffery
L. Schmehl, was aware of the medical limitations of inmate
Dougherty's spouse, Cecilia Dougherty, as well as his claims of
being the only person capable of providing caring for her.

Comments for review staff:

CMC:

Agree — BXdamit

Exec. Asst.:

Agree — BXdamit

RIS Coordinator:

Agree — BXdamit

Warden's Decision:

   ☒  AGREE – The inmate's request is denied for the above
       reason(s).

   ☐  DISAGREE – The inmate's request should not be denied at
       this time.  The Unit Team should submit complete packet
       for RIS processing.

_____              7.15.25
(J) Sage, Warden                      Date

TRULINCS  77031066 - DOUGHERTY, JOHN - Unit: LEW-K-A

--------------------------------------------------------------------------------------------------------

FROM: 77031066
TO: Warden
SUBJECT: ***Request to Staff*** DOUGHERTY, JOHN, Reg# 77031066, LEW-K-A
DATE: 07/15/2025 01:39:11 PM

To: Warden Sage
Inmate Work Assignment: Education

Dear Warden Sage,

I understand my compassionate release application is in your possession. Enclosed in it is a 2-page letter setting forth my wife's medical history, as well as the daily tasks for which I was responsible. These tasks occupy 20 hours of my day each and every day. Also enclosed are 3 videos that depict my wife's daily struggles. I'm available at any time to discuss the matter.

I believe I have been an exemplary inmate for 10 months. If need be you can contact my counselor Mr. Rich, Mr. Z. Wert, and/or Ms. Fisher of the education department. You can also contact Mr. Lincoln. I have worked with him in the GED Department with great success and I have never missed a day of work since my first week here.

Since my incarceration, my 85 year-old father-in-law has attempted to replace the hours of care that I was responsible for. Recently however, he has had a dramatic downturn with his health. He has had in the last 10 weeks a back fusion, prostate cancer surgery, and now serious bladder issues have arisen. He is unable to continue to provide that same level of care. I need to be able to resume that responsibility. My wife needs me more emotionally and physically today than ever before. I could really use your help. Please and thank you.

Respectfully,
John Dougherty 77031-066

# EXHIBIT L

