## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 19-64-1** |
| **JOHN DOUGHERTY** | **:** | |

**GOVERNMENT'S POST-HEARING SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION OF DENIAL OF MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant John Dougherty has failed to carry his burden of showing eligibility for compassionate release, that is, that he presents an "extraordinary and compelling reason" allowing consideration of the exceptional remedy of a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i). This was made manifest at the hearing conducted on May 18, 2026.[1]

Specifically, Dougherty has not shown that there has been any change whatsoever in the extensive and appropriate care his incapacitated wife receives, or will be in the

---

[1] The Court inquired regarding its options in this matter. Under the compassionate release statute, the Court may reduce the sentence. That reduction may be partial, and not necessarily result in a sentence of time served (though in this case, where it is claimed that the defendant's release is necessary to provide care for his wife, a partial reduction to an earlier but not immediate release date would not make any sense). Otherwise, if there are specific needs, the defendant may seek a furlough of up to 30 days for reasons set forth in 18 U.S.C. § 3622(a), including "establishing or reestablishing family or community ties." A furlough lies within the sole discretion of the Bureau of Prisons, though BOP customarily seeks the view of the sentencing judge and the prosecutor when a request is made.

foreseeable future. And moreover, even if that care were to become unavailable for financial reasons, Dougherty himself cannot provide the extensive care she needs. For these reasons, his request for reconsideration of the denial of compassionate release should be denied.

**A.    The Motion is, At Best, Premature, in that Cecilia Dougherty is Receiving Exactly the Same Care She Received at the Time of Sentencing, and Will For the Foreseeable Future.**

In his post-hearing pleading, defendant John Dougherty presents a number of false statements, and sets up a straw man argument: that the only options at this time are for him to provide care to his wife, or for her to "simply be shipped off to a facility." Br. 2.

But in fact, the real situation at this time is exactly the same as it was at the time of sentencing in 2024: Cecilia Dougherty is being ably cared for, 24 hours a day, by a team of trained nurses, in a private three-bedroom apartment. That care is paid for, in large part, by a trust. The premise of Dougherty's recent motion for compassionate release was that the trust would soon run dry, and therefore his release was warranted. But as it turns out, this is not the case. The trust receives substantial donations from a very wealthy friend of the defendant, and retains sufficient funds for many months, perhaps years, to come.[2] In these circumstances, there is simply no basis for consideration of release of the defendant.

---

[2] Bank records show that from October 2025 to April 2026, the trust established for Mrs. Dougherty's care reduced from $212,243.75 to $110,121.96—a difference of $102,121.79. Accordingly, the trust has depleted at an average rate of $17,020.30 per month for the last six months. The defendant also possesses a savings account which contained $81,215.92 in April 2026.

The government is not, as Dougherty avers, making the "callous suggestion that Cecelia simply be shipped off to a facility." Br. 2. Rather, we are contented that there are ample funds available to permit Mrs. Dougherty to continue to receive exactly the same care that she has received for years, before and after her husband's sentencing.

In the defendant's motion for compassionate release, he stated that his wife's care costs upwards of $45,000 per month and there are not "viable fundraising possibilities" to supplement any existing income. ECF 852, ¶ 14. Both the defendant and his daughter, Tara Chupka, informed this Court in August 2025 that the trust would be fully depleted by May 2026 and that there would be "no financial means left to pay for Cecelia's life-sustaining care." ECF 852, ¶ 21; Ex. F ¶ 23. They also represented that the defendant's pensions were the only available source of income for Cecelia's care. *Id.* These statements were all wrong.

At the hearing, Ms. Chupka acknowledged for the first time that a family "friend" had been replenishing the funds in the trust.[3] Bank records show that in the last six months, more than $143,000 was deposited into the Mrs. Dougherty's trust. *See* Gov't Hearing Ex. 3. The defendant and his daughters offered no testimony about these payments coming to an end. This steady influx of cash had never been mentioned in any letter, exhibit, or court filing (including the defendant's post-hearing submission). To the

---

[3] The family friend's identity was elicited on cross-examination. His name is Ron Caplan and he is the founder and President of PMC Property Group, the largest owner/operator of rental units in Philadelphia. *See* https://www.pmcpropertygroup.com/corporate/team-members/ron-caplan. The company is worth more than $3.5 billion. *See* www.pmcpropertygroup.com/corporate/team-members/greg-webster.

contrary, the defendant and his family have insisted for months that the trust was due to run dry imminently and that Mrs. Dougherty would thereafter receive no medical attention at all. That was simply not true, and the defendant and his family likely knew it was false.

It is also telling that the family has taken no steps to lessen the significant luxury costs they incur every month. Ms. Chupka, who is responsible for the day-to-day financial management of Mrs. Dougherty and the defendant, admitted that she has done nothing to look into facilities for Mrs. Dougherty, or even to consider ways to save money in connection with private care for Mrs. Dougherty. Neither she nor her sister, Erin Dougherty, felt concerned enough to look into less expensive private housing for Mrs. Dougherty, to contribute to the expenses of Mrs. Dougherty's care from their own salaries (each earning $150,000 per year or more), or to reduce the financial burden on the trust by relieving the aides on any regular shift. Indeed, Ms. Chupka suggested that she decided not to even save the trust the costs of the family phone bill, which continues to include her own phone and a cell phone line for the incarcerated defendant.

The family's attitude toward the alleged risk of the fund running dry reveals the truth: they are not worried about that possibility. They have made no contingency plans for what to do with a completely helpless loved one who needs full-time care, if and when there are no financial resources to continue to pay private aides to deliver that care. No research, no hard conversations, no planning for running out of money. Instead, they have tried to persuade this Court that the only option for Mrs. Dougherty's care is what is

clearly the least available and reasonable: that the 66-year old defendant, who earned every day of the federal prison sentence he is now serving, will be released from prison very early in order to provide all of the care that his spouse needs, all by himself, with no money for any assistance. The sheer ridiculousness of the proposed plan reveals the reality: the family knows that there will be private money to take care of Mrs. Dougherty for as long as necessary.

At the very earliest, the Court should revisit this issue only at a time that the trust funds are no longer available. That likely will not be in 2026, and probably not for a long time after that, if ever.

### B.    Even If Private Funds Are Not Available, John Dougherty is Not the "Only Available Caregiver."

Looking ahead, should private funds run out, compassionate release likewise still will not be warranted. In the post-hearing motion, Dougherty insists that, as the controlling guideline requires, he would be the "only available caregiver" for his wife. That is not true.

To be sure, the fact that public resources may be available is not dispositive. Contrary to Dougherty's supposition, the government does not maintain that a person is ineligible for compassionate release in any case where an incapacitated loved one could, instead of being cared for at home by a family member, be admitted to a nursing home.[4]

---

[4]  Though we have to observe that the defendant's references to being "warehoused" in a "state facility," Br. 2, would surely be considered profoundly insulting if heard by the millions of Americans who reside in nursing homes and other assisted living facilities, and the tens of thousands of professionals who care for them there.

In the ordinary situation in which early release is granted on the basis of family circumstances, there is a person responsible for the care of an incapacitated relative or young minor, and that caregiver becomes incapacitated or unavailable. In most such circumstances, the government would not contend that relief should be denied only because the person needing care could instead become a ward of the state. Rather, the Court in such a case will ordinarily consider whether release of the inmate is appropriate (after considering all sentencing factors) to allow him or her to take over the caretaker role.

But the present case is completely different, and to our knowledge, unique. The fact of the matter is that Mrs. Dougherty requires more than one caregiver, on a constant basis. She is attended 24 hours a day, 7 days a week, at many if not all times by two professional aides. It is imperative that this Court review the video submitted by the defense that shows her receiving just some of this assistance, for the process of transferring her in her entirely disabled state from her bed to a restroom. This video makes clear in a manner that testimony alone does not just how dire her condition is and how much care she requires at all hours of the day and night.

In the post-hearing filing, Dougherty himself states: "Cecelia requires twenty-four-hour care that includes catheterization, PEG-tube maintenance, IV medication administration, bowel and bladder protocols, oral suctioning, repositioning to prevent pressure injuries, range-of-motion exercises, stoma care, and continuous monitoring of vital signs and bracing." Br. 2-3. The video, and these facts, make clear that the defendant

by himself simply cannot replace that care. The notion that he would or could 24 hours a day, 7 days a week, is absurd.

Dougherty states, "Prior to his incarceration, Mr. Dougherty personally provided that care." Br. 3. As the Court is aware, that is false. Prior to his incarceration, Cecilia was attended in the same manner by the same aides, 24 hours a day, while John Dougherty attended to his employment duties and then his legal affairs. The fact is that Dougherty never provided his wife with the care she needs, because neither he nor any other single person could. Perhaps he can assist, but the family would still be required to either hire aides using trust funds or investigate the myriad public options if the available funds run out.

In his initial motion, the defendant listed 33 examples of caregiver responsibilities including:

- Cleaning medical equipment

- Ordering all necessary supplies and medications

- Paying staff members

- Arranging for, and assisting with, physical therapy

- Dropping off urine specimens

- Applying braces to Mrs. Dougherty

- Ensuring that all equipment is functioning correctly

- Performing bowel routines for Mrs. Dougherty

- Monitoring her vital signs

- Catheterizing her

- Emptying the trash

- Monitoring her skin for potential breakdowns

ECF 852, ¶ 16. Dougherty was never the only person to perform these roles, which is understandable, given how overwhelming the needs are. He admitted as much to this Court. In a 2024 motion for bail pending appeal, he wrote a letter stating that a nurse named Rey Reynar performed the tasks that he now claims were solely his responsibility. Specifically, the defendant stated that Reynar oversaw "management of approximately 15-20 medications, management of Cecelia Dougherty's bowel routines, coordination with Cecelia Dougherty's primary care physical regarding medication updates, maintaining an adequate stock of all equipment needed for daily care, such as adult briefs, medical grade 'chuck' pads, oral suction equipment, medication dispensing equipment, etc. [and] basic care/repair of various medical equipment such as wheelchairs, manual and electrical lifts, suction machines, medication preparation equipment etc." ECF 818-2.[5]

In the most lengthy and authoritative appellate discussion of the family circumstances basis for compassionate release, the Court of Appeals for the Eleventh Circuit recently explained:

> To prove that he is the "only available caregiver," an inmate must establish that no other likely caregiver is both (1) qualified and (2) free to provide care. An

---

[5] At the hearing, the defendant identified "Rey" as being someone who still cares for his wife, further undermining the claim that he and his family have no alternative means of support.

alternative caregiver is qualified if he has the capacity to provide the incapacitated person with the care that the person needs. An alternative caregiver is free if no material constraint prevents him from providing care. Whether an alternative caregiver is both qualified and free is a fact question that necessarily turns on the circumstances of a particular case.

*United States v. Robelo-Galo*, 166 F.4th 1311, 1315 (11th Cir. 2026). The court added:

Section 1B1.13(b)(3) is not concerned with alleviating the burdens of imprisonment on the inmate, but with preventing an inmate's family members from being left without care during the inmate's incarceration. In other words, section 1B1.13(b)(3) operates as a policy of last resort: It authorizes a sentence reduction only when no other realistic caregiving option exists. The health of the family member, not the wishes of the inmate or other potential caregivers, forms the relevant "extraordinary and compelling" justification for the inmate's release.

*Id.* at 1316.

In the unique circumstances of this case, Dougherty is neither qualified nor available to provide the round-the-clock care that his wife needs. He is not the "only available caretaker." Rather, Cecilia now has caretakers who are qualified and are available, and should that ever change because the trust funds run out (which does not seem likely), equally qualified caretakers will have to be found. The government has properly suggested that that would likely involve the considerable public assistance that is available for profoundly disabled persons.

As stated, the present case is unique, where it involves a person as incapacitated and dependent as Mrs. Dougherty. The cases cited by the defendant are instead mostly more ordinary, such as *United States v. Seals*, 509 F. Supp. 3d 259 (E.D. Pa. Dec. 22, 2020) (McHugh, J.), where the defendant was granted release approximately three months before the expiration of a 121-month sentence, to care for a daughter who had

been entrusted to the defendant's mother until the defendant's mother was diagnosed with pancreatic cancer. Dougherty places the greatest weight on *United States v. Haldorson*, 2024 WL 621653 (N.D. Ill. Feb 14, 2024), where the court granted release to afford assistance to the defendant's father. The father was incapacitated, confined to a chair, and required around-the-clock assistance with all activities of daily living. But even that case does not approach the situation presented here. The father was getting some help from his wife, family, and neighbors, and the court stated that the defendant would be of assistance as "someone who's there, able to help Raymond in using the bathroom, personal hygiene, eating, moving around at home, and getting back and forth to a vehicle for the purpose of medical visits and other necessary transport." *Id.* at *3. In this case, in contrast, the video and other evidence presented by Dougherty show that his wife requires and receives a considerably greater level of 24-hour care that one person alone cannot provide.

In this regard, it is again notable that the family has made no effort whatsoever to determine what care is available if the trust funds run out. Perhaps that is because, as suggested above, they know that the funds have not run out and will not run out for the foreseeable future. Whatever the reason, it is intolerable for Dougherty to seek early release from the sentence imposed for his crimes by making no effort to assure that his wife can in his absence receive the round-the-clock care she needs and that he alone cannot provide.

The defendant's post-hearing brief states: "The family has 'pursued every public and private alternative, including Medicaid eligibility, but no viable solution exists.'" Br.

3 (quoting the defendant's earlier pleading). But the testimony at the hearing revealed this claim to be completely false.

It is not the government's obligation to specify the care that Mrs. Dougherty can receive in the years ahead should private funding run out. Rather, it is the defendant's burden to establish eligibility for compassionate release. We have simply pointed out that appropriate programs exist, from Medical Assistance (the Pennsylvania-administered form of Medicaid), to Pennsylvania's Home and Community-Based Services waiver program. The government demonstrated that Mrs. Dougherty is both functionally and financially eligible for such programs, should her family choose to pursue them.

But the available public financing programs have never even been considered by anyone in the Dougherty family. In fact, both of the daughters admitted that they had failed to pursue alternative means of care for Mrs. Dougherty. Tara Chupka, an attorney, acknowledged that she has never consulted with any professionals to help find assistance or researched those programs on her own.  Erin Dougherty admitted she had never conducted so much as a Google search to determine her mother's eligibility. At the time of her father's sentencing Erin gave a compelling account of having asked the medical staff who attended to her mother following a 2017 brain bleed about proper care facilities for their mother. She learned at that time the right facility might have a waitlist. ECF 783 at 50-51. But she testified at the hearing this week that in the lead-up to—and in the aftermath of—her father's report date to prison, she took no steps to follow up on getting her mother into such a facility. This was despite her testimony at the sentencing that

- 11 -

"these waiting lists are a serious concern for me." ECF 783 at 53-54. This begs the question, of course, why did she not take steps to get on a waiting list. The answer that has emerged is that she was reassured, by her father, that such a facility would not be necessary. It thus appears that the defendant had a plan, and one that his daughter felt she could trust. And that plan seems like it might have been taking a shot at getting out of prison on the basis of her mother's need for care, with largesse from Caplan as a fallback.

Instead of taking steps to ameliorate any of these burdens, the defendant and his family have insisted that either programs do not exist to provide her with adequate care or have misrepresented to this Court the state of the available private financing. Both claims are unsupported. At the hearing, the defendant called Dr. Donna Gentile O'Donnell  to testify about the level of care that Mrs. Dougherty requires. But Dr. O'Donnell's testimony focused primarily on the defendant's response to Mrs. Dougherty's 2017 brain bleed, and she admitted that she has not seen Mrs. Dougherty since the defendant reported to prison in October 2024. In other words, she has no idea what type of care Mrs. Dougherty requires or currently receives. Her testimony is further tainted by her close personal friendship with the defendant and her belief that this prosecution was based on the government electing to target the defendant's South Philadelphia upbringing—a view she held so firmly that she espoused it on a television news program shortly after the indictment in this case. Given her biases and lack of firsthand knowledge about relevant care, Dr. O'Donnell's testimony should be discredited.

The defendant's own testimony at the hearing—although emotional—was almost exclusively a recitation of the claimed care and devotion he had given his wife during the many years following the original diagnosis of her risk of a brain bleed in 1999. None of that information is new and it was covered extensively at the defendant's original sentencing. At the recent motion hearing, the defendant clearly evinced that he feels his wife is not receiving a sufficient degree of care even at present, even when private aides are attending to her 24 hours a day, seven days a week, often two at a time. His examples of the inadequacy of her current care included his belief that she was not being given sufficient chance to stand, or to do/observe yoga.

Furthermore, in his testimony, the defendant proclaimed that he, alone, could do more for his wife than the aides are doing. In this regard, he claimed almost magical powers and abilities vis-à-vis his wife, asserting, for example, that he could look into her eyes and thereby assess how much time she could tolerate on the standing exercise machine. In the end, he claimed, incredibly, that he could do all the care of his wife alone, essentially all of the time. This is not credible.

The defendant's daughters are available also. To be sure, they, like their father, cannot remotely provide all of the care their mother needs. But they can assist. Yet Ms. Chupka would not estimate the amount of time she spends assisting her mother, while Ms. Dougherty stated that she attends to her mother between one and three days a month. Both daughters are gainfully employed making an annual salary at or over $150,000, but neither have made meaningful financial contributions to the costs of Mrs. Dougherty's

- 13 -

care. And both daughters reside in South Philadelphia, less than four miles from their mother.[6] Neither have children or care for anyone else.[7]

Following the hearing, it is apparent that the facts do not support the legal standard for compassionate release. So the defendant has resorted to an appeal for sympathy. If sympathy were the standard, the government would not object to the defendant's release. As the government has consistently maintained, it is extremely unfortunate that Mrs. Dougherty is so disabled, and may be suffering further as a result of the defendant's criminality. But sympathy cannot replace the Court's obligation to decide a motion based

---

[6] Both Erin Dougherty and Ms. Chupka testified that their commute from the area of 300 Jackson Street to 1600 Arch can take upwards of 30 to 40 minutes. A Google map search conducted on May 21, 2026, at 6:25 p.m. indicates the ride is less than 20 minutes.

[7] The government appreciates the burden of caring for a disabled family member and the detrimental effects that such a burden can have on caregivers' personal lives. But in the compassionate release context, inconvenience does not mean unavailability. *United States v. Wilkie*, 2025 WL 254833, *2 (M.D.Fl. Jan. 21, 2025) (a family member's need for "breaks" not sufficient to warrant compassionate release). *Seals* distinguished between situations that warrant compassionate release, such as when "family members. . . are in dire need of a defendant's caregiving, and other family members are afflicted by incapacitating, life-threatening illnesses" and those in which a caregiver is "inconvenienced by the defendant's incarceration or is somewhat sick, but not incapacitated." *Seals*, 509 F. Supp. 3d at 263. The former scenario warrants compassionate release, the latter does not. *See id.* (granting compassionate release to care for a child where the child's father was incarcerated, the child's grandmother had pancreatic cancer, and the child's aunts and uncles were either incarcerated, unhoused and facing felony charges, or already caring for seven children in a three-bedroom home); *United States v. Keyosan.* 2020 WL 2039028 (E.D.Ca. April 28, 2020) (compassionate release warranted where alternative potential caregivers were unavailable because they were disabled, drug addicted, suffering from dementia, or already devoted caregivers for other family members).

upon the law and the facts. And the facts show that the defendant is not the only available caregiver for his ailing wife.

### C.    Conclusion.

In sum, there has been no change in the pertinent circumstances since sentencing. Dougherty made the same arguments at sentencing regarding the need to care for his wife, and this Court denied that claim, given the need to impose appropriate punishment for Dougherty's extensive crimes and the fact that Cecilia Dougherty was well cared for in a private apartment by professional aides. The situation at this time, and for the foreseeable future, is exactly the same. The defense notion that the Court's choice at this time is between having Dougherty released and Mrs. Dougherty being "shipped off" to be "warehoused" is grossly false.

This Court should not consider early release until the available funds actually run out, and even then, we maintain, release will not be warranted, given the fact that Dougherty cannot provide the necessary assistance alone, and the family has made no effort to explore the support options they will have to pursue with or without Dougherty's presence.

And of course, if, contrary to our argument, Dougherty presents an extraordinary situation and is eligible for consideration for compassionate release, that relief is not assured. This Court must first consider all of the sentencing factors under 18 U.S.C. § 3553(a). The government continues to maintain that early release, after Dougherty has served less than a third of his six-year sentence, is inappropriate following that analysis

as well. Dougherty's crimes were severe, involving corruption of a City Councilman, persistent defalcation of a union, and other abuses of public and private trust. The Court's original sentencing judgment, that the six-year term is warranted notwithstanding his wife's tragic condition, remains appropriate, particularly given the fact that his wife will not be left without care.

For all of these reasons, the motion for compassionate release should be denied.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

*/s Anthony Carissimi*
ANTHONY CARISSIMI
Assistant United States Attorney

*/s Bea Witzlebem*
BEA WITZLEBEN
Assistant United States Attorney

- 16 -

**CERTIFICATE OF SERVICE**

I hereby certify that this pleading has been served on the Filing User identified

below through the Electronic Case Filing (ECF) system:


George Bochetto, Esquire
*Counsel for John Dougherty*


*/s Anthony Carissimi*
ANTHONY CARISSIMI
Assistant United States Attorney


Date:  May 22, 2026.